## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | |
|---|---|
| WESTCHESTER FIRE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAMS MONTGOMERY & JOHN LTD.;<br>STEVEN J. ROEDER; THEODORE J. LOW;<br>THOMAS C. KOESSL; and ALYSSA M.<br>CAMPBELL.<br><br>Defendants. | )<br>)<br>)<br>)<br>) Case No.:<br>) FILED:    MAY 9, 2008<br>) 08CV 2706 NF<br>) JUDGE ZAGEL<br>) MAGISTRATE JUDGE COLE<br>)<br>) |

---

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES the Plaintiff, WESTCHESTER FIRE INSURANCE COMPANY, by and through the undersigned attorneys, and for its Complaint for Declaratory Judgment, states as follows:

### Parties

1.    Westchester Fire Insurance Company ("Westchester") is a New York corporation with its principal place of business in Roswell, Georgia, and thus is not a citizen of the State of Illinois.

2.    Williams Montgomery & John Ltd. (hereinafter, "WMJ") is a professional corporation, incorporated under the laws of Illinois, with its principal place of business in Chicago, Cook County, Illinois and, as such, is a citizen of the State of Illinois.

3.    On information and belief, Steven J. Roeder is a resident of Illinois and an attorney with WMJ and, as such, is a citizen of the State of Illinois.

4.     On information and belief, Theodore J. Low is a resident of Illinois and a partner with WMJ and, as such, is a citizen of the State of Illinois.

5.     On information and belief, Thomas C. Koessl is a resident of Illinois and a partner with WMJ and, as such, is a citizen of the State of Illinois.

6.     On information and belief, Alyssa M. Campbell is a resident of Illinois and a partner with WMJ and, as such, is a citizen of the State of Illinois.

## Jurisdiction and Venue

7.     Jurisdiction over this matter is founded upon diversity of citizenship jurisdiction under 28 U.S.C. §1332, based upon the facts as specifically alleged in paragraphs 1 through 6, above.

8.     The amount in controversy, exclusive of interest and costs, exceeds $75,000.

9.     Venue for this matter lies in this District under 28 U.S.C. §1391 on the grounds that Defendants' principal place of business is in Cook County, Illinois, in which this Court is situated, and on the grounds that the acts and omissions giving rise to the Appellate Motion for Sanctions for which coverage is disputed herein took place in significant part in Cook County, Illinois.

10.     This Court has the authority to issue a declaratory judgment regarding Westchester's rights and obligations under the Westchester insurance policy at issue herein pursuant to 28 U.S.C. §2201, *et seq*.

11.     An actual controversy of a justiciable nature exists between Westchester and Defendants relative to the coverage, or lack of coverage, provided by the Westchester insurance policy issued to WMJ.

12.    This Court has personal jurisdiction over WMJ because it is a resident of the State of Illinois and conducts regular and systematic business in the State of Illinois.

13.    This Court has personal jurisdiction over Steven J. Roeder because he is a resident of the State of Illinois and conducts regular and systematic business in the State of Illinois.

14.    This Court has personal jurisdiction over Theodore J. Low because he is a resident of the State of Illinois and conducts regular and systematic business in the State of Illinois.

15.    This Court has personal jurisdiction over Thomas C. Koessl because he is a resident of the State of Illinois and conducts regular and systematic business in the State of Illinois.

16.    This Court has personal jurisdiction over Alyssa M. Campbell because she is a resident of the State of Illinois and conducts regular and systematic business in the State of Illinois.

17.    The current action arises in substantial part out of Defendants' professional activities in an underlying lawsuit originally filed in the United States Bankruptcy Court for the Northern District of Illinois and withdrawn to the United States District Court for the District of Northern Illinois and styled, *Andrew J. Maxwell, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc. v. KPMG LLP,* No. 03 C 3524 (the "KPMG Action"), and the subsequent appeal to the United States Court of Appeals for the Seventh Circuit (No. 07-2819).

## FACTS

The Underlying Litigation

18.     On April 11, 2003, WMJ, on behalf of its client, Andrew J. Maxwell, the Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc. (the "Trustee"), filed an adversary complaint in connection with the marchFIRST bankruptcy proceedings[1] against KPMG, LLP, styled *Andrew J. Maxwell, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc. v. KPMG LLP,* No. 03 A 01417. A true and correct copy of the Complaint is attached hereto as Exhibit A.

19.     On May 23, 2003, KPMG filed a Motion to Withdraw Reference of Adversary in the Northern District of Illinois. On July 1, 2003, the Honorable Judge Joan B. Gottschall issued an order granting that motion. The action was therefore withdrawn from the bankruptcy court to the Northern District of Illinois.

20.     On July 19, 2007, Judge Gottschall issued a Memorandum Opinion and Order, granting summary judgment in favor of KPMG. A true and correct copy of the Memorandum Opinion and Order is attached hereto as Exhibit B.

21.     On July 30, 2007, WMJ filed on behalf of the Trustee a notice of appeal to the United States Court of Appeals for the Seventh Circuit.

22.     The Seventh Circuit issued its decision on March 21, 2008, affirming the District Court's ruling. A true and correct copy of the Seventh Circuit's opinion is attached hereto as Exhibit C.

23.     In its opinion, the Seventh Circuit opined that the Trustee's lawsuit against KPMG "may well be frivolous." (Ex. C, p. 10.) The court further stated "that [KPMG] can file a motion in the district court for an award of reasonable attorney's fees . . . (of course to be paid by the trustee personally, not by the bankrupt estate), and a corresponding motion in this court under Fed. R. App. P. 38." (Ex. C, p. 10, internal citations omitted.)

---

[1] *In re marchFIRST, Inc., et al.,* No. 01 B 24742 (Bankr. N.D. Ill.).

24.     KPMG filed a motion for sanctions on Appeal Pursuant to Rule 38 with the Seventh Circuit on April 4, 2008 against the Trustee "and his attorneys on this appeal for legal fees and costs incurred by KPMG in connection with this appeal." (Motion of KPMG for Sanctions on Appeal Pursuant to Rule 38 (the "Appellate Motion for Sanctions"), a true and correct copy of which is attached hereto as Exhibit D, at pp. 1, 8, 11.)

25.     On April 9, 2008, KPMG filed a motion in the Seventh Circuit for leave to file a motion for sanctions in the District Court against the Trustee "and his attorneys for legal fees and costs incurred by KPMG in defending the underlying complaint." (Motion of KPMG LLP for Leave to File a Motion for Sanctions in District Court, a true and correct copy of which is attached hereto as Exhibit E, at p. 1.)

26.     On April 1, 2008, WMJ, through its broker, provided notice to Westchester of the Seventh Circuit's Order as a potential claim circumstance under the Policy, and enclosed a copy of the Seventh Circuit's opinion in the KPMG appeal.

27.     On April 4, 2008, Mr. Jay Fenton of The Plus Companies, Inc., acting on Westchester's behalf, issued a broad reservation of rights to WMJ. A true and correct copy of Mr. Fenton's April 4, 2008 letter is attached hereto as Exhibit F.

28.     Following KPMG's filing of the Appellate Motion for Sanctions with the Seventh Circuit, WMJ requested that Westchester provide it with a defense to that motion. Westchester issued a reservation of rights letter written on its behalf on April 10, 2008, a true and correct copy of which is attached hereto as Exhibit G.

29.     WMJ subsequently notified Westchester's counsel that it intended to retain defense counsel to defend its interests in connection with the Appellate Motion for Sanctions. Westchester subsequently agreed to provide a defense to the Appellate Motion for Sanctions,

subject to Westchester's reservation of rights position and subject to agreement regarding the appropriate hourly rates to be charged by WMJ's chosen defense counsel.

30.    Westchester thereafter issued a supplemental letter on May 5, 2008, pursuant to which it memorialized its agreement to provide a defense subject to the reservation of rights set forth in the April 10, 2008 letter and subject to the right to seek reimbursement for any defense fees advanced in the event it is determined that there is no coverage for the Appellate Motion for Sanctions under the Westchester insurance policy. A true and correct copy of the May 5, 2008 letter is attached hereto as Exhibit H.

31.    On April 22, 2008, Defendants Roeder, Low, Koessl and Campbell filed their Response of Counsel Respondents to the Motion of KPMG, LLP for Sanctions Pursuant to Fed. R. App. P. 38 in the Seventh Circuit. A true and correct copy of Defendants' Response is attached hereto as Exhibit I.

32.    On April 22, 2008, the Trustee also filed responses to the Appellate Motion for Sanctions, both individually and as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., true and correct copies of which are attached hereto as Exhibits J and K, respectively.

The Westchester Policy

33.    Westchester issued Lawyers Professional Liability Policy No. LPL-G2391 1553 001 to WMJ, effective November 29, 2007 through November 29, 2008 (the "Policy").

34.    A true, correct and complete copy of the Policy is attached hereto as Exhibit 1 to Exhibit L, Certification of Robert O'Neil.

35.    The Policy provides $5,000,000 limit of liability per claim and in the aggregate. Ex. 1 to Ex. L, Declarations Page.

36.    With respect to coverage, the Policy provides:

6

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** during the **Policy Period** and first reported to the Company during the **Policy Period** or within thirty (30) days thereafter, arising out of any act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** by an **Insured** or any entity or individual for whom the **Named Insured** is legally liable; provided always that such act, error, omission or **Personal Injury** happens:

A.    during the **Policy Period**; or

B.    prior to the **Policy Period**, provided that:

1.    such act, error, omission or **Personal Injury** happened on or after the **Retroactive Date** as indicated on the Declarations Page of this policy; and

2.    at the inception of this policy the **Insured** had no reasonable basis to believe that any **Insured** had breached a professional duty and no reasonable basis to believe an act, error, omission or **Personal Injury** might be expected to result in such **Claim** or **Suit**.

(Ex. 1 to Ex. L, Section I – Coverage.)

37.    The Policy defines Claim as follows:

When used in this policy (including endorsements forming a part of the policy):

\*        \*        \*

**Claim** means a demand for money, the filing of **Suit** or the institution of arbitration or mediation proceedings naming the **Insured** and alleging an act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**.

**Claim** also means knowledge by an **Insured** of any event or circumstance which could reasonably be expected to result in or lead to a **Claim** being asserted against an **Insured**, provided that the **Insured** gives the Company written notice of such event or circumstance prior to the termination date of the **Policy Period** or within thirty (30) days thereafter, or during the Extended Reporting Period, if applicable.

(Ex. 1 to Ex. L, Section VIII – Definitions, **Claim**.)

38.    With respect to Damages, the Policy provides in relevant part:

**Damages** means compensatory judgments, settlements or awards, but does not include punitive or exemplary damages, fines or penalties, sanctions, the return of fees or other consideration paid to the **Insured**, or that portion of any award or judgment caused by the trebling or multiplication of actual **damages** under

federal or state law. **Damages** does not include matters uninsurable in the jurisdiction governing this policy.

(Ex. 1 to Ex. L, Section VIII – Definitions, **Damages**.)

39.    The Policy further provides that:

This insurance does not apply to **Claims:**

        *    *    *

G.    Seeking restitution, reduction, disgorgement, set off, return, or payment of any form of legal fees, related fees, or any other costs, expenses, or charges;

        *    *    *

(Ex. 1 to Ex. L, Section VII – Exclusions, Clause G.)

40.    The Policy further provides:

**O. Reimbursement**
While the Company has no duty to do so, if the Company pays **Damages** or **Claims Expenses**:
1. Within the amount of the applicable Deductible; or
2. In excess of the applicable Limit of Liability; or
3. *Under a reservation of rights to seek reimbursement, and it is determined that the Company is entitled to reimbursement,*

all **Insureds** shall be jointly and severally liable to the Company for such amounts. Upon written demand, the **Insured** shall repay such amounts to the Company within thirty (30) days. Failure to pay any amount indicated may lead to policy termination.

(Ex. 1 to Ex. L, Section X – General Conditions, Clause O (emphasis supplied).)

<u>**COUNT I – DECLARATORY JUDGMENT**</u>

41.    Westchester adopts and incorporates by reference Paragraphs 1-40 as if fully set forth herein.

42.    Pursuant to 28 U.S.C. §2201 *et seq.*, this Court has jurisdiction to declare the Parties' rights and obligations under the Westchester Policy.

8

43.    It is clear from the face of the Appellate Motion for Sanctions filed in the Seventh Circuit that the only relief sought by KPMG is "sanctions" in the form of "legal fees and costs incurred by KPMG".[2]

44.    Westchester does not have a duty to defend or indemnify Defendants or any other Insured under the Policy in connection with the Appellate Motion for Sanctions because the Motion only seeks an award of sanctions outside the Policy's definition of damages, which expressly eliminates "punitive or exemplary damages, fines or penalties, [and] sanctions" as covered items.

### COUNT II – DECLARATORY JUDGMENT

### (Pleaded in the Alternative to Count I)

45.    Westchester adopts and incorporates by reference Paragraphs 1-44 as if fully set forth herein.

46.    Pursuant to 28 U.S.C. §2201 *et seq.*, this Court has jurisdiction to declare the Parties' rights and obligations under the Westchester Policy.

47.    It is clear from the face of the Appellate Motion for Sanctions that the only relief sought by KPMG is "sanctions" in the form of "legal fees and costs incurred by KPMG".

48.    To the extent that this Court were to rule that the Appellate Motion for Sanctions triggers the Insuring Agreement of the Policy (which Westchester specifically contests), Westchester nonetheless does not have a duty to defend or indemnify Defendants or any other Insured under the Policy in connection with the Appellate Motion for Sanctions because the Appellate Motion for Sanctions falls squarely within the clear and unambiguous language of Exclusion G, which provides that the insurance provided by the Policy does not apply to claims

---

[2] Westchester expressly reserves its right to amend, or to seek leave to amend, this Complaint to seek a declaratory judgment of no coverage for any motion for sanctions that KPMG might file with the District Court.

"[s]eeking restitution, reduction, disgorgement, set off, return, or ***payment of any form of legal fees, related fees, or any other costs, expenses, or charges***" (emphasis supplied).

### PRAYER FOR RELIEF

**WHEREFORE**, WESTCHESTER FIRE INSURANCE COMPANY respectfully requests a judgment declaring:

A.      That the Appellate Motion for Sanctions does not give rise to a claim for "Damages" within the Insuring Agreement of the Westchester Policy given that the Motion seeks only an award of "sanctions".

B.      That the Appellate Motion for Sanctions otherwise is excluded from coverage under Exclusion G of the Policy given that the Motion seeks "payment of any form of legal fees, related fees, or any other costs, expenses, or charges".

C.      That, consequently, Westchester does not have a duty to defend Defendants or any other Insured under the Policy in connection with:

(1)      the Appellate Motion for Sanctions;

(2)      any motion or other request for legal fees, costs or related expenses by KPMG in connection with the KPMG Action; or

(3)      any subsequent motion by the Trustee, either individually or on behalf of the marchFIRST, Inc. bankruptcy estates, against Defendants or any other Insured under the Policy, to the extent it seeks recovery of any punitive or exemplary damages, fines or penalties, sanctions, and/or legal fees, related fees, or any other costs, expenses, or charges.

D.      That, consequently, Westchester does not have a duty to indemnify Defendants or any other Insured under the Policy in connection with:

10

(1)    the Appellate Motion for Sanctions;

(2)    any motion or other request for legal fees, costs or related expenses by KPMG in connection with the KPMG Action; or

(3)    any subsequent motion or other pleading filed by the Trustee, either individually or on behalf of the marchFIRST, Inc. bankruptcy estates, against Defendants or any other Insured under the Policy, to the extent it seeks recovery of any punitive or exemplary damages, fines or penalties, sanctions, and/or legal fees, related fees, or any other costs, expenses, or charges.

E.    That, pursuant to Section X, Clause G of the Policy, Westchester is entitled to reimbursement for any and all Damages and/or Claims Expenses paid by Westchester to WMJ's defense counsel in connection with:

(1)    the Appellate Motion for Sanctions;

(2)    any motion or other request for legal fees, costs or related expenses by KPMG in connection with the KPMG Action; or

(3)    any subsequent motion or pleading filed by the Trustee, either individually or on behalf of the marchFIRST, Inc. bankruptcy estates, against Defendants or any other Insured under the Policy, to the extent it seeks recovery of any punitive or exemplary damages, fines or penalties, sanctions, and/or legal fees, related fees, or any other costs, expenses, or charges.

F.    For any other relief that the Court deems just and equitable.

Respectfully submitted,

WESTCHESTER FIRE INSURANCE
COMPANY,

By: _____

David E. Walker (Bar No. 6202056)
Edward P. Gibbons (Bar No. 6201189)
Tiffany S. Saltzman-Jones (Bar No. 6283921)
Walker Wilcox Matousek LLP
225 West Washington Street
Suite 2400
Chicago, IL 60606
Tel:  (312) 244-6700
Fax: (312) 244-6800/6801

12

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

EXHIBIT A

**EOD** APR 1 1 2003

FILED UNDER SEAL PURSUANT TO FEBRUARY 27, 2003 ORDER
AND IN CONFORMANCE WITH U.S. DISTRICT
COURT RULE LR26.2 AND LOCAL BANKRUPTCY RULE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Chapter 7** |
| | ) | |
| **marchFIRST, Inc., et al.,** | ) | **Case No. 01-B-24742** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | |
| | ) | **The Honorable John D. Schwartz** |
| | ) | |
| ANDREW J. MAXWELL, not | ) | |
| individually, but as Chapter 7 Trustee | ) | |
| for the bankruptcy estates of | ) | |
| marchFIRST, Inc., | ) | **03AC1417** |
| | ) | |
| Plaintiff, | ) | **Adversary No.:** _____ |
| | ) | |
| v. | ) | |
| | ) | |
| KPMG, LLP, | ) | **Jury Trial Demanded** |
| | ) | |
| Defendant. | ) | |

RECEIVED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
APR 11 2003
PUBLIC SERVICE COUNTER

P A I D
APR 11 2003
KENNETH S. GARDNER
UNITED STATES BANKRUPTCY CLERK
BY
BANKRUPTCY COURT

F I L E D
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
APR 11 2003
KENNETH S. GARDNER, CLERK
- PS REP. - DR

## ADVERSARY COMPLAINT

Plaintiff Andrew J. Maxwell, not individually, but in his capacity as the Chapter 7
Trustee for the bankruptcy estates of marchFIRST, Inc. and its affiliates ("marchFIRST"), states
his Adversary Complaint against defendant KPMG, LLP ("KPMG") as follows:

### Introduction

This is an action for malpractice brought against defendant KPMG for its failure to
discharge its professional obligations in planning and performing auditing and other services for
marchFIRST and its predecessor company, Whittman-Hart, Inc. ("Whittman-Hart"). It seeks

damages for the injuries resulting from KPMG's failure to identify and report that Whittman-Hart's financial statements for the fiscal year that ended December 31, 1999 and subsequent quarters did not represent fairly, in all material respects, Whittman-Hart's operating results and cash flows in conformity with generally accepted accounting principles ("GAAP"). Those financial statements materially overstated Whittman-Hart's profits and cash flows. They failed to disclose the linkage between Whittman-Hart's investments in non-public companies and the resultant revenue it derived from contracts to provide professional services to those investees. They failed to disclose adequately Whittman-Hart's revenue recognition policies with respect to such investees, and they failed to disclose adequately the nature and extent of Whittman-Hart's significant related party transactions.

While asserting incorrectly that it performed its audit in accordance with generally accepted auditing standards ("GAAS"), KPMG expressed an unqualified opinion on Whittman-Hart's 1999 financial statements, even though they were not prepared in conformity with GAAP. Additionally, KPMG failed to discharge the professional obligations it assumed in connection with its work on marchFIRST's quarterly filings with the Securities and Exchange Commission ("SEC") after KPMG issued its opinion on the 1999 financial statements.

The damages that directly and proximately resulted to Whittman-Hart and marchFIRST from KPMG's breaches of its professional obligations are significant. Had it properly performed its professional obligations to Whittman-Hart and at least qualified its opinion on the 1999 financial statements -- statements that materially overstated the company's performance, did not disclose the linkage between Whittman-Hart's investments in non-public companies and the revenue derived from those investments, did not disclose adequately Whittman-Hart's revenue recognition policies with respect to such investees, and did not disclose adequately the nature

2

and extent of Whittman-Hart's related-party transactions -- significant additional "roundtripping" transactions that caused Whittman-Hart significant losses would likely not have occurred. Worse, had KPMG disclosed to Whittman-Hart's board or its audit committee that its financial statements results were not prepared in conformity with GAAP, Whittman-Hart would not have been able to complete a disastrous merger with US Web/CKS Corporation and would have been spared millions of dollars of losses resulting therefrom. Furthermore, had KPMG properly discharged the obligations it assumed in connection with its work on marchFIRST's quarterly filings with the SEC, marchFIRST also would have avoided shareholder lawsuits that followed the merger. Indeed, absent the damages that proximately flow from KPMG's breach of its professional obligations, marchFIRST would not have become as deeply insolvent as it has, if it were not able to avoid insolvency altogether.

## Parties

1. Andrew J. Maxwell is a citizen of the State of Illinois. On or about July 16, 2001, the United States Trustee appointed Mr. Maxwell as the Chapter 7 trustee ("Trustee") for the bankruptcy estates of marchFIRST, Inc. ("marchFIRST") and its affiliates. Mr. Maxwell brings this Adversary Complaint solely in his capacity as the Trustee and not individually.

2. Defendant KPMG, LLP ("KPMG") is a limited liability partnership organized and operating under the laws of the State of Delaware. At all relevant times, KPMG has operated, maintained an office and conducted business in Chicago, Illinois. KPMG holds itself out as an accounting and auditing firm that has special expertise and knowledge in the field of auditing businesses such as marchFIRST.

3

## Jurisdiction and Venue

3.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois because this action is related to the underlying bankruptcy case of marchFIRST and its affiliated debtors pending before this Court.

4.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## · Statement of Facts

**Whittman-Hart, Inc., US Web/CKS Corporation and the marchFIRST merger.**

### A.    Whittman-Hart, Inc.

5.    Based in Chicago, Illinois, Whittman-Hart was a Delaware corporation that provided computer and software services primarily to middle market and growing businesses. Started in 1984, Whittman-Hart performed work for its clients primarily on a time and material basis and submitted invoices to its clients every week for the services it performed. As it performed this work and recognized costs therefrom, Whittman-Hart's practice also was to recognize the associated revenue. Following this practice, Whittman-Hart achieved substantial growth from 1984 to 1999 and acquired several other computer consulting companies. Building on this success, Whittman-Hart went public in 1996.

6.    Whittman-Hart's founder, Chairman of the Board and Chief Executive Officer was Robert Bernard. Bernard was also Whittman-Hart's largest shareholder. As of December 31, 1999, Bernard owned 21% of Whittman-Hart's outstanding stock.

7.    Whittman-Hart compensated Bernard primarily through stock options and their associated gains. Indeed, in 1999, Whittman-Hart had eliminated Bernard's salary and cash

4

bonuses altogether. As a result, Bernard's entire compensation that year was dependent on increasing the market value of Whittman-Hart's stock.

8.     Bernard was not the only Whittman-Hart officer who had substantial holdings in the company. Other officers of Whittman-Hart also had substantial stock options and holdings under which they would benefit by increases in the value of their stock.

### B.     US Web/CKS Corporation.

9.     Based in San Francisco and formed in 1995, US Web/CKS Corporation ("US Web") was a Delaware corporation. US Web focused on the companies that specialized in the internet. Unlike Whittman-Hart's practice of providing services primarily on a time and material basis, US Web generally provided services to its internet clients based on fixed price contracts. Like Whittman-Hart, however, US Web also acquired other consulting firms in its short existence. Indeed, it acquired 45 such firms from 1995 to 1999. By 1999, US Web was also publicly traded.

### C.     The marchFIRST merger.

10.     On December 12, 1999, Whittman-Hart, Whittman-Hart's wholly-owned subsidiary and US Web entered into an Agreement and Plan of Merger ("the Merger Agreement"). Under the Merger Agreement, Whittman-Hart would emerge as the surviving corporation.

11.     First discussed in the fall of 1999, the proposed merger came together very quickly. The Merger Agreement the parties signed, moreover, expressed a desire to close this transaction as soon as possible. Rather than set a specific date for the closing of the merger, the Merger Agreement required that the deal be closed no later than two business days after all the conditions to the obligations of the parties were satisfied. (Merger Agreement, § 1.3.)

5

12.    While Whittman-Hart's management enthusiastically endorsed this deal, the stock market did not. The market's immediate reaction to the proposed merger was overwhelmingly negative. Indeed, on the day the merger was announced, the price of both Whittman-Hart and US Web plunged: Whittman-Hart's stock tumbled 31% on the news while US Web's stock fell 14%. Despite this reaction, Whittman-Hart and US Web pressed on to complete the transaction.

13.    Because the shareholders of each company had to approve the merger, the Merger Agreement required the parties to convene meetings of their shareholders promptly. (*Id.*, 6.4.) The Merger Agreement further required the parties to obtain the necessary regulatory clearance for the proxy materials they would send to their shareholders regarding the transaction. In particular, the Merger Agreement required that the parties take reasonable steps to obtain an effective S-4 Registration Statement with the Securities and Exchange Commission for these proxy materials.

14.    To obtain the required clearance, Whittman-Hart filed its S-4 Registration Statement with the SEC on January 13, 2000. On January 27, 2000, Whittman-Hart amended its S-4 Registration Statement to include KPMG's consent to allow the incorporation by reference of its January 14, 1999 report on the 1998 statements. The SEC declared Whittman-Hart's amended S-4 effective that same day.

15.    Once declared effective, Whittman-Hart and US Web used the proxy materials they had filed with the SEC to schedule meetings of their shareholders promptly. Accordingly, on or about January 27, 2000, shareholder meetings of both companies to vote on the mergers were scheduled for February 28, 2000.

16.    While the S-4 Registration Statement incorporated Whittman-Hart's 1998 financial statement and KPMG's report thereon, it did not contain Whittman-Hart's 1999

6

financial statements and KPMG's report and opinion on those statements. The S-4 also contained year to date information Whittman-Hart had reported through September 30, 1999. The Merger Agreement represented that "[t]he consolidated balance sheets and the related consolidated statements of income, stockholders' equity (deficit) and cash flows (including the related notes thereto) of [Whittman-Hart] ... comply as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with generally accepted accounting principles applied on a basis consistent throughout the periods involved ... and present fairly the consolidated financial position of [Whittman-Hart] and its consolidated subsidiaries as of their respective dates, and the consolidated results of their operations and cash flows for the periods presented therein...." (Merger Agreement, § 5.1(h)(ii)).

17.    The Merger Agreement also contained representations regarding the conduct of the businesses since their last SEC filings. As a result, Whittman-Hart represented that "[s]ince September 30, 1999, the business of [Whittman-Hart] and its subsidiaries has been carried on only in the ordinary and usual course, and there has not been any Material Adverse Effect on [Whittman-Hart] and no event has occurred and no fact or set of circumstances has arisen which has resulted in or could reasonably be expected to result in a Material Adverse Effect on [Whittman-Hart]." (*Id*, § 5.1(j)). The Merger Agreement defined "Material Adverse Effect" as "any change in the business, operations, liabilities (contingent or otherwise), results of operations or financial performance, or condition of [Whittman-Hart] ... which is material to [Whittman-Hart] and its subsidiaries as a whole, ... as the case may be." (*Id.*, § 9.10(e)).

18.    Under the Merger Agreement, the representations and warranties the parties made had to remain true through the closing of the transaction. It thus required that "[e]ach of [US

7

Web] and [Whittman-Hart] shall give prompt notice to the other of any circumstances that would cause any of their respective representations and warranties set forth in Section 5.1 or 5.2, as the case may be, not to be true and correct in all material respects at and as of the" effective date of the merger.

19.     Despite the negative stock market reaction to the proposed merger, the shareholders of Whittman-Hart and US Web approved the deal on February 28, 2000. The shareholders of both companies, however, were unaware that Whittman-Hart's financial statements for the year ended December 31, 1999 were not prepared in conformity with GAAP and did not contain adequate informative disclosures, even though KPMG's report thereon is dated January 24, 2000. The merger closed on March 1, 2000. The total purchase price Whittman-Hart paid for US Web, based on the market price of its stock, was $7.1 billion.

20.     On March 23, 2000, Whittman-Hart changed its name to marchFIRST to reflect the effective date of the merger. A majority of the directors and officers in Whittman-Hart remained as members of the board of marchFIRST. Among these was Bernard, who remained CEO and Chairman of the Board.

## The roundtripping "services for equity" transactions

21.     From the time it became a publicly traded company, Whittman-Hart prided itself on reporting consistently improving quarterly results. Styling itself as a leading provider of information technology consulting and systems integration services for middle market and growing companies, by the summer of 1999 Whittman-Hart had reported "record" results for 13 consecutive quarters. Whittman-Hart thus held itself out as a rapidly expanding business that both was poised to take advantage of the newly dawning information age but that also delivered solid quarterly financial results in accordance with analysts' expectations.

8

22. To boost its financial performance and to continue to report "record" profits, Whittman-Hart began a practice known as "roundtripping." The basic roundtripping scheme Whittman-Hart followed worked as follows: Whittman-Hart, a company that was affiliated with Whittman-Hart (or later marchFIRST), or a company controlled by one of its officers or directors, such as its Chairman Robert Bernard, would make an investment in an ostensibly "independent" client. Typically, the "independent" client was a start-up company with little or no assets.

23. The investment was made with the understanding that the investee-client that received the money would enter into a Consulting Services Agreement with Whittman-Hart. Those Consulting Services Agreements often included substantial advance payments against which services rendered to the clients were ostensibly to be applied. In several instances, the amount of the investment and the advance payment returned to Whittman-Hart were identical. Thus, funds used by the investees to pay their advance payments to Whittman-Hart were in fact provided by Whittman-Hart. The Consulting Services Agreements also often provided that services could only be applied toward the initial fixed payment for a certain period of time; once that time expired, the unused portion of the "initial payment" would no longer be available to pay for any fees or expenses and would be retained by Whittman-Hart as "additional compensation."

24. The net result of Whittman-Hart's roundtripping was to inflate its financial statements in several ways. First, Whittman-Hart would carry the investment it made on its books for the amount it nominally "paid" for the investment, even though the actual consideration it paid was less than this amount, since all or a substantial part of the consideration was immediately repaid to Whittman-Hart as an advance payment. Moreover, the advance

9

payment could be forfeited to Whittman-Hart without any apparent business reason for the investee if it did not "use" these services within a certain period of time. Second, Whittman-Hart would recognize the forfeited amounts as revenue, even if it did not do any work to obtain the revenue. Third, and more importantly, Whittman-Hart could use the money it provided to the client who then returned it to Whittman-Hart to inflate the profits Whittman-Hart reported. Moreover, to the extent that amounts recognized as revenue had little or no cost associated with them, this revenue increased profits dollar for dollar.

25. Upon information and belief, Whittman-Hart's roundtripping practices started no later than the third quarter of 1999. As that quarter drew to a close, and after it had become apparent that Whittman-Hart would have trouble meeting its quarterly numbers, several such transactions occurred. In particular, on or about September 22, 1999, just before the end of that quarter, Whittman-Hart entered into a large Consulting Services Agreement with a small Dallas, Texas clothing designer named William Reid. The contract was a surprise to the Dallas office; it suddenly "appeared" there.

26. The William Reid contract was orchestrated by Whittman-Hart's CEO Bernard. In September 1999, shortly before this contract was entered into, Bernard acquired an ownership interest in William Reid. Even though no work had been done on this project in the third quarter of 1999, upon information and belief the Dallas office recognized $1 million in revenue in the third quarter related to this contract.

27. Also on or about September 22, 1999, Whittman-Hart entered into a Consulting Services Agreement with a company called Fourth Floor Consulting, Inc. ("Fourth Floor") which was dated August 31, 1999. On or about September 22, 1999, Bernard personally acquired a 25% interest in Fourth Floor for approximately $300,000 and the obligation to

10

provide rent-free space to Fourth Floor for two years. Upon information and belief, Bernard also personally loaned Fourth Floor $1.32 million to pay any bills to Whittman-Hart.

28.     Whittman-Hart used these late quarter bumps in revenue and profits in the third quarter results it announced. Thus, on October 15, 1999, Whittman-Hart reported record revenues and income for the 14th consecutive quarter. The net income figure it reported was $9.2 million, a number apparently inflated by the roundtripping "profits" recognized in the waning days of the quarter.

### The Whittman-Hart board passes resolutions
### that set the stage for more roundtripping transactions

29.     Even as Whittman-Hart was enjoying any "profits" it obtained through the William Reid and Fourth Floor Consulting transactions, Whittman-Hart's directors institutionalized a structure that, unchecked by Whittman-Hart's auditors, allowed the roundtripping transactions to flourish. Thus, on or about September 23, 1999, the day after the William Reid and Fourth Floor Consulting transactions, the Board of Directors of Whittman-Hart approved a resolution that authorized the company's officers to invest up to $20,000,000 of Whittman-Hart's money in companies without specific board approval for each investment. The Board's resolution made clear that management should generally make such investments in customers that had contracted with Whittman-Hart to provide consulting services.

30.     Whittman-Hart quickly determined that the $20,000,000 limit was not enough. Consequently, on November 18, 1999, before Whittman-Hart had even invested half of what had been authorized, the Board increased the amount that its management could invest without prior specific approval to $25,000,000.

11

31.    By December 31, 1999, Whittman-Hart's records reflected investments of more than $22,000,000 in such companies. Specifically, as of December 31, 1999, one of Whittman-Hart's general ledger accounts contained the following "joint venture" investments:

|    | Investment | Amount |
|----|------------|--------|
| a) | Biosafe Investment | $5,000,000 |
| b) | divine Interventures | $2,000,000 |
| c) | Imana | $ 900,000 |
| d) | Netvendor, Inc. | $1,000,000 |
| e) | Commodities Exchange | $2,500,000 |
| f) | E-First | $3,500,000 |
| g) | Blue Meteor | $6,604,735 |
| h) | Covalex | $ 552,860 |

While Commodities Exchange and Covalex were listed as separate companies, in fact they were the same company. Moreover, one of Whittman-Hart's board members, Robert Steele, owned a substantial interest in this company prior to Whittman-Hart's investment. In addition, Robert Bernard was a board member of another of these companies, divine Interventures.

32.    Reviewing some of these investments reveals the influence they could have on operating results. For example, on October 25, 1999, Whittman-Hart and Biosphere entered into a Consulting Services Agreement that directly related to the investment. The Biosphere Consulting Services Agreement required Biosphere to make a non-refundable "Initial Advance Payment" of $1,750,000 "[o]n the date hereof" and against which fees and expenses would automatically be applied through December 31, 2000. The Biosphere Consulting Services

12

Agreement further provided that "[a]ny portion of the Initial Advance Payment that has not been utilized as of December 31, 2000 shall no longer be available for application toward any fees or expenses and shall be treated by Whittman-Hart as additional compensation."

33.    The Biosphere Consulting Services Agreement also required Biosphere to make an "Additional Advance Payment" on June 1, 2000 that, if not also used by December 31, 2000, would be retained by Whittman-Hart as additional compensation.

34.    Whittman-Hart wired its $5,000,000 investment to Biosphere in November 1999. Although Biosphere was required to pay its Initial Advance Payment of $1,750,000 on October 25, 1999, upon information and belief, it actually made this payment to Whittman-Hart after it received Whittman-Hart's wire.

35.    Other joint venture investments followed the "equity for services" pattern. On November 5, 1999, Whittman-Hart entered into a Consulting Services Agreement with a company called eFIRST. The eFIRST Consulting Agreement specifically conditioned any obligation of eFIRST to pay for any Whittman-Hart consulting services on Whittman-Hart's purchase of 35,000 shares of eFIRST stock for $3,500,000. After Whittman-Hart's investment in eFIRST, eFIRST made a non-refundable "Advance Payment" to Whittman-Hart of the identical amount: $3,500,000.

36.    The investment Whittman-Hart made in CommoditiesExchange.com, later renamed Covalex.com, followed this pattern. In December 1999, Whittman-Hart invested $2,500,000 in the company and, on December 13, 1999, the company entered into a Consulting Service Agreement under which it paid a $2,500,000 "Advance Payment" to Whittman-Hart.

37.    The Commodities Exchange/Covalex investment also involved an exchange of equity for an account receivable that Commodities Exchange/Covalex, upon information and

13

belief, could not pay. As of December 31, 1999, Whittman-Hart recorded an investment of $552,860.70 in "Covalex" based on this receivable and thereby avoided setting an allowance for doubtful accounts.

38.    As of December 31, 1999, Whittman-Hart also recorded an investment of $6,604,735.05 in a company named Blue Meteor, Inc. for services that Whittman-Hart provided to Blue Meteor. Upon information and belief, Blue Meteor was unable to pay this receivable as of December 31, 1999.

39.    In all, as of December 31, 1999, Whittman-Hart's records indicated that it had invested $22,057,595.75 in these "joint ventures," all of which KPMG was aware. KPMG either knew or should have known that all of these investees were also customers of Whittman-Hart.

### The 1999 Audit of Whittman-Hart's financial statements

40.    As it had done in previous years, defendant KPMG audited the financial statements of Whittman-Hart for the fiscal year ended December 31, 1999. The 1999 Whittman-Hart financial statements that KPMG audited represented that Whittman-Hart had revenues of $480,911,489 and after tax profits of $30,290,877. The consolidated statement of cash flows stated that the net cash provided by Whittman-Hart's operating activities was $35,667,703.

41.    Whittman-Hart's 1999 financial statements contained footnotes that were an integral part of its statements. Footnote 2 purported to summarize Whittman-Hart's significant accounting policies. With respect to revenue recognition, it provided as follows:

> In general, the Company recognizes revenues at the time the services are performed. On time and expense contracts, revenue is recognized as costs are incurred. On fixed price contracts, revenues are recorded using the percentage of completion method by estimating contract costs incurred to date to total estimated contract costs at completion. Contract costs include both direct and indirect costs.

14

Contract losses are provided for in their entirety in the period they become known, without regard to the percentage of completion.

42.     Footnote 15 of Whittman-Hart's 1999 financial statements purported to disclose

all of Whittman-Hart's related party transactions. It provided as follows:

> The Company has several notes receivable from executives outstanding at December 31, 1999 and 1998 totaling $250,257 and $168,846, respectively. The notes bear interest at the prime rate and are due on various dates through October 1999. In addition, the Company had accounts receivable in the amount of $8,000 and $338,263 at December 31, 1999 and 1998, respectively, with a related company. Officers of the company own a percentage interest in the related company. The Company has an investment in divine Interventures, Inc. An officer of the Company is a member of the divine Interventures, Inc.'s board of directors.

43.     In performing its audit of Whittman-Hart's 1999 financial statements, KPMG was

required to consider the potential that Whittman-Hart's management might improperly inflate the

numbers it reported in its financial statements. In this regard, the risk factors that KPMG

specifically identified included the following:

    a.    Knowledge that a portion of Whittman-Hart's management's compensation was represented by bonuses and stock options that were contingent upon Whittman-Hart achieving financial targets;

    b.    An interest by Whittman-Hart's management in increasing the Company's stock price and earnings trend that could lead to aggressive accounting practices; and

    c.    Management's awareness of stock-analysts and the market's expectations which may lead to aggressive or potentially unrealistic forecasts.

44.     In recognition of these risk factors, KPMG's workpapers confirmed, among other

things, the need to maintain professional skepticism and a heightened awareness of unusual

transactions.

45.     KPMG was also required to be aware of risk factors that might signal improper

accounting of Whittman-Hart's operating characteristics and financial stability, including its

15

financial condition and profitability. The risk factors that KPMG's workpapers instructed its auditors to consider included the existence of significant transactions with related entities that were not audited or audited by another firm. Another such risk factor KPMG instructed its auditors to consider was the existence of significant or unusual transactions, especially those close to year-end, that posed difficult "substance over form" questions.

46. Although aware of these potential risk factors, KPMG determined that these risk factors were *not* actually present for Whittman-Hart. Instead, the only such risk factor regarding the potential for improper accounting concerning Whittman-Hart's operating characteristics and profitability that KPMG identified was that Whittman-Hart had experienced rapid growth in business and profitability.

47. With specific knowledge of these potential risk factors, KPMG applied audit procedures to Whittman-Hart's long term joint venture investments in companies that were also Whittman-Hart's clients. In particular, KPMG applied audit procedures to the $22,057,595 in joint venture investments in non-marketable companies comprising general ledger account 1208.

48. KPMG's workpapers make clear that it was aware that these investments were made towards the end of the year. It noted that Whittman-Hart began investing in these ventures "late in the fourth quarter of 1999" in an effort to increase its investment returns. Indeed, $7,750,000 of these investments were made as of November 30, 1999, while $14,307,595 were made in the last month of the fiscal year.

49. KPMG further knew that these investments constituted a change in Whittman-Hart's investment objectives, which previously were in marketable securities. KPMG's workpapers noted that Whittman-Hart planned to allocate approximately 10% of its investment

16

portfolio in "more aggressive" investments that would include joint venture investments with customers.

50.     KPMG's workpapers reflect that it specifically reviewed the investment agreements for each investment contained in account 1208. KPMG also sighted copies of Whittman-Hart's wire transfers, noting the date, the amount and the payee. In fact, KPMG reclassified $6,604,735.05 of the total in account 1208, representing the investment in Blue Meteor, because it determined that the investment agreement was not complete prior to December 31, 1999. KPMG, however, did not propose any increase to the allowance for doubtful accounts for the possible uncollectibility of this account. After deducting the amount of that investment from Account 1208 as of December 31, 1999, KPMG calculated that the amount in that account should be $15,452,860.75. This reclassification had no income effect on Whittman-Hart's financial statements.

51.     Although it applied audit procedures to these joint investments in particular, KPMG did not disclose to Whittman-Hart's board, its audit committee or any one else that these investments were part of an arrangement that inflated Whittman-Hart's year-end revenues, profits and operating cash flows and that this practice violated GAAP. Nor did KPMG inform Whittman-Hart's board, its audit committee or anyone else that these investees' Client Service Agreements contained provisions that were inconsistent with Whittman-Hart's footnote disclosure regarding its revenue recognition accounting practices.

52.     Similarly, while aware of the joint venture nature of these transactions – indeed it reviewed board minutes that noted director Steele's ownership interest in the Commodities Exchange/Covalex entity – KPMG did not object to Whittman-Hart's failure to disclose the

17

revenues from those related parties and/or investees and the linkage between the investments and the revenue.

53.    KPMG also did not disclose that, as a result of these transactions, Whittman-Hart had overstated its revenues and profits for 1999.

54.    Nor did KPMG note that Whittman-Hart's statement of cash flows was misleading because it did not disclose that the net cash flows from operating activities of $35,667,703 included at least $7,750,000 that was supplied by Whittman-Hart through the $15,452,861 it listed on that statement as investments in non-marketable securities.

55.    Rather than qualifying its opinion on Whittman-Hart's 1999 consolidated financial statements, KPMG gave an unqualified opinion on those statements. KPMG thus issued an independent auditor's report that expressed the unqualified opinion that

> the consolidated financial statements referred to above [*i.e.*, the consolidated balance sheets of Whittman-Hart and its subsidiaries as of December 31, 1999, the related statements of earnings, stockholders' equity and comprehensive income, and cash flows] present fairly, in all material respects, the financial position of Whittman-Hart, Inc. and their subsidiaries as of December 31, 1999 and 1998, and the results of their operations and their cash flows for each of the years in the three year period ended December 31, 1999, in conformity with generally accepted accounting principles.

KPMG's opinion is dated January 24, 2000, except as to note 17, which referenced the merger. As to that subsequent event, the opinion was dated as of March 1, 2000.

### The Importance of KPMG's failure to object to the financial statements to the Whittman-Hart – US Web/CKS Merger

56.    On January 24, 2000, the day KPMG completed or substantially completed its field work and it approved Whittman-Hart's year-end revenue and profit figures, Whittman-Hart issued a press release that trumpeted these figures. In its press release, Whittman-Hart "reported record revenues and net income for the fourth quarter and year ended December 31, 1999,

18

marking 15 consecutive quarters of record results." On January 26, 2000, KPMG consented to the incorporation of its report and opinion on Whittman-Hart's 1998 financial statements in the Amended S-4 Registration Statement Whittman-Hart filed with the SEC.

57.     Had KPMG properly informed Whittman-Hart's board, its audit committee or others that Whittman-Hart's financial statements were not prepared in conformity with generally accepted accounting principles, and that its 1999 net income and net cash flows for operating activities were overstated through the use of end-of-the-year transactions, Whittman-Hart would have been unable to announce its 15th consecutive quarter of record results. More importantly, had KPMG qualified its opinion on these statements due to material departures from GAAP, the merger would not likely have been completed.

## marchFIRST's Operations and its 3rd Quarter Results

58.     The merger between Whittman-Hart and US Web, effective March 1, 2000, was a disaster. Within a week of the merger, the Nasdaq stock market began its tumultuous slide. Coming into existence just as the technology market imploded, the merged company now called marchFIRST immediately encountered difficulty integrating the operations of the two companies. While publicly touting the opportunities it contended that the merger would bring in the new economy, marchFIRST struggled to meet analysts' profit expectations. Despite the downturn in the technology sector, the company forged on with risky venture capital investments in companies it also did business with or wished to do business with during its first full quarter of operation as marchFIRST, the second quarter of 2000. In this deteriorating economic climate, marchFIRST continued to engage in roundtripping transactions to boost revenues, profits and operating cash flows to hold up its stock value.

19

59. Emboldened by earlier transactions that had drawn no criticism from its auditors, marchFIRST's roundtripping continued as the end of the third quarter of 2000 approached. Indeed, in that quarter, marchFIRST made an additional $19,878,750 in investments with joint venture partners who promptly paid the money back to marchFIRST in non-refundable retainers. In that quarter, marchFIRST realized approximately $17 million in revenue in this fashion.

60. While marchFIRST continued to engage in roundtripping transactions, KPMG also continued to serve as marchFIRST's auditor. In particular, KPMG provided services in the first, second and third quarters of 2000 in connection with quarterly reports that marchFIRST filed with the SEC.

61. In connection with the services KPMG provided regarding marchFIRST's third quarter 10-Q filing, KPMG finally questioned several roundtripping transactions. Without these revenues and the profits they generated, marchFIRST's results badly missed analysts' expectations for the third quarter of 2000.

62. marchFIRST's resulting failure to meet these expectations had an immediate and precipitous impact on its stock. Noting that the company had never missed earnings estimates in its previous 16 quarters as a publicly-traded entity, analysts were in an uproar. Indeed, on these results, analysts who followed and recommended the stock announced that they had lost faith in the company and its management. Shareholder lawsuits soon followed. Had similar results been reported with respect to the 1999 audited financials, the market and analyst reaction would have been similar and the resultant effect on Whittman-Hart's stock would have compromised the proposed merger.

63. marchFIRST's fortunes thereafter declined at a rapid rate. On November 20, 2000, the company filed its 10-Q report for the third quarter with the SEC that revealed that $45

million of revenue recognized for the third quarter had come from related-party companies. In the fourth quarter, marchFIRST lost more than $100,000,000 in the joint venture investments involved with its roundtripping activities, principally from the write down of these investments. Its stock price dropped further. A large capital infusion in late 2000 did not stop the slide and, on February 12, 2001, marchFIRST posted a $6.8 billion loss for the year 2000, $6.5 billion of which was attributable to its writedown of the goodwill it had recorded in connection with the US Web merger. Had the merger with US Web not occurred, these losses would have been avoided.

64.    With its financial position deteriorating with each passing day, marchFIRST laid off employees, sold assets and finally, on April 12, 2001, filed for bankruptcy protection.

## KPMG's professional obligations

65.    As an independent auditor of Whittman-Hart's 1999 financial statements, KPMG was obliged to comply with the relevant and applicable auditing standards then in effect. These standards, *inter alia*, required KPMG to

        a.    maintain an independent mental attitude and apply due care and professional skepticism;

        b.    use due professional care in planning and performing the audit and preparing the auditor's report;

        c.    adequately plan the audit work;

        d.    plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement, whether caused by error or fraud;

        e.    obtain sufficient, competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination;

        f.    report material departures from GAAP in the financial statements; and

g. insure that all informative disclosures in the financial statements are reasonably adequate unless otherwise stated in the auditor's report.

66. As alleged herein, KPMG failed to discharge these obligations to marchFIRST and to Whittman-Hart.

## COUNT I – PROFESSIONAL MALPRACTICE

67. Maxwell realleges and incorporates paragraphs 1 through 66 as paragraph 67 of this Count I.

68. Having represented itself as possessing the highest professional competence to conduct audits of publicly-traded companies, KPMG owed Whittman-Hart (and later marchFIRST) the common law duties of exercising due care, diligence and prudence in the discharge of its professional obligations.

69. KPMG was negligent and failed to exercise its duties of due care, diligence and prudence, including, without limitation, in conducting the 1999 audit and in performing additional work regarding marchFIRST's quarterly reports.

70. More specifically, KPMG was negligent in failing to comply with the requirements of GAAS including, *inter alia*, by failing to:

   a. obtain a sufficient understanding of the linkage between Whittman-Hart's investments in non-public companies and its client service agreements with these investees;

   b. obtain a sufficient understanding of the business purpose of the roundtripping investment transactions with these investees;

   c. test whether Whittman-Hart's investments in these non-public companies included in the financial statements were presented in conformity with GAAP;

   d. adequately assess Whittman-Hart's (and later marchFIRST's) system of internal controls as it related to the recognition of revenue and related party transactions;

22

c. test whether Whittman-Hart properly accounted for and disclosed material related-party transactions; and

f. notify the board or its audit committee of significant and unusual transactions, such as roundtripping transactions, that artificially inflated Whittman-Hart's profits and operating cash flows.

71. Had KPMG properly discharged its professional duties during the 1999 audit and beyond, it would have discovered and reported to the Board and to the management of Whittman-Hart, and later marchFIRST, that these roundtripping transactions were not properly recorded or disclosed. If so informed, just as it did with respect to the roundtripping transactions in the third quarter of 2000, Whittman-Hart would have been restrained from reporting the inflated profit figures for 1999, would not have been in a position to complete the US Web merger, and would have avoided the significant losses arising therefrom. Upon information and belief, the shareholder lawsuits that followed the stock market's reaction to more adequate disclosure of these matters and their effect on marchFIRST would also have been avoided. Indeed, absent these breaches, marchFIRST would either have avoided insolvency altogether or would not have become as deeply insolvent as it is now. The damages complained of therefore are directly and proximately caused by KPMG's breach of its professional duties.

WHEREFORE, plaintiff Andrew J. Maxwell, not individually, but in his capacity as the Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., requests this Court to enter judgment on his behalf and against defendant KPMG, LLP, to award Maxwell damages in an amount determined at trial in excess of $75,000, and to award Maxwell his attorneys' fees and costs.

## COUNT II – BREACH OF CONTRACT

72. Maxwell realleges and incorporates paragraphs 1 through 71 as paragraph 72 of this Count II.

23

73.    KPMG entered into an engagement agreement with Whittman-Hart to conduct

professional services for Whittman-Hart and later marchFIRST.

74.    To work as Whittman-Hart's independent certified public accountant and auditor

in 1999, KPMG sent to Whittman-Hart an engagement letter on or about November 12, 1999.

Under that engagement letter, KPMG promised to

> conduct the audit in accordance with generally accepted auditing standards with
> the objective of expressing an opinion as to whether the presentation of the
> financial statements, taken as a whole, conforms to generally accepted accounting
> principles and our interpretation of the published rules and regulations of the
> Securities and Exchange Commission relative to matters of accounting.

75.    Under the engagement letter, KPMG additionally promised that it would

> Perform tests of the accounting records and such other procedures as we consider
> necessary in the circumstances to provide a reasonable basis for our opinion on
> the financial statements. We will assess the accounting principles used and the
> significant estimates made by management, as well as evaluate the overall
> financial statement presentation.

76.    As alleged herein, KPMG breached is contractual obligations to Whittman-Hart

and later to marchFIRST in connection with the audit of the 1999 financial statements and

beyond.

77.    As a direct and proximate result of these breaches of contract, Whittman-Hart,

and later marchFIRST, sustained damages as also alleged herein.

WHEREFORE, plaintiff Andrew J. Maxwell, not individually, but in his capacity as the

Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., requests this Court to enter

judgment on his behalf and against defendant KPMG, LLP, to award Maxwell damages in an

amount determined at trial in excess of $75,000, and to award Maxwell his attorneys' fees and

costs.

ANDREW J. MAXWELL, not individually, but in his capacity as Chapter 7 Trustee for bankruptcy estates of marchFIRST, INC. and its affiliates.

By: _____
One of His Attorneys

Steven J. Roeder
Eric R. Lifvendahl
Suzanne Lee
Williams Montgomery & John Ltd.
2100 Civic Opera Building
20 North Wacker Drive
Chicago, IL 60606
(312) 443-3200

Doc ID – 602044

25

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW J. MAXWELL, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., | ) ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 03 C 3524 |
| v. | ) ) | Judge Joan B. Gottschall |
| KPMG, LLP, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On March 1, 2000, Whittman-Hart, Inc. ("Whittman-Hart"), an information technology consulting company, and USWeb/CKS Corporation ("USWeb"), an internet professional services firm, merged to form marchFIRST, Inc. ("marchFIRST"), an information technology consulting company. After the merger, the technology bubble burst and marchFIRST filed for bankruptcy just one year later, on April 12, 2001. Andrew J. Maxwell, the Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc. (the "Trustee"), has sued KPMG LLP ("KPMG"), Whittman-Hart's independent auditor. Specifically, the Trustee alleges that KPMG breached its professional responsibilities by failing to inform Whittman-Hart's board of directors, its audit committee, and others, that its 1999 net income and fourth quarter results were overstated in an unaudited Earnings Release prior to the closing of the merger. The Trustee claims that absent these breaches, marchFIRST would either have avoided insolvency altogether or would not have become as deeply insolvent as it is now because had USWeb known about this overstatement, it would have backed out of the merger. Had the merger not

1

gone through, Whittman-Hart—unburdened by USWeb—would have survived the
technology crash. Therefore, the Trustee seeks to hold KPMG liable for not saving
Whittman-Hart from the disastrous consequences of the Whittman-Hart/USWeb merger.

KPMG has moved for summary judgment. For the reasons stated below,
KPMG's motion is granted.

## I. BACKGROUND

Whittman-Hart was engaged in the business of providing information technology
("IT") consulting services primarily to middle-market and Fortune 500 companies.
Those services included, among other things, systems integration, strategic planning,
business process improvement, and design and electronic commerce solutions. In the late
1990's, more than half of Whittman-Hart's clients were demanding digital
communications and/or Internet expertise. As part of a five-year strategic plan to expand
its range of IT services and its geographic presence, Whittman-Hart sought acquisition
opportunities or potential merger partners to increase its size and competitive position,
and to gain access to the Internet and e-commerce sectors. During 1998 and 1999,
Whittman-Hart acquired a number of IT consulting companies such as Four Points
Digital, L.L.C., a company that had digital communications and Internet expertise. In the
fall of 1999, Whittman-Hart identified USWeb as a potential merger candidate. The
merger came together quickly and was "enthusiastically endorsed" by Whittman-Hart's
management. Compl. ¶¶ 11-12.

On November 21, Whittman-Hart retained KPMG to perform an audit of its
consolidated financial statements for the year ended December 31, 1999.

2

On December 12, 1999, the Whittman-Hart Board unanimously adopted resolutions approving the Merger Agreement and authorizing its corporate officers to execute, deliver and perform the Merger Agreement. Whittman-Hart subsequently entered into a written Agreement and Plan of Merger with USWeb (the "Merger Agreement"). According to the terms of the Merger Agreement, the merger was a stock-for-stock exchange. The stockholders of USWeb received .865 shares of Whittman-Hart for each share of USWeb common stock. After the merger, Whittman-Hart would be the surviving corporation.

On or about January 13, 2000, Whittman-Hart filed its Form S-4 Registration Statement, including a joint proxy statement, with the Securities and Exchange Commission ("SEC"). One of the purposes of this filing was to register the shares of common stock to be issued in connection with the Merger Agreement. The S-4 Statement announced "the signing of a definitive agreement to merge" with USWeb, touting the anticipated strategic benefits of the merger. The S-4 Statement also included extensive risk disclosures, such as: (1) "The market for Internet professional services is relatively new, intensely competitive, rapidly evolving and subject to rapid technological change"; (2) "If the market for such services does not continue to develop or develops more slowly than expected, or if the combined company's services do not achieve market acceptance, its business will be negatively affected"; and (3) "[A] significant shortfall in demand for services could have an immediate and a significant negative effect on the combined company's business and results of operations." Ex. 18 to Def.'s Statement of Facts (Form S-4).

3

The stock market reacted negatively to the proposed merger. On the day it was announced, Whittman-Hart's stock price fell 31% and USWeb's stock price fell 14%. Despite this reaction, Whittman-Hart and USWeb pressed on to complete the merger. On January 21, 2000, KPMG met with Whittman-Hart's audit committee and reported on the status of its work auditing the company's 1999 financial statements, stating that it expected to substantially complete its fieldwork by January 24, 2000.

On January 24, 2000, Whittman-Hart issued an unaudited earnings release reporting its earnings for the fourth quarter of 1999, and the year ended December 31, 1999 ("1999 Earnings Release"). According to this earnings release, Whittman-Hart reported revenues of $133 million and net income of $8.4 million. For the year ended December 31, 1999, Whittman-Hart reported revenues of $480.9 million and net income of $30.3 million. The financial statements attached to the 1999 Earnings Release were identified as "unaudited." On January 26, Whittman-Hart filed a Form 8-K ("January 26 8-K") with the SEC, attaching a copy of the text of the 1999 Earnings Release. The January 26 8-K did not contain the unaudited Balance Sheet or the unaudited Income Statement from the 1999 Earnings Release.

On January 27, 2000, Whittman-Hart filed an amendment to its Form S-4 Statement related to the merger. Though KPMG consented to the use of Whittman-Hart's 1998 Financial Statements and its Audit Report for 1998 in connection with the S-4 Filings, KPMG did not consent to the use of any audit report on Whittman-Hart's 1999 Financial Statements in connection with the S-4 Filings.

On February 28, 2000, the shareholders of Whittman-Hart and USWeb voted to approve the merger. Following the meeting at which the merger was approved, KPMG

4

met with Whittman-Hart's audit committee to present the results of the 1999 audit.
KPMG informed the committee it expected to deliver an unqualified audit report. The
merger closed on March 1, 2000, and Whittman-Hart subsequently changed its name to
marchFIRST.

There is no statement by KPMG associated with the financial information
contained in the unaudited 1999 Earnings Release. Indeed, KPMG did not issue its audit
report on Whittman-Hart's 1999 financial statements until March 27, 2000, well after the
merger had closed. Further, Whittman-Hart did not file its Form 10-K for the period
ended December 31, 1999, until March 30, 2000.

Following the merger, the technology market underwent a major economic crisis,
often referred to as the bursting of the technology bubble. In the third quarter of 2000,
marchFIRST announced earnings that badly missed analysts' expectations. The
company's fortunes thereafter declined at a rapid rate, and on February 12, 2001, it
announced a $6.8 billion loss for the year 2000. On April 12, 2001, marchFIRST filed
voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. On
or about July 16, 2001, Andrew J. Maxwell was appointed as the Chapter 7 Trustee for
the bankruptcy estates of marchFIRST.

The Trustee has brought claims for professional malpractice and breach of
contract against KPMG, alleging that the 1999 Earnings Release and the January 26 8-K
overstated Whittman-Hart's revenues. The Trustee admits that there is no statement by
KPMG associated with the financial information contained in the 1999 Earnings Release.
However, KPMG did review the 1999 Earnings Release. KPMG admits—solely for the
purposes of this motion—that Whittman-Hart would not have issued the Earnings

5

Release if KPMG had not approved of the financial numbers contained therein. The

Trustee contends that because KPMG either knew or should have known that there was a

problem with the 1999 Earnings Release and the January 26 8-K, it should have insisted

that Whittman-Hart issue and file correct financial information. Interestingly, the Trustee

claims that while this allegedly correct information "would still show that Whittman-Hart

was a successful company," it would "also show that Whittman-Hart was not growing

rapidly through expanding internet services." Pl.'s Opp. 1. This, according to the

Trustee, would have been enough to make USWeb back out of the merger. Had

USWeb—a company that is much larger than Whittman-Hart—done so, then Whittman-

Hart would not have "been burdened by the problems involved in attempting to integrate

and manage a company more than twice its size," and the stand-alone Whittman-Hart

would have been able to survive and succeed. Pl.'s Opp. 1-2.

The Trustee is suing KPMG for the difference between the value of a hypothetical

stand-alone Whittman-Hart on April 12, 2001, and the purported negative value of

marchFIRST on April 12, 2001, on the ground that had KPMG pointed out the problems

with the 1999 Earnings Release, the merger would not have happened.[1]

---

[1] The Trustee's damages expert calculates damages as follows. Maxwell, as Trustee, offers the value of
marchFIRST on April 12, 2001 (the date of bankruptcy), based on his estimates of what the liabilities and
assets of the company were on that date. Maxwell asserts that the fair value of the debtors' business on the
date of bankruptcy was negative $93.6 million. Marcus, the Trustee's damages expert, offers two figures.
First, he estimates the value of Whittman-Hart's stock on the day before the merger ("February 29, 2000
valuation") had the accounting malpractice not occurred. Based on this value, he created a peer group
stock index, using eight comparable companies, to estimate the value of Whittman-Hart had it not merged
with USWeb and continued instead as a stand alone company ("April 12, 2001 valuation"). Marcus's
index shows that comparable companies declined 70% in stock value over the observed time. Thus, he
concludes that the stock market value of a hypothetical stand alone Whittman-Hart on April 12, 2001, (the
date of bankruptcy) would have been $535 million. The total damages in this case are estimated to be the
difference between this number and negative $93.6 million, the number that Maxwell opines is the value of
marchFIRST on April 12, 2001. This leaves KPMG responsible for the $628.6 million difference that was
caused by the merger. *See* Pl.'s Opp. to Motion to Exclude Opinion Testimony of Marcus, Maxwell.

6

## II. ANALYSIS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists only where the potential evidence would permit a reasonable finder of fact to return a verdict for the nonmoving party. *Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 960 (7th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006) (citing *Anderson*, 477 U.S. at 255).

"The elements of a professional negligence cause of action are: (1) the existence of a professional relationship, (2) a breach of duty arising from that relationship, (3) causation, and (4) damages." *MC Baldwin Financial Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006) (citing *Belden v. Emmerman*, 560 N.E.2d 1180, 1181 (Ill. 1990)).[2]

Under Illinois law, "a finding of 'but for' causation (what philosophers call a 'necessary condition') is not a sufficient basis for imposing legal liability." *Movitz v.*

---

[2] Accounting malpractice, like legal malpractice, can be styled as a tort claim or a contract claim. Under either theory, the plaintiff must prove proximate causation. *See Cleveland v. Rotman*, 297 F.3d 569, 572 (7th Cir. 2002) ("Under either a tort or contract theory, the elements of a legal malpractice claim are (1) an attorney-client relationship establishing a duty on the attorney's part, (2) breach of that duty, (3) proximate cause establishing that but for the breach the plaintiff would not have been injured, and (4) resulting damages.")

*First Nat. Bank of Chicago*, 148 F.3d 760, 762 (7th Cir. 1998). "[P]laintiffs must prove

that a defendant's actions proximately caused their injuries before they can recover in

tort, even in instances of intentional torts where fiduciaries are involved." *Martin v.*

*Heinold Commodities, Inc.,* 643 N.E.2d 734, 747 (1994). Proximate causation, which is

also referred to as loss causation[3] in the securities context, is especially helpful in cases

that involve natural or financial disasters such as market collapses. *See Ray v. Citigroup*

*Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (loss causation "attempts to

distinguish cases where the misrepresentation was responsible for the drop in the share's

value from those in which market forces are to blame"). Although proximate cause

generally is a fact question, *see Kavales v. City of Berwyn,* 712 N.E.2d 842 (Ill. 1999)), it

"may be determined as a matter of law when the facts not only are undisputed but allow

no difference in the judgment of reasonable men as to the inferences to be drawn

therefrom." *See Prodromos v. Everen Securities, Inc.*, 793 N.E.2d 151, 159 (Ill. App. Ct.,

2003) (citing *Seef v. Ingalls Memorial Hospital,* 724 N.E.2d 115 (Ill. 1999)).

"A proximate cause is one that produces an injury through a natural and

continuous sequence of events unbroken by any effective intervening cause."

---

[3] "Loss causation" is "the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990). Courts have used variations of this principle to cut off liability when, though the plaintiff may be able to demonstrate "but-for" causation, he cannot demonstrate proximate causation. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiff in a 10b-5 action must prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss); *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (common law fraud); *Movitz v. First Nat. Bank of Chicago*, 148 F.3d 760, 764 (7th Cir. 1998) (breach of contract and fiduciary duty in real estate case). Though the distinction between but-for causation and legal causation for a plaintiff's loss is particularly well developed in securities cases, where it is known as the distinction between "transaction causation" and "loss causation," the idea of loss causation is not limited to securities fraud. *See Movitz*, 148 F.3d at 763 ("The requirement of proving loss causation is a general requirement of tort law."); *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 747 (Ill. 1994) (adopting the principle of loss causation as analogous to the idea that "damages must be a proximate, and not remote, consequence of the [wrongful act]" (internal quotation marks omitted)).

*Cleveland v. Rotman*, 297 F.3d 569, 573 (7th Cir. 2002) (citing *Kleen v. Homak Mfg. Co.*, 749 N.E.2d 26 (Ill. App. Ct. 2001)). In order to prove proximate causation, the Trustee must offer evidence demonstrating that KPMG's alleged negligence caused Whittman-Hart's losses. This goes beyond simply proving "but for" causation because an accountant cannot be held liable for losses if subsequent events over which the accountant had no control—such as the plaintiff's bad luck or poor management decisions—caused the losses. *See Ryan v. Wersi Elec. GmbH and Co.*, 59 F.3d 52, 54 (7th Cir. 1995) (affirming summary judgment on loss causation grounds when plaintiffs "at best, made a showing sufficient to establish that [defendant's] false promises and misrepresentations were 'the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one.'" (quoting *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 684 (7th Cir. 1990)). As the Seventh Circuit recently noted in a fraudulent misrepresentation case, "It is not sufficient for an investor to allege only that it would not have invested but for the fraud. . . . [I]t is also necessary to allege that, but for the circumstances that the fraud concealed, the investment would not have lost its value." *Ray*, 482 F.3d at 995 (internal quotation marks omitted). In other words, the Trustee must offer evidence that shows a causal connection between KPMG's alleged negligence and Whittman-Hart's damages.

The Trustee must also prove that those losses were a foreseeable consequence of the violation of KMPG's legal duty. *See Cleveland*, 297 F.3d at 573 ("Legal cause exists where the injury was of a type that a reasonable person would foresee as a likely result of his or her conduct."); *Movitz*, 148 F.3d at 763; Restatement (Second) of Torts § 548A, Comment b (Legal causation is present only if the plaintiff's pecuniary loss is the

9

foreseeable result of the matters misrepresented by the defendant.) In *Movitz*, a real

estate investor relied on a bank's evaluation regarding a building's structural soundness

prior to his purchase of the building. *Id.* at 761. After the purchase "turned out to be a

disaster," and the real estate market took a plunge, the investor sued the bank. *Id.* at 762.

The Seventh Circuit held that while the element of "but for" causation was met—had the

bank been more careful and discovered the structural problems with the building, the deal

might not have gone through—proximate causation was not. Importantly, the Seventh

Circuit reasoned, "The care that the bank was contractually required to take in advising

[the investor] with regard to the purchase of the office building was not intended to

prophesy or avert market fluctuations but to make sure that the building was a sound

purchase under current market conditions." *Id.* at 763.

Here, assuming without deciding that KPMG did in fact breach a duty to

Whittman-Hart in connection with its review of the 1999 Earnings Report, the Trustee is

not entitled to try this case before a jury because he is unable to prove proximate

causation. The Trustee's theory is that but for KPMG's failure to raise a red flag

regarding the 1999 Earnings Report, USWeb would have backed out of the merger with

Whittman-Hart in 2000. But for this merger, the combined company would not have

gone bankrupt in 2001. Because Whittman-Hart's business and entire worth were

destroyed as a result of the merger, and because the merger would not have occurred if

KPMG had not committed malpractice, the Trustee seeks to hold KPMG liable for the

company's losses due to the merger. The Trustee's theory is too attenuated.

First, the Trustee's argument that KPMG's alleged malpractice caused Whittman-

Hart's demise is belied by his own admissions that the cause of Whittman-Hart's failure

10

was the bursting of the internet bubble and the fact that the merger partner, USWeb, was
"a larger [technology] company." *See* Pl.'s Opp. 1-2 ("Had [Whittman-Hart] not been
burdened by the problems involved in attempting to integrate and manage a company
more than twice its size, a non-merged, stand-alone Whittman-Hart would have been able
to survive and succeed."); *id.* 45-46 ("KPMG was a substantial factor in bringing about
the merger which exposed Whittman-Hart to market forces that it otherwise would not
have to endure in such a weakened condition."); *id.* 50 ("The destruction of Whittman-
Hart's business and entire worth were in fact the result of the merger."). The Trustee
himself admits that marchFIRST went bankrupt because of the effect market forces had
on an unstable merger. Even if the Trustee could somehow prove that KPMG's failure to
raise a red flag regarding the 1999 Earnings Report "caused" the merger, the Trustee
cannot show that KPMG caused the merger *to fail*. *See Ryan*, 59 F.3d at 54 (affirming
summary judgment on loss causation grounds in Illinois Consumer Fraud Act claim when
plaintiff failed to show that his business losses were caused by the defendant's
misrepresentations, "as opposed to a general downturn in the market . . . or simple cash
flow mismanagement"). Without a causal connection between KPMG's alleged
negligence and the Trustee's damages, there is not enough to warrant a reasonable jury in
finding that, had KPMG acted with due care, Whittman-Hart would not have gone
bankrupt.[4]

Second, the Trustee has failed to demonstrate that KPMG should have foreseen
that USWeb would be a poor merger partner for Whittman-Hart or that the technology

---

[4] The Trustee counters this point by arguing that his damages theory "very carefully attempts to segregate
out those losses that Whittman-Hart would have incurred had there been no malpractice (and hence no
merger)," thus excluding from the damages he seeks the effect market forces would have had on Whittman-
Hart had there been no merger. Pl.'s Opp. 51. This does not resolve the fundamental flaw with the theory,
however, which is that the Trustee is unable to prove that KPMG's actions caused the merger to fail.

11

market would undergo a major upheaval. There is no evidence that KPMG ever advised Whittman-Hart as to the wisdom or the risk of the merger with USWeb. Thus, even if KPMG knew that the 1999 Earnings Report painted a rosier picture of Whittman-Hart's growth than was merited, it should not have anticipated that its failure to raise a red flag would lead to Whittman-Hart's demise because USWeb would prove to be a poor merger choice for Whittman-Hart, the technology market would undergo "a major economic crisis" and USWeb would be particularly susceptible to this market fluctuation.[5] *AUSA Life Ins. Co. v. Ernst & Young*, 119 F.Supp.2d 394, 405 (S.D.N.Y. 2000) (proximate cause of plaintiffs' loss was corporation's catastrophic decision to acquire a near-bankrupt retailer and other post-audit developments that could not have been anticipated by accountants); *see generally Movitz*, 148 F.3d at 764 ("To hold the defendant liable for [a loss that was not the kind that the defendant's disclosure requirement was intended to prevent] would produce overdeterrence by making him an insurer against conditions outside his control.").

The events that caused Whittman-Hart's demise were all unforeseeable post-audit events, including, most notably, a major market crisis and a bad merger choice. To hold KPMG liable in this case would make it an insurer against conditions that are outside of its control. Because the Trustee is unable to prove proximate causation, the court does not reach KPMG's other arguments in support of its motion for summary judgment.

---

[5] In fact, if the Trustee's own argument is to be believed, KPMG had an interest in maintaining a long-term relationship with Whittman-Hart; it is incredible for the Trustee to argue that KPMG should have known its actions would destroy Whittman-Hart, rendering it bankrupt. *See* Pl.'s Opp. 25 ("In early 2000, Whittman-Hart was an important client for KPMG. . . . KPMG thus had strong incentives to continue a relationship, both as auditor and as business advisor, with an entity that would be more than two times the size of Whittman-Hart. . . . KPMG lobbied to continue its profitable relationship with the company *after* the merger.") (emphasis in original).

## III. CONCLUSION

For the foregoing reasons, KPMG's motion for summary judgment is granted.


ENTER:

                                    /s/
                                    _____
                                    JOAN B. GOTTSCHALL
                                    United States District Judge

DATED:  July 19, 2007

13

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

# EXHIBIT C

In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-2819

ANDREW J. MAXWELL,

*Plaintiff-Appellant,*

*v.*

KPMG LLP,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 3524—**Joan B. Gottschall**, *Judge.*

ARGUED FEBRUARY 27, 2008—DECIDED MARCH 21, 2008

Before EASTERBROOK, *Chief Judge*, and POSNER and WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff is the Chapter 7 bankruptcy trustee of a company named marchFIRST. He brought this suit against KPMG, the accounting firm claiming that marchFIRST had been harmed as a result of the accounting firm's breaching its duty of care in violation of Illinois tort law. He seeks more than $600 million in damages. The district judge withdrew the case from the bankruptcy court and ultimately granted summary judgment in the defendant's favor.

KPMG was the auditor of a firm called Whittman-Hart, which offered consulting services in information technology. In the fall of 1999 Whittman-Hart became interested in buying a firm larger than itself called US Web/CKS, which provided consulting services primarily to companies that used the Internet to sell goods or services. The purchase was consummated on March 1, 2000; the date became Whittman-Hart's new name. Whittman-Hart paid the owners of US Web more than $7 billion. It paid entirely in the form of stock, a risky currency; for beginning in the following month many Internet-related ("dot.com") businesses experienced deep, often terminal, reverses. By virtue of the acquisition of US Web, marchFIRST was such a business, and the following April, thirteen months after the acquisition, it declared bankruptcy.

The trustee argues that while the acquisition was being negotiated, KPMG approved a statement of Whittman-Hart's fourth-quarter 1999 earnings that it should have known was false. It should have known, the trustee argues, that Whittman-Hart had engaged in a form of what is called "round-tripping." A company makes a loan to a firm controlled by it, with the understanding that the borrower will purchase services from the lender in an amount equal to the amount of the loan, though the services may never be performed or if performed may have little value and thus cost the lender little or nothing. In effect the loan is reclassified from an account receivable by the lender to operating income to him minus only the zero or nominal cost of the services that he renders or pretends to render the borrower.

The trustee also complains that KPMG should not have approved Whittman-Hart's classifying prepaid consulting fees that it had received in the fourth quarter of 1999 as revenue in that quarter, rather than allocating

No. 07-2819                                                    3

them to 2000, when the fees were earned. Cf. *Indiana Lumbermens Mutual Ins. Co. v. Reinsurance Results, Inc.*, 513 F.3d 652, 653-55 (7th Cir. 2008).

As a result of these accounting maneuvers, Whittman-Hart's fourth-quarter 1999 earnings were significantly overstated. We'll assume, without having to decide, that KPMG was negligent in approving the maneuvers that generated the overstatement. Had the earnings been correctly stated, US Web would have learned that they had been considerably lower than Whittman-Hart's third-quarter earnings and its anticipated as opposed to realized fourth-quarter earnings. Therefore, the trustee argues, US Web would have lost interest in being acquired by Whittman-Hart and the acquisition would have fallen through. There is no "therefore." Whittman-Hart was eager to make the acquisition and so might have paid more for US Web to offset, as it were, the poor fourth-quarter results—in which event KPMG's alleged negligence would actually have saved Whittman-Hart's shareholders money had marchFIRST prospered. But we'll accept the trustee's argument, though just to move the analysis along, and also accept his further argument that had the acquisition fallen through, Whittman-Hart, though presumably not US Web, would have survived the travails of the dot.com sector. US Web was larger than Whittman-Hart and more of a dot.com business. It was, the argument goes, only because Whittman-Hart was chained to a drowning US Web by virtue of the acquisition that it too drowned.

An immediate problem, unremarked by the parties, is that the principal beneficiaries should the trustee prevail in this suit would be the former shareholders of US Web, even though there is no claim that US Web

would have survived had it not been acquired. The trustee is asking for damages far in excess—more than $500 million in excess—of the $93.6 million owed marchFIRST's unsecured creditors. The bulk of the recovery would thus go to the shareholders, and US Web's shareholders received 57 percent of the stock of marchFIRST. Yet the linchpin of the trustee's case is that US Web pulled marchFIRST down to its doom. US Web cannot be at once the cause of the bankruptcy and its principal beneficiary.

More important, to say that had it not been for KPMG's negligence the acquisition would have fallen through and Whittman-Hart would have survived, and therefore KPMG was a cause of the debacle, conflates a necessary condition—confusingly called by lawyers a "but-for cause"—with a real "cause," confusingly called by them a "proximate cause" and enigmatically defined as something "that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause." *Cleveland v. Rotman*, 297 F.3d 569, 573 (7th Cir. 2002) (Illinois law). Conventional as these usages are, they are unhelpful.

A necessary condition is a sine qua non, but it is rarely a "cause" in any meaningful sense of the word. No one would say that Whittman-Hart's demise was "caused" by the invention of the Internet, though had it not been invented and enticed US Web, Whittman-Hart would, if the trustee is correct, be fine. Cf. *Movitz v. First National Bank of Chicago*, 148 F.3d 760, 762 (7th Cir. 1998). Among the myriad of necessary conditions for anything to occur, the one designated "the cause" is the one that is significant from the standpoint of the person making the designation. There may of course be more than one such necessary condition, and there was here. There are also cases in

No. 07-2819                                                          5

which a condition that is not necessary, but is sufficient, is deemed the cause of an injury, as when two fires join and destroy the plaintiff's property and each one would have destroyed it by itself and so was not a necessary condition; yet each of the firemakers (if negligent) is liable to the plaintiff for having "caused" the injury. *Kingston v. Chicago & N.W. Ry.*, 211 N.W. 913 (Wis. 1927); cf. *Summers v. Tice*, 199 P.2d 1 (Cal. 1948). This is not such a case.

The necessary conditions for Whittman-Hart's demise that are relevant to this appeal were first its decision to buy US Web and second the precipitate decline of the dot.com business. The decision to buy US Web was not influenced by KPMG's approving Whittman-Hart's accounting decisions, and neither, of course, were the dot.com troubles. US Web's agreement to be bought may have been influenced by KPMG's advice to Whittman-Hart, but that is irrelevant because US Web was doomed by the coming collapse of its market and so was not harmed by the advice.

The same conclusions can be reached by a different route, by asking what duty, enforceable by tort law, was assumed by KPMG as Whittman-Hart's auditor. It was the duty to protect creditors of and investors in Whittman-Hart from being misled to their harm by financial statements issued by Whittman-Hart that contained errors that would be material to a creditor or an investor. E.g., 15 U.S.C. § 77k(a)(4); 225 ILCS 450/30.1; *FDIC v. Ernst & Young LLP*, 374 F.3d 579, 580-81 (7th Cir. 2004) (Illinois law). It was not a duty to give the company business advice, such as advice on whether to acquire another company. *Johnson Bank v. George Korbakes & Co.*, 472 F.3d 439, 443 (7th Cir. 2006) (Illinois law); *Fehribach v. Ernst & Young LLP*, 493 F.3d 905, 911-12 (7th Cir. 2007). The knowledge required to give such advice is possessed by the business itself and by business-consulting firms, as

distinct from auditors. The auditors' concern is with the
accuracy of the company's books rather than with the
demand for the company's products or services or the
attractiveness of its investment opportunities. It is true
that many accounting firms offer business consulting as
well as auditing services and that KPMG is one of them
and did some consulting for Whittman-Hart and hoped
to continue doing so for marchFIRST. But the suit com-
plains only about KPMG's auditing services, and there is
no contention that they were influenced by the firm's
consulting wing.

The failure to state Whittman-Hart's fourth-quarter
earnings accurately, insofar as it was due to KPMG,
may as we said have been a wrong to US Web (though a
wrong that did no harm if indeed that firm was doomed),
but it was not a wrong to Whittman-Hart, as the auditor
neither was asked to nor did advise Whittman-Hart to
buy US Web. By swallowing a larger company, and one
concentrated in the dot.com business, Whittman-Hart
assumed the risk of being injured, fatally as it turned out,
by a downturn in that business. It wants to make its auditor
the insurer against the folly (as it later turned out) of a
business decision (the decision to try to acquire US Web)
unrelated to what an auditor is hired to do.

Nothing in Illinois law permits such an attempt to
succeed. As we explained in the *Movitz* decision, also a case
governed by Illinois law, "The distinction between 'but for'
causation and actual legal responsibility for a plaintiff's
loss is particularly well developed in securities cases,
where it is known as the distinction between 'transaction
causation' and 'loss causation.' Suppose an issuer
of common stock misrepresents the qualifications or
background of its principals, and if it had been truthful
the plaintiff would not have bought any of the stock. The

price of the stock then plummets, not because the truth is discovered but because of a collapse of the market for the issuer's product wholly beyond the issuer's control. There is 'transaction causation,' because the plaintiff would not have bought the stock, and so would not have sustained the loss, had the defendant been truthful, but there is no 'loss causation,' because the kind of loss that occurred was not the kind that the disclosure requirement that the defendant violated was intended to prevent. To hold the defendant liable for the loss would produce overdeterrence by making him an insurer against conditions outside his control . . . . Also, it is bad policy to encourage people harmed in some natural or financial disaster to cast about for someone on whom to lay off the consequences who had, however, committed only a technical breach of duty. The legal system is busy enough without shouldering the burden of providing insurance against business risks. Had [the investor] diversified his investments, he would not have taken such a big hit when the Houston real estate market collapsed." 148 F.3d at 763 (citations omitted).

As if this were not bad enough, the evidence that the trustee presented to prove damages was outlandish. The plaintiff's expert, a financial analyst named Paul Marcus, testified that had it not been for the acquisition of US Web, Whittman-Hart would have had a "fair market value" (whatever exactly that means) of $535 million on the day that instead marchFIRST declared bankruptcy. He based this estimate on the market capitalizations that day, compared with what they had been at the time of the acquisition, of companies that he deemed comparable to marchFIRST. But he admitted that before the high-tech stock market bubble burst, movements in the stock prices of those companies were not correlated with each other or with movements in the price of Whittman-Hart's

stock. He suggested no basis for thinking that nevertheless they would have been affected the same way by the events that caused the bubble to burst.

In addition, he based his estimate of what Whittman-Hart's stock would have been worth in April 2001 on the average decline in the stock prices of his comparison group of companies without taking account of their capital structures. Yet an external shock will cause a company's stock price to fall farther the more debt the company has. If the value of a company's assets falls by 50 percent, and it has no debt, its stock price (setting aside any other influences on that price besides asset value) will fall by 50 percent. But if the company has 40 percent debt before the shock, its stock price will fall by 83 percent. For, originally worth $1 million, the company now is worth only $500,000 yet owes its creditors $400,000, leaving only $100,000 of value for the shareholders. The original equity value was $600,000 ($1 million minus the $400,000 in debt), and the decline in equity value was $500,000, which is 83 percent of $600,000.

The expert also failed to correct for the fact that although his valuation of what Whittman-Hart would have been worth in April 2001 assumed that US Web would not have been acquired, 57 percent of that value, if awarded as damages, would go to the former shareholders of US Web, contradicting the premise of his analysis that they would never have had an interest in Whittman-Hart. The trustee's lawyer confused matters at argument by stating incorrectly that he was representing only the unsecured creditors of Whittman-Hart. In fact he is representing the entire bankrupt estate of marchFIRST, and, as we know, seeking damages far in excess of the claims of the creditors.

The extreme weakness of the trustee's case, both on liability and on damages, invites consideration of the exercise of litigation judgment by a Chapter 7 trustee. The filing of lawsuits by a going concern is properly inhibited by concern for future relations with suppliers, customers, creditors, and other persons with whom the firm deals (including government) and by the cost of litigation. The trustee of a defunct enterprise does not have the same inhibitions. A related point is that while the management of a going concern has many other duties besides bringing lawsuits, the trustee of a defunct business has little to do besides filing claims that if resisted he may decide to sue to enforce. Judges must therefore be vigilant in policing the litigation judgment exercised by trustees in bankruptcy, and in an appropriate case must give consideration to imposing sanctions for the filing of a frivolous suit. The Bankruptcy Code forbids reimbursing trustees for expenses incurred in actions not "reasonably likely to benefit the debtor's estate," 11 U.S.C. § 330(a)(4)(A)(ii)(I), and authorizes an "appropriate sanction" against parties who file such a claim. Bankruptcy Rule 9011(b)(2), (c)(1)(B); *In re Bryson*, 131 F.3d 601, 603-04 (7th Cir. 1997); *In re Cohoes Industrial Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991). Not "reasonably likely to benefit the debtor's estate" may well be a correct description of this suit.

We are particularly disturbed by the damages claim. It is not only groundless, as we have seen; it is intimidating, because of its size. Nor is it a good plea that yes, the damages claim of $626 million is preposterous, but suppose that therefore the probability of its succeeding is only 1 in 1000; well, .001 × $626 million is $626,000, and that "expected value" of suing may exceed the cost of the suit to the bankrupt estate. There is something wrong

with this reasoning. For if .001 is too high an estimate, the trustee can up his damages claim to $6.26 billion—the probability of success will be even lower, but even if it is only 1 in 10,000 (and how exactly would one demonstrate that it is less?), the expected value of suing will still be $626,000. A frivolous appeal has *some* chance of success: lightning may strike, or the law may change while the appeal is pending; and a trustee who succeeds in obtaining a judgment will share in it. 11 U.S.C. §§ 326(a), 330.

But frivolous suits are forbidden. So frivolousness must depend not on the net expected value of a suit in relation to the cost of suing, but on the probability of the suit's succeeding. If that probability is very low, the suit is frivolous; really that is all that most courts, including ours, mean by the word. See, e.g., *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 952 (7th Cir. 2006); *Moreland v. Wharton*, 899 F.2d 1168, 1170 (11th Cir. 1990). By that standard, this suit may well be frivolous. We note, therefore, that the defendant can file a motion in the district court for an award of reasonable attorney's fees, *In re Roete*, 936 F.2d 963, 966-67 (7th Cir. 1991) (of course to be paid by the trustee personally, not by the bankrupt estate), and a corresponding motion in this court under Fed. R. App. P. 38. We do not, however, prejudge the outcome of either type of motion.

AFFIRMED.

```
08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE
```

# EXHIBIT D

J.S.C.A. — 7th Circuit
R E C E I V E D

APR 4    2008 COD

GINO J. AGNELLO
CLERK

U.S.C.A. — 7th Circuit
R E C E I V E D

APR 4    2008 COD

GINO J. AGNELLO
CLERK

No. 07-2819

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| ANDREW J. MAXWELL, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois |
| Plaintiff-Appellant, ) ) | |
| v. ) ) | Case No. 03 C 3524 |
| KPMG LLP, ) ) | Hon. Joan B. Gottschall |
| Defendant-Appellee. ) ) | |

## MOTION OF KPMG LLP FOR SANCTIONS
## ON APPEAL PURSUANT TO RULE 38

Defendant-Appellee KPMG LLP ("KPMG"), by and through its attorneys, hereby moves this Court, pursuant to Rule 38 of the Federal Rules of Appellate Procedure, for the entry of an order awarding sanctions in favor of KPMG and against Plaintiff-Appellant Andrew J. Maxwell, the Chapter 7 trustee for the bankruptcy estates of marchFIRST, and his attorneys on this appeal for legal fees and costs incurred by KPMG in connection with this appeal.

U.S.C.A. — 7th Circuit
F I L E D

APR – 4 2008  AD

GINO J. AGNELLO
CLERK

## FACTUAL BACKGROUND

marchFIRST, Inc. ("marchFIRST") was an information technology consulting company formed from the merger of Whittman-Hart, Inc. ("Whittman-Hart") and US Web/CKS Corporation ("US Web") on March 1, 2000. Soon after the merger, the high-tech stock market bubble burst and marchFIRST was one of the many technology companies caught in the "spectacular crash" that followed. On April 12, 2001, marchFIRST filed for bankruptcy protection.

The bankruptcy trustee blamed the fall of the company on the merger, and filed suit against KPMG, Whittman-Hart's independent auditor. He claimed that KPMG should have discovered during its audit of Whittman-Hart's 1999 financial statements that the company had engaged in an alleged scheme to overstate its earnings for the fourth quarter of 1999. The trustee contended that US Web, if informed by KPMG of Whittman-Hart's true earnings, would have backed out of the merger. Yet (according to the trustee) the merged company failed because of US Web, which was more exposed than Whittman-Hart to the dot.com business and suffered more when the high-tech stock market bubble burst. The trustee sought damages in the amount of $628.6 million.

On July 20, 2007, the United States District Court for the Northern District of Illinois, the Honorable Joan B. Gottschall, entered an order

2

granting summary judgment dismissing the case. On July 30, 2007, the trustee filed a notice of appeal to this Court.

On March 21, 2008, this Court affirmed the order granting summary judgment. The Court found a number of failures in the trustee's case. KPMG could not have caused the company's damages: "The decision to buy US Web was not influenced by KPMG's approving Whittman-Hart's accounting decisions, and neither, of course, were the dot.com troubles." Slip Op. at 5. In addition, as the company's auditor, KPMG had not assumed a duty to give "business advice" about the merger, much less become "the insurer against the folly (as it later turned out) of a business decision (the decision to try to acquire US Web) unrelated to what an auditor is hired to do." *Id.* at 5-6.

Further, "the evidence that the trustee presented to prove damages was outlandish." Slip Op. at 7. The trustee based his claim on the stock prices of "comparable" companies after the merger, but admitted that these movements did not correlate before the merger. *Id.* at 7-8. He did not consider market capitalization. *Id.* at 8. And the trustee did not consider that (if he actually succeeded in recovering $628.6 million) the vast majority of the recovery would go to the shareholders of US Web, the company that caused the collapse. *Id.* Finally, the Court observed that the damages claim "is not only groundless . . . it is intimidating, because of its size." *Id.* at 9.

3

In view of the "extreme weakness of the trustee's case," this Court recognized that a motion for reimbursement of reasonable attorneys' fees and costs pursuant to Fed. R. App. P. 38 would be appropriate. Slip Op. at 8-9.

## ARGUMENT

Federal Rule of Appellate Procedure 38 provides that "[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." Fed. R. App. P. 38. "The usual form of sanctions for filing a frivolous suit or appeal is an order to pay the litigation expenses of the winning party." *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1200 (7th Cir. 1987); *accord Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 938 (7th Cir. 1989) (*en banc*) ("Attorneys' fees are a form of 'damages' under Rule 38.").

## I.    The Trustee Had No Reasonable Expectation of Altering The District Court's Judgment And Ignored Controlling Authority.

"Sanctions are appropriate 'if the appeal was prosecuted with no reasonable expectation of altering the district court's judgment and for purposes of delay or harassment or sheer obstinacy.'" *Hartz v. Friedman*, 919 F.2d 469, 475 (7th Cir. 1990) (quoting *Reid v. United States*, 715 F.2d 1148, 1155 (7th Cir. 1983)). "The standard for the imposition of sanctions under Rule 38 is an objective one, however; it has nothing to do with the mental

4

state of the person sanctioned." *Hill*, 814 F.2d at 1202. In other words, "[t]he standard depends on the work product: neither the lawyer's state of mind nor the preparation behind the appeal matter." *Mars Steel*, 880 F.2d at 938.

The appeal at issue is particularly appropriate for sanctions, including double costs.

This Court has repeatedly observed that "[t]he ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist is as unprofessional as it is pointless." *Hill*, 814 F.2d at 1198; *Mars Steel Corp.*, 880 F.2d at 939 (granting sanctions under Rule 38 where the appellant ignored contrary authority); *Hartz*, 919 F.2d at 475 (granting Rule 38 sanctions due, in part, to plaintiffs' failure to make any attempt to distinguish the decisions relied upon by the district court).

Here, the district court granted summary judgment on the first of several flaws cited in this Court's opinion – holding that even if the trustee's various arguments were "assume[d]" and "accept[ed]," slip op. at 3, KPMG did not cause Whittman-Hart's losses.    This was perhaps the most straightforward ground for dismissing the case, since the claim failed even if one accepted the trustee's theory as a whole. Moreover, the district court could (and did) point to a long line of "loss causation" opinions from this Court dismissing similar claims.[1]

---

[1] The district court explicitly pointed to the decisions in *Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 762 (7th Cir. 1998); *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007); *Ryan v. Wersi Elec. GmbH & Co.*, 59 F.3d 52, 54 (7th Cir. 1995) (*per curiam*); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683

Yet the Trustee did not discuss, distinguish or even cite a single one of these decisions, either in his opening appellate brief or on reply.[2] It is hard to imagine a better example of "ostrich-like" behavior. *Hill*, 814 F.2d at 1198.

Moreover, Rule 38 sanctions are proper in order "to protect this court's ability to serve litigants with meritorious cases and in order to make lawyers give thoughtful consideration to whether there are grounds for an appeal before filing an appeal." *Id.* at 1202. This Court further stated in *Hill* that "[t]he filing of an appeal should never be a conditioned reflex. 'About half the practice of a decent lawyer consists in telling would-be clients that they are damned fools and should stop.'" *Id.* (quoting 1 Jessup, *Elihu Root* 133 (1938)).

As this Court noted -- and not for the first time -- a plaintiff cannot make a defendant the "insurer" against poor business decisions. "Nothing in Illinois law permits such an attempt to succeed." Slip Op. at 6 (citing *Movitz*, 148 F.3d at 763). "Stop" should have been the direction given by the trustee in this matter long before the district court issued its decision. With that

---

(7th Cir. 1990); *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007); and *Cleveland v. Rotman*, 297 F.3d 569, 573 (7th Cir. 2002). The district court also cited the Illinois Supreme Court's decision in *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734 (Ill. 1994), and the United States Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 554 U.S. 336, 345-46 (2005). A.11-13.

[2] On reply, the trustee only addressed the Illinois Supreme Court decision in *Martin*. The trustee argued that the decision has no bearing on professional malpractice or negligence cases (Appellant's Reply Br. at 4-5). The trustee's argument wholly ignored the Illinois Supreme Court's statement in *Martin* that loss causation is "a fundamental principle applicable alike to breaches of contract and to torts." 643 N.E.2d at 746.

decision in hand, setting out in clear terms (and with plenty of controlling authority) just one of the many failures in this case, the decision nevertheless to pursue an appeal was frivolous.

Double costs and attorneys' fees constitute an appropriate sanction for a frivolous appeal. *E.g., Dal Pozzo v. Basic Machinery Co.*, 463 F.3d 609, 615 (7th Cir. 2006) (awarding double costs and attorneys' fees to appellee where appeal was deemed frivolous); *Indiana v. Haws*, 131 F.3d 1205, 1210 (7th Cir. 1998) (awarding appellee attorneys' fees and double costs where "appeals had no reasonable basis in law, [and] nor did they make reasonable arguments for the modification of existing law"); *Ashkin v. Time Warner Cable Corp.*, 52 F.3d 140, 146-47 (7th Cir. 1995) (issuing sanctions and ordering client and attorney each to pay half of the appellee's attorneys' fees and costs).

Good reason exists for awarding double costs and attorneys' fees in this matter. Not only did the claim fail on a number of grounds, all of which were or should have been evident, but the trustee prosecuted those failed claims together with an "outlandish," "groundless" and "intimidating" claim for $628.6 million in damages. Slip Op. at 7, 9.

As this Court observed, "[t]he trustee of a defunct enterprise" has few of the "inhibitions" that can prevent other litigants from prosecuting frivolous claims:

> while the management of a going concern has many other duties
> besides bringing lawsuits, the trustee of a defunct business has
> little to do besides filing claims that if resisted he may decide to
> sue to enforce. Judges must therefore be vigilant in policing the

7

> litigation judgment exercised by trustees in bankruptcy, and in
> an appropriate case must give consideration to imposing
> sanctions for the filing of a frivolous suit.

Slip Op. at 9. To say that the pursuit of this appeal lacked "inhibitions" is an understatement. The trustee wholly ignored the applicable law, spent a sizable amount of the estate's limited resources prosecuting an action with no chance of success on the merits, against a party who (according to his own claims) could not have caused the estate's injuries, in the apparent hope of "intimidating" a settlement. Such a record presents a classic case for sanctions.

## II.     Sanctions In The Amount Of KPMG's Attorneys' Fees And Costs On Appeal Are Warranted.

In connection with this appeal, KPMG incurred legal fees and costs in the amount of $233,227.00 and $1,001.99, respectively.[3] Attached hereto as Exhibit 1 is the Affidavit of James R. Figliulo and supporting documentation concerning the fees and costs incurred by KPMG on this appeal.

"An award of attorneys' fees under Fed. R. App. P. 38 should be fully compensatory." *In re Central Ice Cream Co.*, 841 F.2d 732, 735 (7th Cir. 1988). The fees sought in this motion are reasonable. Faced with a staggering damage claim of $628.6 million, KPMG was forced to vigorously defend both the underlying lawsuit and the appeal of the decision granting

---

[3] The $1,001.99 in costs reflect Westlaw charges, which should be recoverable as attorneys' fees. *Haroco, Inc. v. American Nat'l Bank and Trust Co.*, 38 F.3d 1429, 1440 (7th Cir. 1994) ("computer research costs 'are more akin to awards under attorneys' fees provisions than under costs'").

8

summary judgment.    Even a slight chance of prevailing can justify significant legal fees in defense. *Mortell v. Mortell Co.*, 887 F.2d 1322, 1328 (7th Cir. 1989). As this Court has recognized, "the time properly devoted to a case rises with the stakes." *Central Ice Cream*, 841 F.2d at 733. Here, there can be no doubt the stakes were high.

Indeed, the trustee is ill-positioned to object to the amount of the fees, which appear to be somewhat less than he spent (out of the estate's funds) pursuing this appeal during the same period. The latest fee application filed by the trustee's attorneys with the bankruptcy court seeks payment for attorneys' fees and costs of $202,968.00 and $5,518.52, respectively, which were incurred during much (but not all) of the appeal period. *See* Exhibit 2 attached hereto. By comparison, KPMG's fees and costs for the appeal during the same period through December 31, 2007, were substantially lower, totaling $158,898.75 and $810.89, respectively. *See* Exhibit 1 summary table.[4]

It can be no objection to this motion that KPMG did not face any great problem demonstrating that the trustee's claim was meritless: that the case law on which the district court relied was clear and uniform, and that the irrationality of the damages claim was patent. Even setting aside the gross amount of the damage claim, the primary problem that KPMG faced

---

[4] Indeed, according to the most recent fee application of the attorneys representing the trustee in this case, as of the end of 2007, the estate has paid at least $3,019,393.50 in attorneys' fees and $1,488,448.79 in expenses, a total of $4,507,842.29, pursuing this claim. *See* Exhibit 2.

9

throughout this action was determining just what the trustee's claim was. KPMG had every reason to expect it would continue to face this problem during the appeal, and it did. As the Court noted in its opinion, counsel for the trustee misstated who he was representing. Slip Op. at 8. Even before the argument, the appeal briefs sought to introduce a new theory of the case, a theory that had never been presented to the district court, that failed to include more than nominal citations to the record, and in fact had never been pursued in discovery. The apparent willingness of the trustee and his counsel to "say anything" not only supports an award of sanctions, it underscores the reasonableness of the approach that KPMG took on this appeal.

Finally, KPMG notes this Court's statement that any award of fees and costs are "of course to be paid by the trustee personally, not by the bankruptcy estate". Slip Op. at 10. A court may impose sanctions on the client or his counsel. *Greening v. Moran*, 953 F.2d 301, 307 (7th Cir. 1992); *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1201-02 (7th Cir. 1987). That decision is committed to the sound discretion of the Court. *Burlington R.R. Co. v. Woods*, 480 U.S. 1, 4 (1987); *Wisconsin v. Ho-Chunk Nation*, 463 F.3d 655, 662 (7th Cir. 2006). KPMG does not take any position on who should bear the cost of sanctions in this matter, except to note that the estate has already been burdened with several million dollars in fees and costs in this matter. *See* Exhibit 2. KPMG agrees (for what it is worth) that the estate

10

should not be forced to incur still more costs as a result of this frivolous lawsuit.

## CONCLUSION

For the foregoing reasons, KPMG prays for the entry of an order awarding sanctions in favor of KPMG and against the Plaintiff-Appellant Andrew J. Maxwell, the Chapter 7 Trustee for the bankruptcy estates of marchFIRST, and his attorneys on this appeal, for legal fees and costs in the amount of $233,227.00 and $1,001.99, respectively, incurred by KPMG in connection with this frivolous appeal, and for such other relief as this Court deems just and proper.

Respectfully submitted,

KPMG LLP

By: _____

One of Its Attorneys

James R. Figliulo
Michael K. Desmond
James H. Bowhay
FIGLIULO & SILVERMAN, P.C.
10 South LaSalle Street
Suite 3600
Chicago, Illinois 60603
(312) 251-4600

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on April 4, 2008, he caused two copies of the foregoing MOTION OF KPMG LLP FOR SANCTIONS ON APPEAL PURSUANT TO RULE 38 to be served by messenger before 5:00 p.m. on the following:

> Steven J. Roeder
> Thomas C. Koessl
> Alyssa M. Campbell
> Williams Montgomery & John Ltd.
> 20 North Wacker Drive, Suite 2100
> Chicago, Illinois 60606-3094

James R. Figliulo

Dated: April 4, 2008

12

No. 07-2819

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

| | |
|---|---|
| ANDREW J. MAXWELL, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., | Appeal from the United States District Court for the Northern District of Illinois |
| Plaintiff-Appellant, | |
| v. | Case No. 03 C 3524 |
| KPMG LLP, | Hon. Joan B. Gottschall |
| Defendant-Appellee. | |

---

### AFFIDAVIT OF JAMES R. FIGLIULO

James R. Figliulo, having first been duly sworn on oath, deposes and states as follows:

1)   I am an attorney licensed to practice law within the State of Illinois, and have been engaged in the practice of law in Illinois for over 28 years. I am admitted to practice before the United States Court of Appeals for the Seventh Circuit and the United States District Court for the Northern District of Illinois.

2)   I am a member of the law firm of Figliulo & Silverman, P.C. ("Figliulo & Silverman"), and currently serve as one if its managing shareholders.

3)    KPMG LLP ("KPMG"), retained Figliulo & Silverman to represent it in connection with its defense of the complaint filed by the Plaintiff-Appellant Andrew J. Maxwell, the Chapter 7 Trustee for the bankruptcy estates of marchFIRST (the "Trustee").

4)    I am the attorney with primary responsibility over the representation of KPMG in this matter, and I am responsible for client billing.

5)    The other attorneys from Figliulo & Silverman who assisted in the representation of KPMG on the appeal of this matter were James H. Bowhay, Michael K. Desmond, Catherine M. Towne and Michael T. Graham.

6)    The hourly billing rates charged to KPMG for legal services related to this appeal are as follows:

| James R. Figliulo | Shareholder | $450.00 |
| James H. Bowhay | Shareholder | $340.00 |
| Michael K. Desmond | Shareholder | $340.00 |
| Catherine M. Towne | Associate | $205.00 |
| Michael T. Graham | Associate | $205.00 |

7)    The rates charged by the attorneys at Figliulo & Silverman for the services performed in connection with this appeal are reasonable and well within the range of customary rates for attorneys of similar years of experience and ability in this area. I have knowledge of the rates charged by other lawyers and law firms for similar work in this area.

8)    In connection with this appeal, the attorneys at Figliulo & Silverman expended a total of 741.9 hours for total of $233,227.00 in

2

attorneys' fees through February 29, 2008. A summary of the attorney time is set forth below:

| Attorney | Hours | Fees |
|---|---|---|
| James R. Figliulo | 134.9 | $60,705.00 |
| James H. Bowhay | 157.7 | 53,618.00 |
| Michael K. Desmond | 198.5 | 67,490.00 |
| Catherine M. Towne | 232.1 | 47,580.50 |
| Michael T. Graham | 18.7 | 3,833.50 |
| Total | 741.9 | $233,227.00 |

9)    Attached hereto is a summary of the monthly billings along with a detailed statement of all attorney time entries related to services rendered to KPMG in connection with this appeal. This information was obtained from the time and billing system maintained by Figliulo & Silverman in the ordinary course of business.

10)    In addition to the above, as of February 29, 2008, KPMG was billed a total of $1,001.99 for Westlaw computerized research charges incurred in connection with the appeal. *See* attached.

11)    I have personal knowledge of the legal services rendered in connection with this appeal and in my opinion those services, the fees charged for those services and the costs incurred were reasonable and necessary.

12)    The fees and costs for which KPMG seeks reimbursement pursuant to this motion have been paid in full by KPMG.

3

13)    I have personal knowledge of the matters set forth herein.   If called to personally testify, I would testify to the matters set forth in this affidavit.

Dated: April 4, 2008

_James R. Fighulo_

SUBSCRIBED AND SWORN to before
me this 4th day of April, 2008

_Notary Public_

"OFFICIAL SEAL"
DORIS BAY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/6/2008

4

Figliulo & Silverman
P.C.
Summary of Fees and
Expenses by Month

Maxwell v. KPMG LLP
07-2819

| 2007 | Fees | Costs | Total |
|------|------|-------|-------|
| August | $15,284.00 | $150.16 | $15,434.16 |
| September | 9,843.00 | 64.88 | 9,907.88 |
| October | 77,789.50 | 483.27 | 78,272.77 |
| November | 54,232.25 | 112.58 | 54,344.83 |
| December | 1,750.00 | 0.00 | 1,750.00 |
| Sub-Total | 158,898.75 | 810.89 | 159,709.64 |
| | | | |
| 2008 | | | |
| January | 903.75 | 0.00 | 903.75 |
| February | 73,424.50 | 191.10 | 73,615.60 |
| Grand Total | $233,227.00 | $1,001.99 | $234,228.99 |

Figliulo & Silverman, P.C.
Ten South LaSalle Street
Suite 3600
Chicago, IL 60603

KPMG LLP
c/o Steven B. Carlin
Office of the General Counsel
FDR Station, Box 5340
New York, NY 10150-5340

April 04, 2008

In Reference To:    marchFIRST, Inc.


Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 8/1/2007 | JRF | Review Notice of Appeal; Review sanction issue re appeals. | 0.30 450.00/hr | 135.00 |
| 8/17/2007 | MKD | Review Notice of Appeal; Research Circuit Rules re: Briefing schedule; Conference with JRF re: Same; Research re: Bill of Costs; Review schedule of costs. | 2.00 340.00/hr | 680.00 |
| 8/9/2007 | MKD | Conference with S. Carlin and JRF re: Appeal; Research Circuit Rules re: Settlement conference. | 0.75 340.00/hr | 255.00 |
| 8/14/2007 | MKD | Review docketing statement filed by Maxwell. | 0.25 340.00/hr | 85.00 |
| 8/15/2007 | JRF | Conference with MKD re mediation and related issues; Telephone conference with Roeder and MKD re confidential matters in record on appeal and our position re same. | 1.00 450.00/hr | 450.00 |
|  | MKD | Review notice of settlement conference from Seventh Circuit; Conference with JRF; Send same to S. Carlin. | 0.50 340.00/hr | 170.00 |
| 8/16/2007 | MTG | Research into frivolous appeal issues. | 2.10 205.00/hr | 430.50 |
| 8/17/2007 | MTG | Research into FRAP 38 issues; draft of memo on rule 38 issues. | 5.30 205.00/hr | 1,086.50 |
|  | MKD | Review appendices filed by Maxwell re: Summary Judgment; Research Seventh Circuit cases re: Confidential designation of Record; Correspondence with S. Carlin re: Same. | 2.50 340.00/hr | 850.00 |

| | | | | |
|---|---|---|---|---|
| | MKD | Research re: Rule 38 and 28 U.S.C. 1912; Objections to fee applications. | 1.00 340.00/hr | 340.00 |
| 8/21/2007 | MKD | Review record on Appeal. | 1.00 340.00/hr | 340.00 |
| 8/23/2007 | JRF | Review summary judgment briefs and Daubert motions re preparation for mediation; Conference with MKD re same. | 2.00 450.00/hr | 900.00 |
| 8/24/2007 | JRF | Review motion for summary judgment briefs re preparation for mediation; Review preference issues; Conference with MKD re same. | 3.50 450.00/hr | 1,575.00 |
| | MKD | Review correspondence file re: Settlement communications; Review damage interrogatories; Prepare for Seventh Circuit Mediation Conference. | 1.00 340.00/hr | 340.00 |
| 8/27/2007 | JRF | Prepare for and participate in Court ordered mediation at 7th Circuit; Meet with Steve Carlin and MKD re same. | 8.50 450.00/hr | 3,825.00 |
| | MKD | Meeting with S. Carlin; Prepare for and attend Seventh Circuit Mediation Conference. | 7.00 340.00/hr | 2,380.00 |
| 8/28/2007 | MKD | Review Summary Judgment Briefs and Issues on appeal; Research Rules re: Appendix to Briefs. | 1.00 340.00/hr | 340.00 |
| 8/29/2007 | MKD | Conference with T. Low re: Appendices; Research Federal Rules of Appellate procedure re: Designation re: Same. | 1.00 340.00/hr | 340.00 |
| 8/30/2007 | MKD | Draft designation of relevant docket entries for appendix; Conference with T. Low re: Same. | 1.00 340.00/hr | 340.00 |
| 8/31/2007 | JRF | Conference with MKD re record on appeal. | 0.30 450.00/hr | 135.00 |
| | MTG | Research into loss causation case law. | 1.40 205.00/hr | 287.00 |
| 9/4/2007 | MTG | Research and update loss causation cases. | 4.70 205.00/hr | 963.50 |
| 9/5/2007 | MTG | Research and updated loss causation cases. | 5.20 205.00/hr | 1,066.00 |
| | MKD | Review objection to Bill of Costs; Conference with S. Carlin re: Same. | 0.50 340.00/hr | 170.00 |
| 9/6/2007 | MKD | Research re: recent Illinois cases re: loss causation. | 1.00 340.00/hr | 340.00 |
| 9/17/2007 | MKD | Conference with JRF and S. Carlin re: Briefing schedule on appeal; Review recent cases re: Accounting malpractice; Conference calls with J. Shapiro, S. Roeder and JRF re: Briefing schedule. | 1.50 340.00/hr | 510.00 |
| | JRF | Telephone conferences with MKD and Steve Carlin re mediation issues with 7th Circuit settlement counsel; telephone conference with Joel Shapiro re status and related matters; conference with MKD re same. | 1.50 450.00/hr | 675.00 |
| 9/19/2007 | MKD | Conference calls with J. Shapiro, S. Roeder and JRF re: revised briefing schedule and settlement negotiations; Phone conferences with S. Carlin re: Same. | 1.50 340.00/hr | 510.00 |

| | | | | |
|---|---|---|---|---|
| | JRF | Telephone conferences with Roeder, Joel Shapiro, Steve Carlin and MKD re various issues concerning 7th Circuit mediation and briefing schedule; telephone conferences with Steve Carlin and MKD re same. | 1.50 450.00/hr | 675.00 |
| 9/20/2007 | MKD | Conferences with J. Shapiro and JRF re: Settlement discussions. | 1.00 340.00/hr | 340.00 |
| | JRF | Telephone conferences among Joel Shapiro, Roeder and MKD re briefing schedule and various issues re settlement negotiations; telephone conference with Steve Carlin re same. | 1.50 450.00/hr | 675.00 |
| 9/27/2007 | MKD | Conference with JRF re:  Drafting schedule for Appeal Brief. | 0.50 340.00/hr | 170.00 |
| 9/28/2007 | JRF | Conference with JHB, MKD, and CT re legal research and drafting of appellate brief and scheduling assignments and discussion of issues; telephone conferences with Steve Carlin re same. | 1.50 450.00/hr | 675.00 |
| | JHB | Office conference with JRF, MKD and CMT re appellate issues and scheduling. | 1.00 340.00/hr | 340.00 |
| 9/28/2007 | CMT | Meeting with JRF, MKD and JHB re research and drafting schedule for appellate brief. Analyzed Comm Colleges decisions and briefs. | 3.70 205.00/hr | 758.50 |
| | MKD | Meeting with JRF and JHB re: Drafting schedule; Draft and revise same; Conference call with S. Carlin; Review summary judgment briefs; Review recent 7th Circuit decisions. | 2.50 340.00/hr | 850.00 |
| | JRF | Meeting to review proposed briefing schedule for our internal purposes and assignments of responsibility and status and strategy; Telephone conference with Steve Carlin re same. | 2.50 450.00/hr | 1,125.00 |
| 10/2/2007 | MKD | Draft and revise Statement of Facts for Appeal brief; Review District Court opinion re: Same. | 1.00 340.00/hr | 340.00 |
| 10/3/2007 | MKD | Draft and revise Statement of Facts for Appeal brief. | 1.00 340.00/hr | 340.00 |
| 10/4/2007 | JRF | Review case law re loss causation; Review draft statement of facts and issues presented. | 2.50 450.00/hr | 1,125.00 |
| | MKD | Draft Jurisdictional statement; Issues on appeal; Standard of review and Proposed statement of facts; Review appendices to Summary Judgment motion. | 6.50 340.00/hr | 2,210.00 |
| 10/5/2007 | JRF | Conference with MKD re issues presented and strategy for brief. | 0.80 450.00/hr | 360.00 |
| | JHB | Review and revise portions of initial sections of brief. | 0.80 340.00/hr | 272.00 |
| | MKD | Draft and revise Statement of facts and issues on appeal; Conference with JHB and JRF re: Same. | 3.00 340.00/hr | 1,020.00 |
| 10/8/2007 | MKD | Review revisions to Statement of facts from S. Carlin. | 0.50 340.00/hr | 170.00 |
| 10/9/2007 | JRF | Review Steve Carlin's revised draft statement of facts and conference with MKD and JHB re same. | 1.50 450.00/hr | 675.00 |

| 10/10/2007 | JRF | Conference with MKD re preparation for briefing. | 0.30 450.00/hr | 135.00 |
|---|---|---|---|---|
| 10/13/2007 | MKD | Research Court docket re: Appeal Brief; Conferences with S. Roeder and J. Figliulo re: Same. | 1.00 340.00/hr | 340.00 |
| 10/15/2007 | JHB | Review appellant's brief; telephone conference with JRF, MKD, CMT and Mr. Carlin re same; outline and analysis in preparation of response brief. | 4.50 340.00/hr | 1,530.00 |
| | JRF | Review and analysis of opening brief; Conference with MKD, JHB, and CT re same; Telephone conference with Steve Carlin re brief, issues and assignments. | 6.00 450.00/hr | 2,700.00 |
| 10/15/2007 | MKD | Review appeal brief and appendix filed by Trustee; Research and review cases cited by Trustee; Meeting with JRF and JHB re: Same; Conference call with S. Carlin. | 5.00 340.00/hr | 1,700.00 |
| | CMT | Meeting with JRF, JHB, and MKD research and drafting of appellate brief. Research on seventh circuit guidelines concerning drafting, formatting and filing of brief. Drafted email memo on same. | 5.20 205.00/hr | 1,066.00 |
| 10/16/2007 | JHB | Research and analysis re loss causation issues for response brief. | 3.00 340.00/hr | 1,020.00 |
| | JRF | Conference with MKD and JHB re various issues re brief. | 0.80 450.00/hr | 360.00 |
| | MKD | Review summary judgment briefs and appendices; Draft annotated response to Statement of facts presented by Trustee in appeal brief. | 4.50 340.00/hr | 1,530.00 |
| | CMT | Legal research on waiver and loss causation issues. | 3.20 205.00/hr | 656.00 |
| 10/17/2007 | JRF | Review and analysis of brief, identify issues, Review cases and conference with MKD re same. | 4.50 450.00/hr | 2,025.00 |
| | JHB | Preparation of draft loss causation argument | 7.10 340.00/hr | 2,414.00 |
| 10/17/2007 | MKD | Review depositions of Moskowitz and K. Gabouer; Review Trustee's response to statement of facts. | 4.00 340.00/hr | 1,360.00 |
| 10/18/2007 | JHB | Preparation of draft loss causation argument. | 4.50 340.00/hr | 1,530.00 |
| | MKD | Draft annotated response to Trustee's statement of facts; Review exhibits and deposition transcripts re: same. | 4.50 340.00/hr | 1,530.00 |
| 10/19/2007 | JRF | Review cases; Review misrepresentations and omissions in brief; Conference with MKD and JHB re status and strategy for brief. | 2.50 450.00/hr | 1,125.00 |
| | JHB | Preparation of loss causation argument. | 1.50 340.00/hr | 510.00 |
| | MKD | Draft and revise annotated response to statement of facts; Review record on appeal. | 3.00 340.00/hr | 1,020.00 |
| | CMT | Legal research on waiver/new theory on appeal and loss causation issues. | 3.40 205.00/hr | 697.00 |
| 10/21/2007 | JHB | Preparation of loss causation argument. | 2.50 340.00/hr | 850.00 |

| Date | Initials | Description | Hours/Rate | Amount |
|---|---|---|---|---|
| 10/21/2007 | CMT | Legal research on waiver issue.  Drafted memo on same. | 3.20 205.00/hr | 656.00 |
| 10/22/2007 | JHB | Preparation of appellate brief. | 8.20 340.00/hr | 2,788.00 |
| | JRF | Review draft sections of brief. | 1.00 450.00/hr | 450.00 |
| | MKD | Draft annotated response to trustee's statement of facts; Draft argument on loss causation; Review Marcus depositions; Conference with JHB and CMT re: Loss causation research. | 5.00 340.00/hr | 1,700.00 |
| | CMT | Legal research on issues of loss causation and waiver. Draft memo on waiver/"new theory on appeal" issues. | 8.10 205.00/hr | 1,660.50 |
| 10/23/2007 | JHB | Preparation of appellate brief. | 7.50 340.00/hr | 2,550.00 |
| | MKD | Draft and revise arguments on loss causation; Draft outline of foreseeability argument; Research and review cases cited by Trustee re: same. | 5.50 340.00/hr | 1,870.00 |
| | CMT | Legal research on loss causation issues. Reviewed memo re loss causation. | 9.80 205.00/hr | 2,009.00 |
| 10/24/2007 | JHB | Preparation of appellate brief. | 6.50 340.00/hr | 2,210.00 |
| | MKD | Draft and revise arguments re: Forseeability; Draft and revise statement of facts for response brief. | 4.50 340.00/hr | 1,530.00 |
| | CMT | Legal research on loss causation issues and drafted memo on same. | 9.70 205.00/hr | 1,988.50 |
| 10/25/2007 | JHB | Preparation of appellate brief. | 5.00 340.00/hr | 1,700.00 |
| | MKD | Draft and revise statement of facts; Revise arguments on loss causation. | 3.00 340.00/hr | 1,020.00 |
| | CMT | Legal research on loss causation issues. Drafted memo re same. | 13.50 205.00/hr | 2,767.50 |
| 10/26/2007 | JHB | Preparation of appellate brief. | 2.40 340.00/hr | 816.00 |
| | MKD | Draft and revise arguments re: burden shifting and forseeability arguments; Research and review cases re: same; Revise statement of facts; Review Trustee's response to KPMG Statement of facts. | 6.00 340.00/hr | 2,040.00 |
| 10/26/2007 | CMT | Drafted memorandum to JHB, MKD and JRF re loss causation research. | 7.00 205.00/hr | 1,435.00 |
| 10/27/2007 | MKD | Review revised draft of brief; Correspondence with S. Carlin re: Statement of facts and exhibits relied upon by Trustee. | 1.00 340.00/hr | 340.00 |
| | JRF | Review draft brief and Telephone conference with MKD re status. | 1.00 450.00/hr | 450.00 |
| 10/28/2007 | JHB | Preparation of appellate brief. | 2.30 340.00/hr | 782.00 |
| | MKD | Draft and revise response brief; Conferences with S. Carlin and JRF re: Same; Research re: Illinois Supreme Court decision in Community College. | 4.00 340.00/hr | 1,360.00 |

| 10/29/2007 | MKD | Draft and revise response brief; Conferences with S. Carlin; Research re: Waiver of arguments on appeal. | 5.00 340.00/hr | 1,700.00 |
|---|---|---|---|---|
| | JRF | Review and revise draft brief; Conferences with JHB and CT re same. | 2.50 450.00/hr | 1,125.00 |
| 10/29/2007 | CMT | Reviewed draft of appellate brief and conducted legal research on issue of assertion of new theories on appeal. | 3.40 205.00/hr | 697.00 |
| 10/30/2007 | JHB | Preparation of appellate brief. | 6.20 340.00/hr | 2,108.00 |
| | MKD | Draft and revise response brief; Review of record on Appeal | 8.00 340.00/hr | 2,720.00 |
| | JRF | Review and revise current draft of brief. | 1.50 450.00/hr | 675.00 |
| | CMT | Legal research for 7th Circuit case law supporting the proposition that the court of appeals can affirm the judgment on the district court on any basis presented to the district court. Meeting with JRF, JHB and MKD. | 2.80 205.00/hr | 574.00 |
| 10/31/2007 | JHB | Preparation of appellate brief. | 6.60 340.00/hr | 2,244.00 |
| | MKD | Draft damages argument; Review and revise response brief Conference with S. Carlin and JRF re: same | 5.00 340.00/hr | 1,700.00 |
| | CMT | Reviewed draft of appellate brief. | 0.80 205.00/hr | 164.00 |
| 10/31/2007 | JRF | Work on draft brief; Prepare for conference call with S. Carlin. | 3.00 450.00/hr | 1,350.00 |
| 11/1/2007 | JHB | Preparation of appellate brief; telephone conference with S. Carlin and JRF, MKD and CMT re same. | 5.50 340.00/hr | 1,870.00 |
| | MKD | Draft and revise appellate brief; Conference call with S. Carlin re: status of brief and proposed revisions. | 4.00 340.00/hr | 1,360.00 |
| | JRF | Work on appellate brief; Conference with MKD, JHB, and CT re revisions to brief and issues; Telephone conference with Steve Carlin, MKD, JHB, and CT re same and strategy for next draft. | 4.50 450.00/hr | 2,025.00 |
| | CMT | Reviewed draft of appellate brief. Conferred with MKD, JHB, and JRF. Phone call with JRF, MKD, JHB, and S. Carlin. | 1.20 205.00/hr | 246.00 |
| 11/2/2007 | JRF | Review revised draft of brief; draft new argument on loss causation; Conference with MKD re same. | 1.20 450.00/hr | 540.00 |
| | MKD | Draft and revise loss causation argument; Research re: Same; Review record and citation scheme. | 6.00 340.00/hr | 2,040.00 |
| 11/4/2007 | JHB | Preparation of appellate brief. | 3.80 340.00/hr | 1,292.00 |
| 11/4/2007 | JRF | Review current draft of brief and revise same. | 1.50 450.00/hr | 675.00 |
| 11/5/2007 | JHB | Preparation of appellate brief. | 7.50 340.00/hr | 2,550.00 |

| 11/5/2007 | CMT | Reviewed draft of appellate brief; review jurisdictional statement and applicable rules of appellate procedure; confer with MKD and research issue of whether bankruptcy adversarial rules govern appeals to the Seventh Circuit. | 2.10 205.00/hr | 430.50 |
|---|---|---|---|---|
| | JRF | Conferences with MKD and JHB re proposed additions and changes to appellate brief and review same. | 1.00 450.00/hr | 450.00 |
| | MKD | Draft and revise appellate brief. | 6.50 340.00/h | 2,210.00 |
| 11/6/2007 | JRF | Review current draft of brief and conferences among Steve Carlin, MKD and JHB re same. | 2.00 450.00/hr | 900.00 |
| | MKD | Draft summary of argument; Draft and revise appellate brief; Review revisions from S. Carlin. | 3.50 340.00/hr | 1,190.00 |
| | CMT | Legal research. | 0.80 205.00/hr | 164.00 |
| 11/7/2007 | JHB | Preparation of appellate brief; telephone conference with S. Carlin and JRF and MKD re same. | 3.50 340.00/hr | 1,190.00 |
| | MKD | Draft and revise appellate brief; Draft summary of argument; Conference call with S. Carlin. | 5.00 340.00/hr | 1,700.00 |
| 11/8/2007 | JRF | Review and revise appellate brief; Review emails and prepare for and conference with Steve Carlin, MKD, and JHB. | 3.50 450.00/hr | 1,575.00 |
| | MKD | Draft and revise appellate brief; Review revisions from S. Carlin. | 2.00 340.00/hr | 680.00 |
| 11/9/2007 | CMT | Review oral argument in Seventh Circuit of the Ray v. Citigroup case; Review with JRF re same. | 0.80 205.00/hr | 164.00 |
| | MKD | Draft and revise appellate brief; Research re: same. | 2.00 340.00/hr | 680.00 |
| 11/10/2007 | JRF | Review and revise current draft of appellate brief. | 2.00 450.00/hr | 900.00 |
| 11/12/2007 | JHB | Preparation of appellate brief. | 3.50 340.00/hr | 1,190.00 |
| 11/12/2007 | MKD | Draft and revise appellate brief; Review record and insert record cites. | 5.00 340.00/hr | 1,700.00 |
| 11/13/2007 | JRF | Review redlined current version of brief; Conference with MKD re same and issues relating to Community College and other cases cited by Trustee. | 1.50 450.00/hr | 675.00 |
| | MKD | Draft and revise appellate brief. | 3.00 340.00/hr | 1,020.00 |
| 11/14/2007 | JBB | Preparation of appellate brief. | 8.00 340.00/hr | 2,720.00 |
| | JRF | Conference with MKD re status of brief and issues being discussed with Steve Carlin. | 0.50 450.00/hr | 225.00 |
| | MKD | Draft and revise appellate brief. | 6.50 340.00/hr | 2,210.00 |
| | CMT | Cite checked and shepardized brief. Updated research. | 3.40 205.00/hr | 697.00 |
| 11/15/2007 | JHB | Preparation of appellate brief. | 3.50 340.00/hr | 1,190.00 |

| 11/15/2007 | JRF | Review and revise current draft of brief. | 1.20 450.00/hr | 540.00 |
|---|---|---|---|---|
| | MKD | Draft and revised appellate brief. | 6.50 340.00/hr | 2,210.00 |
| | CMT | Cite checked, shepardized and proof read draft of appellate brief. | 5.40 205.00/hr | 1,107.00 |
| 11/16/2007 | JHB | Preparation of appellate brief. | 1.70 340.00/hr | 578.00 |
| | MKD | Draft and revise appellate brief; Research and review cases cited by Trustee. | 4.00 340.00/hr | 1,360.00 |
| | CMT | Cite checked, shepardized and proof-read draft of brief. | 2.60 205.00/hr | 533.00 |
| 11/17/2007 | MKD | Draft and revise appellate brief; Review and revise argument re Community Colleges. | 1.50 340.00/hr | 510.00 |
| 11/18/2007 | JHB | Preparation of appellate brief. | 4.30 340.00/hr | 1,462.00 |
| 11/18/2007 | MKD | Revise arguments re: Community Colleges; Review Trustee's Appeal Brief; Correspondence with S. Carlin re: same. | 2.00 340.00/hr | 680.00 |
| 11/19/2007 | JRF | Review final draft appellate brief and conference with MKD re same. | 1.50 450.00/hr | 675.00 |
| | CMT | Cite checked appellate brief. Shepardized cases and performed final updating of legal research. Present draft of brief to Clerk of Seventh Circuit for review. Proof read same. | 9.75 205.00/hr | 1,998.75 |
| | JHB | Preparation of appellate brief. | 2.50 340.00/hr | 850.00 |
| | MKD | Draft and revise appellate brief; prepare Table of Contents and Table of Authorities; Review record and record cites; Prepare same for filing. | 6.00 340.00/hr | 2,040.00 |
| 11/20/2007 | JHB | Preparation of appellate brief. | 4.00 340.00/hr | 1,360.00 |
| | MKD | Draft and revise appellate brief and prepare for filing; Prepare electronic version and file Same. | 5.50 340.00/hr | 1,870.00 |
| 12/11/2007 | MKD | Review Reply Brief filed by Trustee; Conference with JRF and JHB re: Same. | 1.00 340.00/hr | 340.00 |
| 12/12/2007 | JHB | Review and analysis of appellant's reply brief. | 1.50 340.00/hr | 510.00 |
| | JRF | Review Trustee's Reply brief and conferences with MKD re various issues and preparation for oral argument. | 2.00 450.00/hr | 900.00 |
| 1/28/2008 | MKD | Review notice from Seventh Circuit re: Oral Argument; Meeting with JRF and CMT re: Case summaries. | 1.00 340.00/hr | 340.00 |
| | CMT | Conferred with JRF and MKD re assignment in preparation for oral argument. Began reviewing briefs to complete assignment of summarizing and organizing cases for JRF. | 0.50 205.00/hr | 102.50 |
| 1/30/2008 | CMT | Reviewed appellate briefs and began drafting case summaries for JRF in preparation for oral argument. | 2.25 205.00/hr | 461.25 |

| 2/1/2008 | JRF | Preparation for oral argument; review briefs. | 2.50 450.00/hr | 1,125.00 |
|---|---|---|---|---|
| 2/5/2008 | JHB | Preparation for oral argument. | 1.80 340.00/hr | 612.00 |
| 2/6/2008 | JHB | Preparation for oral argument. | 1.30 340.00/hr | 442.00 |
| 2/6/2008 | JRF | Review briefs and prepare for oral argument. | 1.50 450.00/hr | 675.00 |
| 2/7/2008 | JHB | Preparation for oral argument. | 2.50 340.00/hr | 850.00 |
|  | CMT | Preparation for oral argument by organizing major cases for each side in binder for oral argument; summarized cases. | 8.30 205.00/hr | 1,701.50 |
| 2/8/2008 | CMT | Prepared for oral argument by organizing binder, summarizing cases, and updating research. | 5.50 205.00/hr | 1,127.50 |
| 2/10/2008 | CMT | Met with JRF re preparing for oral argument; summarized arguments and key cases for oral argument binder. | 5.00 205.00/hr | 1,025.00 |
| 2/11/2008 | JHB | Preparation for oral argument. | 1.30 340.00/hr | 442.00 |
|  | CMT | Prepared for oral argument by summarizing cases and factual information for JRF; conferred with JRF re same. | 8.20 205.00/hr | 1,681.00 |
| 2/12/2008 | JHB | Preparation for oral argument. | 3.50 340.00/hr | 1,190.00 |
| 2/12/2008 | JRF | Preparation for oral argument. | 4.50 450.00/hr | 2,025.00 |
|  | MKD | Review appeal briefs; meeting with JRF and JHB re preparation for oral arguments. | 2.00 340.00/hr | 680.00 |
|  | CMT | Assisted JRF in preparing for oral argument by updating research, organizing binder and summarizing key cases. | 8.60 205.00/hr | 1,763.00 |
| 2/13/2008 | JRF | Preparation for oral argument; conferences with CT, JHB, and MKD; review briefs and cases. | 6.00 450.00/hr | 2,700.00 |
|  | CMT | Assisted JRF in preparing for oral argument by organizing cases and factual information. | 8.20 205.00/hr | 1,681.00 |
| 2/14/2008 | JHB | Office conference with Mr. Carlin, JRF, MKD and CT re oral argument; preparation for same. | 5.60 340.00/hr | 1,904.00 |
|  | CMT | Meeting with Mr. Carlin, JRF, JHB and MKD re oral argument; summarized cases for JRF's argument binder. | 8.80 205.00/hr | 1,804.00 |
|  | JRF | Meeting with Mr. Carlin, JHB, MKD, and CT re preparation for oral argument. | 5.50 450.00/hr | 2,475.00 |
| 2/14/2008 | MKD | Meeting with Mr. Carlin, JRF and JHB re preparation for oral argument; review appeal briefs and record on appeal. | 5.50 340.00/hr | 1,870.00 |
| 2/15/2008 | JHB | Preparation for oral argument. | 2.60 340.00/hr | 884.00 |

| | | | | |
|---|---|---|---|---|
| | CMT | Updated legal research; research on Ray oral argument; organized binder in preparation for oral argument. | 5.60 205.00/hr | 1,148.00 |
| | JRF | Preparation for oral argument. | 1.50 450.00/hr | 675.00 |
| 2/17/2008 | CMT | Conferred with JRF re organizing factual information for oral argument; draft factual outline. | 2.20 205.00/hr | 451.00 |
| | JRF | Preparation for oral argument. | 1.50 450.00/hr | 675.00 |
| 2/18/2008 | CMT | Preparation for oral argument by organizing factual information and quotations; drafted explanation of five challenged transactions and analysis of loss causation discussed in Ray decision. | 5.40 205.00/hr | 1,107.00 |
| | CMT | Preparation for oral argument by summarizing factual information and organizing binder. | 7.80 205.00/hr | 1,599.00 |
| 2/19/2008 | CMT | Preparation for oral argument by organizing factual information and quotations; drafted explanation of five challenged transactions and analysis of loss causation in Ray decision. | 6.80 205.00/hr | 1,394.00 |
| 2/20/2008 | CMT | Preparation for oral argument by organizing factual information and quotations; reviewed Marcus and Maxwell depositions for information regarding Trustee's position on strength of Whittman-Hart prior to the merger and cause of the failure of the merger. | 3.70 205.00/hr | 758.50 |
| | JRF | Review cases and outlines to prepare for oral argument. | 2.00 450.00/hr | 900.00 |
| 2/21/2008 | CMT | Preparation of factual information for JRF; organized and summarized information on Marcus's opinion in preparation for oral argument. | 3.40 205.00/hr | 697.00 |
| | JRF | Preparation for oral argument; conference with CT re same; review cases and record. | 3.50 450.00/hr | 1,575.00 |
| | JHB | Preparation for oral argument. | 3.70 340.00/hr | 1,258.00 |
| 2/22/2008 | CMT | Preparation of factual information for JRF; organized and summarized information on Marcus's opinion in preparation for oral argument. | 8.40 205.00/hr | 1,722.00 |
| | JHB | Preparation for oral argument. | 4.00 340.00/hr | 1,360.00 |
| 2/23/2008 | CMT | Meeting with JRF to discuss preparation for oral argument; updated research and analyzed Stoneridge decision; organized reference sheets on alternative arguments relating to duty, transaction causation and damages. | 6.20 205.00/hr | 1,271.00 |
| | JRF | Preparation for oral argument. | 3.50 450.00/hr. | 1,575.00 |
| 2/24/2008 | CMT | Summarized various arguments and responses thereto by the Trustee for JRF in preparation for oral argument; met with JRF re same. | 8.30 205.00/hr | 1,701.50 |
| | JRF | Preparation for oral argument; work with CT re outlines and legal research. | 6.00 450.00/hr | 2,700.00 |

| 2/25/2008 | JRF | Preparation for oral argument. | 4.50 450.00/hr | 2,025.00 |
|---|---|---|---|---|
| | CMT | Shepardized cases cited in the Trustee's brief and reply; updated research; continued organizing and summarizing factual information and cases for oral argument binder. | 6.60 205.00/hr | 1,353.00 |
| 2/26/2008 | JHB | Preparation for oral argument; office conference with JRF, MKD, CT and Mr. Carlin for same. | 8.50 340.00/hr | 2,890.00 |
| | CMT | Summarized damages cases in preparation for oral argument; updated binder for oral argument; attended meeting with SBC, JRF, MKD and JHB re oral argument; updated research and shepardized cases in briefs; researched potentially relevant recent decisions of the Seventh Circuit. | 10.00 205.00/hr | 2,050.00 |
| 2/26/2008 | JRF | Meet with Mr. Carlin, JHB, MKD, and CT re preparation for oral argument of appeal; review and analysis of cases and record. | 12.00 450.00/hr | 5,400.00 |
| | MKD | Meeting with Mr. Carlin, JRF, JHB and CMT re preparation for oral argument. | 8.00 340.00/hr | 2,720.00 |
| 2/27/2008 | JHB | Preparation for oral argument; attend oral argument. | 4.00 340.00/hr | 1,360.00 |
| | CMT | Prepare for and attended oral argument. | 2.50 205.00/hr | 512.50 |
| | JRF | Prepare for and court appearance at oral argument of appeal to Seventh Circuit and conferences relating thereto. | 6.00 450.00/hr | 2,700.00 |
| | MKD | Court appearance re oral arguments; review decisions by panel judges on loss causation and prepare for same. | 3.50 340.00/hr | 1,190.00 |

For professional services rendered          741.90      $233,227.00


Additional Charges:                        Qty/Price   Amount

8/31/2007 – Westlaw Computerized Legal Research          1          150.16
                                                        150.16

9/30/2007 – Westlaw Computerized Legal Research          1          64.88
                                                        64.88

10/31/2007 – Westlaw Computerized Legal Research         1          483.27
                                                        483.27

11/30/2007 – Westlaw Computerized Legal Research         1          112.58
                                                        112.58

2/29/2008 – Westlaw Computerized Legal Research          1          191.10
                                                        191.10

          Total costs                                   $1,001.99

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| marchFIRST, INC., *et al.*, | ) | Case No. 01-24742 |
| | ) | |
| Debtors. | ) | Substantively Consolidated |
| | ) | |
| | ) | Hon. John D. Schwartz |
| | ) | |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on the . 14th day of February, 2008, at 10:30 a.m. or as soon thereafter as counsel may be heard, I shall appear before The Honorable John D. Schwartz or any Judge sitting in his stead in Courtroom 719 in the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois and present the **Eleventh Interim Application for Allowance of Compensation and Reimbursement of Expenses of Williams Montgomery & John Ltd. as Special Counsel to Andrew J. Maxwell, Trustee**, a copy of which is attached hereto and served upon you.

ANDREW J. MAXWELL, AS CHAPTER 7
TRUSTEE OF THE ESTATES OF marchFIRST,
INC., *et al.*

By: _____/s/ Steven J. Roeder_____
One of His Attorneys

Steven J. Roeder (6188428)
David E. Stevenson (6181112)
Thomas C. Koessl (6239337)
Williams Montgomery & John Ltd.
2100 Civic Opera Building
20 North Wacker Drive
Chicago, IL 60606
(312) 443-3200

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MARCHFIRST, INC., et al., | ) | Case No. 01 B 24742 |
| | ) | Substantively Consolidated |
| | ) | |
| Debtors. | ) | Hon. John D. Schwartz |
| | ) | **Hearing Date: February 14, 2008** |
| | ) | **Hearing Time: 10:30 a.m.** |

COVER SHEET FOR APPLICATION FOR
PROFESSIONAL COMPENSATION
(Appendix to Rule 607)

NAME OF APPLICANT:                                          Williams Montgomery & John Ltd.

AUTHORIZED TO PROVIDE
PROFESSIONAL SERVICES TO:                        Andrew J. Maxwell, as Trustee for the
                                                                               Estate of marchFIRST, Inc., et al.

DATE OF ORDER AUTHORIZING
EMPLOYMENT OF WILLIAMS
MONTGOMERY & JOHN LTD.:                          September 26, 2002

PERIOD FOR WHICH
COMPENSATION SOUGHT:                                April 2007 through December 31, 2007

AMOUNT OF FEES SOUGHT:                            $202,968.00

AMOUNT OF EXPENSE
REIMBURSEMENT SOUGHT:                            $5,518.52

AMOUNT OF EXPERT FEES, RETAINER
AND EXPENSES:                                                    $0 -- All Experts Paid From Existing
                                                                               Retainer

TOTAL EXPERT FEES AND ALL EXPENSES:    $5,518.52

AMOUNT OF FEES AND
EXPENSES PREVIOUSLY
SOUGHT/ALLOWED:                                          Fees previously allowed: $2,816,425.50
                                                                               Expenses previously allowed: $1,482,930.27

THIS IS THE:                    Eleventh Interim Application For Allowance of
                                Compensation and Reimbursement of Expenses of
                                Williams Montgomery & John Ltd. as Special
                                Counsel for Andrew J. Maxwell, Trustee

This is the Eleventh application filed herein by this professional.

APPLICANT:                      WILLIAMS MONTGOMERY & JOHN LTD.

DATE: January 24, 2008          By:___/s/ Steven J. Roeder_____
                                      Steven J. Roeder

Steven J. Roeder (6188428)
David E. Stevenson (6181112)
Thomas C. Koessl (6239337)
Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, Illinois, 60606

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MARCHFIRST, INC., et al., | ) | Case No. 01 B 24742 |
| | ) | Substantively Consolidated |
| | ) | |
| Debtors. | ) | Hon. John D. Schwartz |
| | ) | Hearing Date: February 14, 2008 |
| | ) | Hearing Time: 10:30 a.m. |

ELEVENTH INTERIM APPLICATION
FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT
OF EXPENSES OF WILLIAMS MONTGOMERY & JOHN LTD.
AS SPECIAL COUNSEL TO ANDREW J. MAXWELL, TRUSTEE

Williams Montgomery & John Ltd. ("Applicant") submits this Eleventh Application for

Allowance of Compensation and Reimbursement of Expenses (the "Application") for

professional services rendered and costs incurred by Applicant as Special Litigation Counsel to

Andrew J. Maxwell, the trustee (the "Trustee") for the estate of marchFIRST, Inc., et al. (the

"Estate" or "marchFIRST"). The form of and procedure for this Application was authorized by

this Court by an Order entered June 6, 2002 (docket #805). The Application seeks allowance of

$202,968.00 in total fees (the "Fees") and reimbursement of $5,518.52 in total expenses (the

"Expenses") earned or incurred by Applicant in providing professional services to the Trustee

during the period beginning April 1, 2007 and ending on December 31, 2007 (the "Application

Period"), and requests that the Court approve the form and manner of notice of the Application

and waive any further notice, as set forth below.

## I. BACKGROUND

1. On April 12, 2001 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court").

2. On April 26, 2001, the Delaware Court entered an order converting the Debtors' cases to Chapter 7 cases.

3. On July 10, 2001, the Debtors' chapter 7 cases were transferred to this Court. On July 16, 2001, the United States Trustee appointed Andrew J. Maxwell as Trustee.

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

5. On September 26, 2002, this Court entered an Order authorizing the retention of the Applicant in this case (the "Retention Order").

## II. DESCRIPTION OF SERVICES RENDERED BY APPLICANT

6. During the Application Period, Applicant conducted extensive legal work in pursuing an action related to a claim asserted by the Trustee against a professional, including briefing an appeal to the Court of Appeals for the Seventh Circuit. In connection with the development of these professional claims, Applicant also employed experts, however, there were no new expert fees during the application period.

7. Additionally, because of the expenses involved, this Court previously allowed the establishment of a retainer from which Applicant could retain and pay experts necessary for the prosecution of the Trustee's case for professional negligence between interim applications. However, because of the stage of this litigation, Applicant requests that the retainer be maintained at the current level of $15,752.97, which requires no additional funding.

2

8.  At all times during Applicant's representation of the Trustee, Applicant was a disinterested person and neither represented nor held an interest adverse to the estate with respect to matters on which Applicant was employed.

9.  Applicant requests court approval limiting notice of this Application to (i) the United States Trustee; and (ii) all parties who have filed requests for notices under Rule 2002 of the Federal Rules of Bankruptcy Procedure and pursuant to the Court's procedures order dated 8/28/01. Rule 2002(a) ordinarily requires notice of applications for professional fees in excess of $500 to be served on all creditors and parties-in-interest. In this instance, however, the number of creditors exceeds 5,000, so to serve notice of this Application on all parties in interest would impose a significant burden on the Applicant and the Estate. Applicant further requests that this Court, pursuant to Rule 9006(c), approve a shortened notice period of fifteen days, given that notice will be immediately served on all notice parties on the date of the Application by e-mail, rather than by regular mail.

WHEREFORE, Applicant requests that this Court enter an order substantially in the form of the order attached to this Application as Exhibit A: (a) allowing Applicant compensation for professional services in the aggregate amount of $202,968.00; (b) allowing Applicant's expenses in the aggregate amount of $5,518.52; (c) ordering that the Trustee be authorized to immediately pay to Applicant one hundred percent (100%) of such allowed compensation for services and reimbursement of expenses from marchFIRST's cash reserves; and (d) approving the form and manner of notice of this Application.

WILLIAMS MONTGOMERY & JOHN LTD.

DATE: January 24, 2008                  By:____/s/ Steven J. Roeder_____

Steven J. Roeder (6188428)
David E. Stevenson (6181112)
Thomas C. Koessl (6239337)
Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, Illinois, 60606

Doc ID – 761824

4

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| | ) | Case No. 01 B 24742 |
| marchFIRST, INC., et al., | ) | Jointly Administered |
| | ) | |
| | ) | Hon. John D. Schwartz |
| Debtors. | ) | Hearing Date:    February 14, 2008 |
| | ) | Hearing Time:    10:30 a.m. |

**ORDER GRANTING ELEVENTH INTERIM APPLICATION FOR ALLOWANCE OF
COMPENSATION AND REIMBURSEMENT OF EXPENSES OF WILLIAMS
MONTGOMERY & JOHN LTD. AS SPECIAL LITIGATION COUNSEL TO
ANDREW J. MAXWELL, TRUSTEE**

The Court having reviewed the Eleventh Interim Application of Williams Montgomery & John Ltd. (the "Firm") for the Allowance of Compensation and Reimbursement of Expenses, and having conducted a hearing thereon,

IT IS HEREBY ORDERED that the Firm's fees are allowed on an interim basis in the amount of $202,968.00, that the Firm's expenses are allowed on an interim basis in the amount of $5,518.52, and that all fees and expenses paid pursuant to this Order shall be subject to review upon the presentation of the Applicant's final fee application in this case.

IT IS HEREBY FURTHER ORDERED that this Order will become effective immediately upon its entry and that the Trustee may promptly pay the fees and expenses allowed herein.

_____
United States Bankruptcy Judge

**EXHIBIT A**

STATE OF ILLINOIS    )
                          ) SS
COUNTY OF C O O K   )

### CERTIFICATE OF SERVICE

The undersigned, being first duly sworn on oath, state that I caused a copy of the foregoing Notice and the **Eleventh Interim Application for Allowance of Compensation and Reimbursement of Expenses of Williams Montgomery & John Ltd. as Special Counsel to Andrew J. Maxwell, Trustee,** served via e-mail upon the parties on the attached Service List this 24th day of January, 2008.

/s/ Steven J. Roeder

## m1 Email Service List

| Name | Email |
|---|---|
| A. Peter Chapman | Peter@bankrupt.com |
| Allen J. Guon | aguon@shawgussls.com |
| Amy Wyler | AmyWyler@aol.com |
| Andrew Cardonick | Andrew.Cardonick@goldbergkohn.com |
| Andrew J. Maxwell | Maxwelllawchicago@yahoo.com |
| Arlene N. Gelman | agelman@sachnoff.com |
| B. Michael Joseph | Mjoseph@ferryjoseph.com |
| B. Shaw | bshaw100@shawgussls.com |
| Barbara L. Yong | blyong@fieldgolan.com |
| Charles Schulman | cschulman@sachnoff.com |
| Chris Horvay | chorvay@gouldratner.com |
| Christina M. Berish | cberish@fagelhaber.com |
| Christopher Beard | chris@beard.com |
| Colleen McManus | Colleen.mcmanus@piperrudnick.com |
| David Neff | david.neff@piperrudnick.com |
| David Wirt | dwirt@winston.com |
| Dennis Dressler | ddressler@askborst.com |
| Dimitri Karcazes | Dimitri.Karcazes@goldbergkohn.com |
| Eric Prezant | eprezant@vedderprice.com |
| Erich Buck | ebuck@sachnoff.com |
| Erica Wax | erica_wax@llnb.uscourts.gov |
| Gregg E. Szilagyi | Geszilagyi@uhlaw.com |
| Judy Archer | juditharcher@dla.com |
| Reimer, Craig E. | CReimer@mayerbrownrowe.com |
| Russell Pollock | Rpollock@grmslaw.com |
| Bruce Bernstein | BBernstein@MilbergWeiss.com |
| Daniel Dawson | ddawson@nisen.com |
| David B. Rowe | Rowedb@aetna.com |
| DiMaio Vito | Vdimaio@parcelsinc.com |
| Dimitri G. Karcazes | Dimitri.Karcazes@goldbergkohn.com |
| E. Felger Mark Esq. | Mfelger@cozen.com |
| E. Leta David Esq. | Dleta@swlaw.com |
| Edward Lopez Jr. Esq. | Dallas.bankruptcy@publicans.com |
| Fleming Beth Esq. | Bsf@stevenslee.com |
| Frank F. McGinn | ffm@bostonbusinesslaw.com |
| G. Hermes Peter Esq. | Phermes@hrsc.org |
| G. Karcazes Dimitri Esq. | Dimitri.karcazes@goldbergkohn.com |
| Gaston P. Loomis Esq | gloomls@reedsmith.com |
| Greg Eichorn | Gaeichorn@tcco.com |
| Gus A. Paloian | gpaloian@seyfarth.com |
| H. Maddock John III | Jmaddock@mcguirewoods.com |
| Harold Kaplan Esq. | Hkaplan@gcd.com |
| Howard Cohen | hcohen@reedsmith.com |
| J. Becket William | Wbecket@becket-lee.com |
| J. Dowd Mary Esq. | Dowdm@arentfox.com |
| J. Mark Fisher Esq. | Mfisher@schiffhardin.com |
| J. Marwil | Jmarwil@Jenner.com |
| Jaclyn H. Smith | jhsmith@maxwellandpotts.com |
| Jack Simantob | JSimantob@ArtResources.us |
| James C. Swindler | Swindlerjc@yahoo.com |
| Jeffrey M. Carbino | jeffrey.carbino@blpc.com |
| Jeff Schwartz Esq. | Jschwartz@gcd.com |
| Jeffrey C. Wisler | jcw@cbbhlaw.com |
| Jeffery Widman | jlwidman@shawgussls.com |
| Jerry Brown | jerryb@prestongates.com |
| Jim Christenson | jim_christenson@hermanmiller.com |
| Jim Hanlon | hanlonj@howrey.com |
| Joe Russell | joe.Russell@jpmchase.com |
| John D. McLaughlin Esq. | mclaughlin@ycst.com |
| John J. Voorhees Jr. | JVoorhees@mayerbrownrowe.com |
| John P. Dillman | Houston_bankruptcy@publicans.com |
| John S. Mrowiec | jsm@cmcontractors.com |
| John Stine | john.stine@gecapital.com |
| K. Curtin Sandra | Scurtin@becket-lee.com |
| K. Kortanek Steven Esq. | Skortanek@klehr.com |
| Karen Singer | singerki@aol.com |
| Kathleen M. McGuire | kammcguire@aol.com |
| Keith E. Allen | kallen@mandellmenkes.com |
| Keith J. Shapiro | shapirok@gtlaw.com |
| Kenneth Jones | Kjones@bowlesverna.com |
| Kevin Calhoun | kevincalhounlaw@earthlink.net |
| Kurt Gabouer | kgabouer@kpmg.com |
| Kurizmen Jeffrey Esq | jkurizman@klehr.com |
| L. Barreca Marc Esq. | marc.barreca@klgates.com |
| Lain Dan | Dlain@lainfaulkner.com |
| Lauren Newman | lnewman@fagelhaber.com |
| Lawrence M. Schwab | Lschwab@bbslaw.com |
| Leslie Bayles | Lbayles@Vedderprice.com |
| Linda Boyle | Linda.boyle@lwltelecom.com |
| M. Benjamin Lawrence Esq. | Lbenjamin@ngelaw.com |
| M. Desmond | MDesmond@fslegal.com |
| M. Fishman Robert | Rfishman@shawgussls.com |
| Ma, Alicia | aliciama@yahoo.com |
| Mahdi, Sajida A. | SAMahdi@mayerbrownrowe.com |
| Margaret Anderson Esq. | panderson@lordbissell.com |
| Mark A. Berkoff | mark.berkoff@dlapiper.com |
| Markhelm Steve | Smarkhelm@electrorent.com |
| Marwil, Jeff | jmarwil@jenner.com |
| Michael Curran | Michael.curran@kbc.be |
| Michael Molinaro Esq. | Mmolinaro@ngelaw.com |
| Mike O'Grady | mjogrady@fbtlaw.com |
| Michael Snyder | Michael.snyder@wilmerhale.com |
| Monica McCoy-Purdy Esq | Dallas.bankruptcy@publicans.com |
| N. Neville Reid Esq. | NReid@mayerbrownrowe.com |
| Neal White Esq. | Nwhite@mwe.com |
| Nicole A. Frankel | nfrankel@vedderprice.com |
| Norman L. Pernick Esq. | Npernick@saul.com |
| P. Eagel Lawrence | Eagel@bragarwexler.com |
| Patrick M. Costello | Pcostello@bbslaw.com |
| Patrick J. Heneghan | heneghan@sw.com |
| Peter Castaneda | Peter_Castaneda@ilnb.uscourts.gov |
| Peter Clark | Pclark@reedsmith.com |
| Peter Seideman Esq. | p.seideman@pslegal.com |
| R. Cardonick Andrew | Andrew.cardonick@goldbergkohn.com |
| R. Fimhoff | rfimhoff@rsplaw.com |
| Ramsey Natalie Esq. | Nramsey@mmwr.com |
| Rebecca Maxwell | rebmax@gmail.com |
| Robert Radasevich | rradasevich@ngelaw.com |
| S. Chernack Gregory | Gchernack@wilmer.com |
| Sandra Rasnak | sandra.rasnak@usdoj.gov |
| Sean Scott Esq. | STScott@mayerbrownrowe.com |
| Seth Meisel | smeisel@hugheslluce.com |
| Sedlak Brian | Briansedlak@jonesday.com |
| Shawn M. Christianson | schristianson@buchalter.com |
| Stephanie Deviney | snolan@brownconnery.com |
| Stephen E. Garcia | stephengarcia312@sbcglobal.net |
| Stephen Rosenfeld | srosenfeld@mandellmenkes.com |
| Steve Potts | otispott@comcast.net |
| Steve Sherman | sesherman@shearman.com |
| Steven B. Towbin Esq. | Stowbin@shawgussls.com |
| Steven Scesa Esq. | Steven.scesa@lw.com |
| T. Cusack John Esq. | John.cusack@piperrudnick.com |
| T. Keating Kevin Esq. | Ksltd@flash.net |
| Terence G. Banich II | tbanich@jenner.com |
| Thomas A. Gugliotti Esq. | Tgugliotti@uks.com |
| Thomas P. McShane | tmcshane@mcshanegroup.com |
| Vincent D'Agostino | vdagostino@lowenstein.com |
| Weiner Ross | Ross.weiner@csfb.com |
| William J. Factor | wfactor@seyfarth.com |
| William H. Schorling | william.schorling@blpc.com |
| William L. Wallander Esq. | Bwallander@velaw.com |

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

# EXHIBIT E

O'Brien

No. 07-2819

U.S.C.A. — 7th Circuit
RECEIVED

APR - 9 2008 RMS/RM

GINO J. AGNELLO
CLERK

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| ANDREW J. MAXWELL, not individually,<br>but as Chapter 7 Trustee for the<br>bankruptcy estates of marchFIRST, Inc.,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>KPMG LLP,<br><br>    Defendant-Appellee. | Appeal from the<br>United States District<br>Court for the Northern<br>District of Illinois<br><br>Case No. 03 C 3524<br><br>Hon. Joan B. Gottschall |

U.S.C.A. — 7th Circuit
F I L E D

APR - 9 2008 RMS

GINO J. AGNELLO
CLERK

### MOTION OF KPMG LLP FOR LEAVE TO FILE
### MOTION FOR SANCTIONS IN DISTRICT COURT

Defendant-Appellee KPMG LLP ("KPMG"), by and through its attorneys, hereby moves this Court, for the entry of an order granting KPMG leave to file a petition for sanctions in the district court pursuant to Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927, against Plaintiff-Appellant Andrew J. Maxwell, the Chapter 7 trustee for the bankruptcy estates of marchFIRST (the "trustee"), and his attorneys for legal fees and costs incurred by KPMG defending the underlying complaint.

## BACKGROUND

marchFIRST, Inc. ("marchFIRST") was an information technology consulting company formed from the merger of Whittman-Hart, Inc. ("Whittman-Hart") and US Web/CKS Corporation ("US Web") on March 1, 2000. Soon after the merger, the high-tech stock market bubble burst and marchFIRST was one of the many technology companies caught in the "spectacular crash" that followed. On April 12, 2001, marchFIRST filed for bankruptcy protection.

On April 11, 2003, the trustee filed a two-count adversary complaint against KPMG alleging, *inter alia,* that KPMG failed to discharge its professional obligations in performing auditing services marchFIRST's predecessor company, Whittman-Hart, Inc. ("Whittman-Hart"). The trustee sought damages in the amount of $628.6 million. On July 20, 2007, the United States District Court for the Northern District of Illinois, the Honorable Joan B. Gottschall, entered an order granting KPMG's summary judgment motion based on the trustee's inability to establish loss causation. On July 30, 2007, the trustee filed a notice of appeal to this Court.

On March 21, 2008, this Court affirmed the order granting summary judgment, citing a number of failures in the trustee's case, including his "outlandish" claim for damages. Slip Op. at 7. In view of the "extreme weakness of the trustee's case," this Court stated that KPMG could file a motion in the district court for an award of reasonable attorneys' fees, along

2

with a corresponding motion before this Court under Fed. R. App. P. 38. Slip Op. at 8-10.

On April 4, 2008, KPMG filed a motion with this Court, pursuant to Rule 38, seeking sanctions against the trustee and his attorneys for legal fees and costs incurred by KPMG in connection with this appeal. By this motion, KPMG seeks leave to file a motion for sanctions in the district court pursuant to Rule 11 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 11, and 28 U.S.C. § 1927, for legal fees and costs incurred by KPMG defending the underlying complaint.

## ARGUMENT

As a general rule, the perfection of an appeal vests jurisdiction with the Court of Appeals and no further proceedings can take place in the district court without leave of the court of appeals. *Overnite Transp. Co. v. Chicago Indus. Tire Co.,* 697 F.2d 789, 792 (7th Cir. 1983); *Asher v. Harrington,* 461 F.2d 890, 895 (7th Cir. 1972). However, exceptions to this rule exist for motions that are collateral to the judgment and are filed in the district court while the appeal on the merits is pending. *Overnite Transp. Co.,* 697 F.2d at 792; *Cedar Crest Health Center, Inc. v. Bowen,* 129 F.R.D. 519, 523-24 (S.D. Ind. 1989). This Court has previously found attorneys' fee awards to be a collateral question. *See Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1078 (7th Cir. 1987) (district court loses jurisdiction upon the filing of a

3

notice of appeal but only on the merits, "because awards of fees are collateral questions").

In *Overnite*, this court reversed an award of attorneys' fees in favor of a defendant under 28 U.S.C. § 1927, holding that the district court had no jurisdiction to act because the motion was not filed until after the mandate was docketed. *Overnite*, 697 F.2d at 792. The Court found that "a motion for attorneys' fees and costs under section 1927 is so inexorably bound to the underlying merits of the case that a party must bring a motion for fees and costs either before an appeal is perfected, or during the pendency of the appeal on the merits." *Id*. at 793.

In this case, KPMG believes it has grounds for sanctions against the trustee and his attorneys for filing frivolous claims under both Fed. R. Civ. P. 11 and 28 U.S.C. § 1927. As of the date of this motion, the mandate from this Court has not been issued. It in not clear whether this Court's mandate will preserve KPMG's ability to pursue its motion for sanctions in the district court.[1] Therefore, by this motion, KPMG seeks leave to file a petition for sanctions in the district court pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927, against the trustee and his attorneys, for legal fees and costs incurred by KPMG defending the underlying complaint.

WHEREFORE, for the foregoing reasons, KPMG respectfully requests entry of an order granting KPMG leave to file a petition for sanctions in the

---

[1] The district court can also impose sanctions *sua sponte* under both Fed. R. Civ. P. 11 and 28 U.S.C. § 1927.

4

district court pursuant to Rule 11 of the Federal Rules of Civil Procedure and

28 U.S.C. § 1927, against the trustee and his attorneys, and for such other

relief as this Court deems just and proper.

Respectfully submitted,

KPMG LLP

By: _____

One of Its Attorneys

James R. Figliulo
Michael K. Desmond
James H. Bowhay
FIGLIULO & SILVERMAN, P.C.
10 South LaSalle Street
Suite 3600
Chicago, Illinois  60603
(312) 251-4600

5

CERTIFICATE OF SERVICE

The undersigned attorney certifies that on April 9, 2008, he caused two copies of the foregoing MOTION OF KPMG LLP FOR LEAVE TO FILE MOTION FOR SANCTIONS IN DISTRICT COURT to be served by messenger before 5:00 p.m. on the following:

> Steven J. Roeder
> Thomas C. Koessl
> Alyssa M. Campbell
> Williams Montgomery & John Ltd.
> 20 North Wacker Drive, Suite 2100
> Chicago, Illinois 60606-3094

Michael K. Desmond

Dated: April 9, 2008

U.S.C.A. – 7th Circuit
F I L E D

APR – 9 2008 RMS

GINO J. AGNELLO
CLERK

6

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

# EXHIBIT F

# The Plus Companies, Inc.

Date: 4/4/2008

Williams Montgomery & John, Ltd.
20 North Wacker Drive
Chicago, IL 60606
Attention: Mr. David Stevenson

RE:   Insured:       Williams Montgomery & John, Ltd.
      D/Loss:        TBD
      Our Claim #:   TBA
      Policy #:      G23911553001
      Policy Limit:  $5,000,000.00 each claim, $5,000,000.00 in the aggregate
                     Deductible per claim and in the aggregate
      Subject:       Andrew Maxwell

Dear Mr. Stevenson:

This letter confirms Westchester Fire Insurance Company's receipt of the above captioned matter. Please direct all future questions and correspondence regarding this matter to my attention. My direct dial telephone number is 630-799-1545, my e-mail address is jfenton@thepluscos.com and my mailing address is 2020 Calamos Ct., Suite 200, Naperville, IL 60563-2793. Upon receipt of this letter I would appreciate your cooperation in contacting me to discuss the captioned matter.

For your convenience I will note that Westchester Fire Insurance Company issued a Lawyers Professional Liability Insurance Policy to Williams Montgomery & John, Ltd., Policy Number G23911553001; effective 11/29/2007 expiring 11/29/2008. This policy provides a $5,000,000.00 limit of liability with a $5,000,000.00 aggregate limit. A $75,000.00 deductible applied to losses on each claim but this deductible does not apply to expenses.

Finally, please be aware that this letter is not intended as a full articulation of Westchester Fire Insurance Company's position on this claim. Rather, this letter acknowledges receipt of the captioned claim and provides you with my contact information. Further, please be aware that because I have not yet concluded my investigation into this matter, I must inform you that I expressly reserve any and all rights and coverage defenses Westchester Fire Insurance Company may currently have and which may become apparent during the course of Westchester Fire Insurance Company's investigation. This

reservation extends to include the right to deny coverage for all and/or any part of this
claim: · ·

Regards,

*Jay C. Fenton*

Jay C. Fenton
Executive Vice President

```
08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE
```

# EXHIBIT G



FOUNDERS

William P. Bila
Robert P. Conlon
Edward P. Gibbons
Celeste M. King
Gary L. Lockwood
Paul F. Matousek
David E. Walker
Mark D. Wilcox

**David E. Walker**
Tel: 312.244.6704
dwalker@wwmlawyers.com

April 10, 2008

**VIA EMAIL AND CERTIFIED MAIL-RRR**

Mr. David Stevenson
Williams Montgomery & John Ltd.
20 North Wacker Drive
Chicago, IL 60606

Re:   Westchester Fire Policy No.: LPL-G2391 1553 001
      Named Insured: Williams Montgomery & John Ltd.
      Claimant: KPMG, LLC
      Our File No.: 100104.007

Dear Mr. Stevenson:

We represent Westchester Fire Insurance Company with respect to the notice of circumstance that was forwarded to Westchester via The Plus Companies by Jody Harris of Arthur J. Gallagher on April 2, 2008. The notice of circumstances pertains to a motion for sanctions, filed by KPMG, LLP in the United States Court of Appeals for the Seventh Circuit on April 4, 2008 against your firm and its client, Andrew J. Maxwell, as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc. Westchester previously acknowledged receipt of this matter via The Plus Companies on April 4, 2008, subject to a full reservation of rights.

Our understanding is that you are the appropriate person to receive Westchester's statement of position as to coverage on this matter. Please contact us immediately in the event this understanding is incorrect.

Briefly, the captioned matter arises out of a professional malpractice and breach of contract action filed by your firm, on behalf of Mr. Maxwell, against KPMG, styled *Andrew J. Maxwell, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc. v. KPMG LLP,* No. 03 C 3524 (N.D. Ill.). On July 19, 2007, the district court entered an opinion and order granting summary judgment in favor of KPMG in that action. Your firm filed a notice of appeal on behalf of Mr. Maxwell to the Seventh Circuit on July 30, 2007.

Mr. David Stevenson
April 10, 2008
Page 2

The Seventh Circuit issued its opinion in the appeal on March 21, 2008, affirming the district court's dismissal. On April 1, 2008, you submitted a notice of circumstances enclosing the Seventh Circuit's opinion, and stating that counsel for KPMG had advised that they "intend[ed] to file a motion seeking damages and costs" in connection with the appeal. On April 4, 2008, KPMG did in fact file a motion for sanctions against Mr. Maxwell "and his attorneys," seeking approximately $234,000 in legal fees and costs. In its motion, KPMG further asserts that it would be appropriate to award double costs and attorneys' fees in this instance.

Westchester Fire issued a policy of Lawyers Professional Liability Insurance to Williams Montgomery & John Ltd. for the period November 29, 2007 through November 29, 2008. The policy provides limits of $5 million each Claim and in the aggregate subject to your firm's $75,000 each claim/aggregate deductible. The deductible is applicable as to Damages only. Claims expenses are paid in addition to policy limits for Claims covered, or at least colorably covered, by the Westchester Fire policy.

First, the Insuring Agreement of the policy provides as follows:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages for Claims first made against the Insured during the Policy Period and first reported to the Company during the Policy Period or within thirty (30) days thereafter, arising out of any act, error, omission or Personal Injury in the rendering of or failure to render Professional Services by an Insured or any entity or individual for whom the Named Insured is legally liable; provided always that such act, error, omission or Personal Injury happens:
>
> A.    during the Policy Period; or
>
> B.    prior to the Policy Period provided that:
>
> > 1.    such act, error, omission or Personal Injury happened on or after the Retroactive Date as indicated on the Declarations Page of this policy; and
> >
> > 2.    at the inception of this policy the Insured had no reasonable basis to believe that any Insured had breached a professional duty and no reasonable basis to believe an act, error, omission or Personal Injury might be expected to result in such Claim or Suit.

Next, the policy defines Claim as follows:

> Claim means a demand for money, the filing of Suit or the institution of arbitration or mediation proceedings naming the Insured and alleging an act, error, omission or Personal Injury resulting from the rendering of or failure to render Professional Services.

Mr. David Stevenson
April 10, 2008
Page 3

> Claim also means knowledge by an Insured of any event or circumstance which
> could reasonably be expected to result in or lead to a Claim being asserted against
> an Insured, provided that the Insured gives the Company written notice of such
> event or circumstance prior to the termination date of the Policy Period, or within
> thirty (30) days thereafter, or during the Extended Reporting Period, if applicable.

With respect to Damages, the policy provides:

> Damages means compensatory judgments, settlement or awards, *but does not
> include punitive or exemplary damages, fines or penalties, sanctions,* the return
> of fees or other consideration paid to the Insured, *or that portion of any award or
> judgment caused by the trebling or multiplication of actual damages* under
> federal or state law. Damages does not include matters uninsurable in the
> jurisdiction governing this policy.

(Emphasis added.) Based upon the foregoing policy language, the notice of circumstances and
ensuing motion for sanctions appear to constitute a "Claim." However, the amounts sought by
KPMG, if awarded, would not be covered Damages as defined by the policy. That is because the
definition of Damages expressly does not include "fines or penalties" or "sanctions", which is
the relief sought in the Motion for Sanctions filed with the Seventh Circuit.

Moreover, Section VII – Exclusions, Clause G provides that the insurance provided under the
policy *"does not apply to Claims . . . [s]eeking* restitution, reduction, disgorgement, set off,
return, or *payment of any form of legal fees, related fees, or any other costs, expenses, or
charges"* (emphasis added). Based upon our initial review of the information provided to date,
this matter appears to fall within this exclusion to coverage.

Accordingly, Westchester expressly reserves the right to deny coverage for both Damages and
Claims Expenses incurred in connection with this action if, after reviewing all of the available
information, it determines that this matter fails to qualify as a claim for "Damages" or falls
entirely within the scope of this exclusion.

It is our understanding that Williams Montgomery intends to handle the defense of the Rule 38
motion in-house. Westchester does not object to this arrangement and, therefore, it is our
understanding that there is no need for Westchester to retain, or give its consent to the retention
of, defense counsel at this time. However, Westchester continues to reserve its all of its rights
with respect to defense arrangements, including the right to reevaluate this position. To that end,
please keep this office closely apprised of all developments in this matter so that we may advise
Westchester immediately should circumstances warrant a change in the defense arrangements or
should your firm deem it necessary to retain outside counsel. Finally, please note that Williams
Montgomery may not "assume any liability, any obligations, incur any costs, charges, or
expenses or enter into any settlement" without Westchester's consent.

Please be advised that by enumerating the foregoing reservation of rights, Westchester does not
waive but rather expressly reserves all other rights as to coverage it may have under the terms
and conditions of the policy and also at law, and further reserves the right to assert any and all

Mr. David Stevenson
April 10, 2008
Page 4

rights and coverage defenses that may now exist or which may become apparent during the
course of its investigation into the captioned matter. This reservation of rights extends to include
the right to decline insurance coverage for any part, or all, of the captioned matter. It includes
the right to withdraw from further investigation, defense, payment or settlement of this claim by
tendering control of this claim to you and it includes the right to seek reimbursement of all fees
and costs expended in defending this claim in the event it is determined that Westchester does
not, or did not, have a duty to defend or indemnify you or another other putative Insured with
respect to the captioned matter.

Lastly, and subject to the foregoing reservation of rights, we ask that you provide all information
germane to the coverage issues raised herein, as soon as possible so that Westchester may
conclude its initial review and analysis of the facts. In addition, please keep us closely apprised
of any and all further developments in this matter.

Please do not hesitate to contact the undersigned with any questions you may have regarding this
matter.

Very truly yours,

WALKER WILCOX MATOUSEK LLP

David E. Walker

cc:     Mr. Jay Fenton
        The Plus Companies
                (via email)

        Ms. Adrienne Woodhull
        The Plus Companies
                (via email)

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

# EXHIBIT H



William P. Bila
Robert P. Conlon
Edward P. Gibbons
Celeste M. King
Gary L. Lockwood
Paul F. Matousek
David E. Walker
Mark D. Wilcox

**David E. Walker**
Tel: 312.244.6704
dwalker@wwmlawyers.com

May 5, 2008

**VIA EMAIL AND CERTIFIED MAIL-RRR**

Mr. David Stevenson
Williams Montgomery & John Ltd.
20 North Wacker Drive
Chicago, IL 60606

Re:  Westchester Fire Policy No.: LPL-G2391 1553 001
      Named Insured: Williams Montgomery & John Ltd.
      Claimant: KPMG, LLC
      Our File No.: 100104.007

Dear Mr. Stevenson:

As you know, we represent Westchester Fire Insurance Company with respect to the captioned matter, which arises out of a professional malpractice and breach of contract action filed by your firm, on behalf of Mr. Maxwell, against KPMG, styled *Andrew J. Maxwell, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc. v. KPMG LLP,* No. 03 C 3524 (N.D. Ill.), and the subsequent appeal to the Seventh Circuit (No. 07-2819). We write to supplement our correspondence to you dated April 10, 2008, which we incorporate herein by reference. We have also attached a copy of that letter for your convenience.

It is our understanding that, subsequent to our April 10, 2008 letter, your firm retained Richard J. Prendergast of Richard J. Prendergast, Ltd. to defend the Insureds' interests in connection with this matter. Westchester has no objection to the retention of Mr. Prendergast, subject to the following reservations of rights, and the reservation of rights set forth in our April 10, 2008 letter. Please ensure that Mr. Prendergast receives your firm's complete cooperation. Your participation in the selection, direction and control of Mr. Prendergast is particularly important because of Westchester's reservation of rights position and particularly because Westchester reserves any and all rights and coverage defenses that may now exist or which may become apparent during the course of its investigation into the captioned matter.

Westchester's reservation of rights extends to include the right to decline insurance coverage for any part, or all, of the captioned matter. It includes the right to withdraw from further

Mr. David Stevenson
May 5, 2008
Page 2

investigation, defense, payment or settlement of this claim by tendering the entire control of this claim to you. It further includes the right to seek reimbursement of all fees and costs expended in defending this claim in the event it is determined that Westchester does not, or did not, have a duty to defend or indemnify Williams Montgomery & John, Ltd. or another other putative Insured with respect to the captioned matter.

In that regard, we note that Section X – General Conditions, Clause O of the policy provides:

> **O. Reimbursement**
> While the Company has no duty to do so, if the Company pays **Damages** or **Claims Expenses**:
> 1. Within the amount of the applicable Deductible; or
> 2. In excess of the applicable Limit of Liability; or
> 3. Under a reservation of rights to seek reimbursement, and it is determined that the Company is entitled to reimbursement,
>
> all **Insureds** shall be jointly and severally liable to the Company for such amounts. Upon written demand, the **Insured** shall repay such amounts to the Company within thirty (30) days. Failure to pay any amount indicated may lead to policy termination.

Please be advised that by enumerating the foregoing reservation of rights and the reservation of rights set forth in our April 10, 2008 letter, Westchester does not waive but rather expressly reserves all other rights as to coverage it may have under the terms and conditions of the policy and also at law, and further reserves the right to assert any and all rights and coverage defenses that may now exist or which may become apparent during the course of its investigation into the captioned matter.

Lastly, and subject to Westchester's reservation of rights, we ask that you keep us closely apprised of any and all further developments in this matter.

Please do not hesitate to contact the undersigned with any questions you may have regarding this matter.

Very truly yours,

WALKER WILCOX MATOUSEK LLP

David E. Walker

enclosure

Mr. David Stevenson
May 5, 2008
Page 3


cc:     Mr. Jay Fenton
        The Plus Companies
                (via email)

        Mr. Barry Montgomery
                (via email)

        Mr. Richard Prendergast
                (via email)

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

# EXHIBIT I

DATE OF DECISION

MAR 2 1 2008

No. 07-2819

U.S.C.A.- 7th Circuit
RECEIVED

APR 2 2 2008

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

GINO J. AGNELLO
CLERK

| | |
|---|---|
| Andrew J. Maxwell, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., | ) Appeal from the United States ) District Court for the Northern ) District of Illinois ) |
| Plaintiff-Appellant, | ) ) Case No. 03 C 3524 ) |
| v. | ) Honorable Joan B. Gottschall ) Magistrate Judge Morton Denlow |
| KPMG LLP, | ) |
| Defendant-Appellee. | ) |

U.S.C.A.- 7th Circuit
FILED AJB

APR 2 2 2008

GINO J. AGNELLO
CLERK

## RESPONSE OF COUNSEL RESPONDENTS TO THE MOTION OF KPMG, LLP FOR SANCTIONS PURSUANT TO FED.R.APP.P. 38

STEVEN J. ROEDER, THEODORE J. LOW, THOMAS C. KOESSL, and ALYSSA M. CAMPBELL (collectively "counsel respondents") respectfully request that this Court deny the Motion of KPMG, LLP For Sanctions on Appeal Pursuant to Rule 38.

### I.    INTRODUCTION

This Court's March 21, 2008 decision affirming summary judgment in favor of defendant KPMG on the issue of proximate cause noted that "this suit may well be frivolous" and that defendant could, among other things, file a motion in this Court for sanctions against the bankruptcy Trustee pursuant to Fed.R.App.P. 38 ("Rule 38"). KPMG subsequently did so, seeking an award of attorneys' fees and costs against the Trustee and, in addition, against the Trustee's counsel.[1]

---

[1] Counsel respondents Steven J. Roeder, Theodore J. Low, Thomas C. Koessl, and Alyssa M. Campbell, all partners in the firm of Williams Montgomery & John Ltd., filed appearances with this Court on behalf

Prior to this Court's March 2008 Opinion, including throughout the multi-year district court proceedings, neither KPMG nor District Judge Gottschall (nor Magistrate Judge Denlow), raised the specter of sanctions, even after the issuance of Judge Gottschall's summary judgment opinion in favor of KPMG.  Nor, until this Court's March 2008 Opinion, did KPMG ever suggest that during the appellate phase of this case sanctions were warranted.  Simply put, this is not a case in which grounds for sanctions were so obvious to the parties or the district court as to prompt the threat of a punitive response, and it is not a case where, in the face of sanctions threats by opposing counsel or warnings of possible sanctions by the district court, the Trustee and his counsel obstinately trudged on without regard to whether there existed any reasonable expectation of prevailing.

In determining whether an appeal is frivolous and subject to sanctions under Rule 38, this Court has explained that "'typically, courts have looked for some indication of the appellant's bad faith suggesting that the appeal was prosecuted with no reasonable expectation of altering the district court's judgment and for purposes of delay or harassment or out of sheer obstinacy.'"  *See Depoister v. Mary M. Holloway Foundation*, 36 F.3d 582, 588 (7th Cir. 1994).  Under that standard, KPMG's motion for Rule 38 sanctions should be denied.

Based upon Illinois state court decisions, there was an objectively reasonable belief that the district court's judgment could be altered *if* the Trustee succeeded in convincing this Court that the traditional foreseeability standard commonly employed in negligence cases applied to the Trustee's negligence claims against KPMG.  Beyond the fact that counsel respondents had an objectively reasonable expectation that the district court's judgment could be altered, there is no

---

of the Trustee.  Steven J. Roeder, Thomas C. Koessel and Alyssa M. Campbell appeared on the briefs filed in this Court on behalf of the Trustee.

evidence in the record, and nothing presented by KPMG in its motion, to suggest that this case was pursued in bad faith or for some improper purpose.

To support its motion for sanctions under Rule 38, KPMG argues that "the Trustee did not discuss, distinguish or even cite a single one" of the decisions KPMG now describes as the controlling authority for proximate cause in auditor negligence cases. Contrary to KPMG's characterization, the Trustee's briefs specifically discussed the competing standards for proximate cause that the parties advanced before the Court and argued that the "loss causation" cases cited by KPMG involved fraud-related claims that were not applicable to the negligence claims at issue here. (*See* Trustee's brief pp. 30-36; reply brief pp. 3-8 and n. 2). In short, contrary to KPMG's characterization, this is not a case where the Trustee and his counsel simply buried their heads in the sand and ignored applicable law. Instead, at its core, this was a case where there was a serious and objectively reasonable disagreement over the standard applicable to determining proximate cause in auditor malpractice actions.

Nor is this a case where the Trustee and his counsel whimsically filed a claim without seriously vetting the merits of the contemplated action. Rather, this case was filed only after thorough review and analysis of KPMG's audit work papers and with expert consultation concerning whether KPMG failed to discharge its duties. (*See infra* pp. 15-16). Indeed, the imposition of sanctions here may only serve to unnecessarily discourage legitimate efforts in the future to pursue claims in cases where there exists doubt about controlling legal precedent. Such claims, though more often rejected, are also sometimes successful and, in either event, can contribute positively to the development of the law. As this Court held, in the context of overturning a district court's Rule 11 sanction, "Rule 11 cannot be allowed to thoroughly undermine zealous advocacy. 'The rule is not intended to chill an attorney's enthusiasm or

3

creativity in pursuing factual or legal theories.'" *Thompson v. Duke*, 940 F.2d 192, 195-96 (7th Cir. 1991).

Finally, even if this Court were to find that the appeal was technically frivolous, we respectfully submit that this Court should exercise its discretion, as is permitted under Rule 38, to deny the request for sanctions because there is no evidence that the appeal was pursued in bad faith.

## II.    THE RULE 38 STANDARD

This Court set forth the standard for awarding sanctions under Rule 38 in *Depoister v. Mary M. Holloway Foundation*:

> To award sanctions under Rule 38, Federal Rules of Appellate Procedure, we must conclude that (1) the appeal is frivolous, and (2) sanctions are appropriate. "An appeal is frivolous when the result is obvious or when the appellant's argument is wholly without merit." In determining whether an award of sanctions is appropriate, "'typically, courts have looked for some indication of the appellant's bad faith suggesting that the appeal was prosecuted with no reasonable expectation of altering the district court's judgment and for purposes of delay or harassment or out of sheer obstinacy.'"

36 F.3d at 588 (citations omitted); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 459 (7th Cir. 1994) (where this Court noted that it has "required some evidence that an appeal was pursued in bad faith before finding that sanctions should be imposed").

Moreover, this Court has recognized that an appeal based on a questionable legal position may not be deemed frivolous if the underlying litigation is complex or confusing or the appeal presents an issue of first impression. *See Maneikis v. Jordan*, 678 F.2d 720, 722 (7th Cir. 1982). And, even if the appeal is found to be frivolous, it is within this Court's discretion whether to award any sanction. *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 938 (7th Cir. 1989) (*en banc*).

4

## III.   ARGUMENT

### A.    The Record Fails To Show That The Trustee And His Counsel Had "No Reasonable Expectation of Altering the District Court's Judgment."

Summary judgment was granted by the district court based on Judge Gottschall's holding that plaintiff had to prove loss causation – *i.e.*, that KPMG's malpractice actually caused the merged company – marchFIRST – to fail. The issue, then, for purposes of the Rule 38 motion is whether there existed no objectively reasonable expectation by the Trustee or his counsel that a contrary conclusion concerning what needed to be proven could be established on appeal. For the reasons explained below, such an objectively reasonable expectation clearly existed. Indeed, that expectation was based upon a reasonable interpretation of recent Illinois caselaw addressing the issue of proximate cause in auditor negligence cases. While this Court has now forcefully rejected the Trustee's position, the appeal was not wholly without merit or otherwise frivolous and does not warrant the imposition of sanctions.

At the time this case was filed, various cases predicated on claims of fiduciary duty breaches, fraud and securities law violations held that a plaintiff must prove not only that defendant's conduct was one of the events that foreseeably led to plaintiff's damages, but also that defendant's conduct actually caused the failure of the transaction or other event from which plaintiff's damages arose. This concept of loss causation, however, had not been held applicable to accountant negligence cases. In fact, in what was viewed as the closest case under Illinois law – the *City Colleges* case – the Illinois Appellate Court's decision supported the proposition that the caused-the-transaction-to-fail standard does not apply in an auditor malpractice case. *See Board of Trustees of Community College, Dist. No. 508 v. Coopers & Lybrand LLP*, 775 N.E.2d 55, 63 (Ill. App. Ct. 1st Dist. 2002), *aff'd in part, rev'd on other grounds*, 803 N.E.2d 460 (2003) ("*City Colleges*").

As described in the Illinois Appellate Court's opinion in *City Colleges*, the initial complaint in that case alleged that defendants Arthur Anderson ("Anderson"), [City Colleges' auditor for the 1991 and 1992 fiscal years] and Coopers and Lybrand ("Coopers") [the auditor for fiscal year 1993] "failed to detect and notify the Board of illegal, inappropriate and highly risky investments" City College's treasurer had made and that "if the auditors had exercised their duties of professional due care, they would have disclosed in their reports and advised the Board of the treasurer's activity." 775 N.E.2d at 61.  Plaintiff then alleged that, if so informed, "the Board would have taken the necessary steps to bring the investments into compliance with the [plaintiff's] investment policy and avoided the losses as a result of the policy violation." *Id.*

The plaintiff settled with Anderson while the case was pending, amended the complaint to name only Coopers and, on the negligence claim, won a verdict of $23 million reduced by 45% attributable to plaintiff's comparative negligence.  *Id.*  The causation evidence, unsuccessfully challenged by Coopers on appeal as insufficient, consisted primarily of the testimony of three members of City College's Board and two former members "as to the action they would have taken if Coopers had indicated any deviation from the investment policy." *Id.* at 62.  Essentially, those witnesses claimed they would have put a stop to any improper investment practices had they been reported. *Id.* at 63.

Clearly, the direct causes of the losses sustained by the plaintiff in the *City Colleges* case were the treasurer's conduct in engaging in improper investment practices, contrary to investment policies which he was obliged to follow, and the sudden change in interest rates.  Coopers therefore argued that there was no competent evidence of loss causation attributable to Coopers' alleged failure to properly advise the Board of the treasurer's conduct, particularly

6

since the specific investments that became losing ones were made *after* the audits were completed.[2] *Id.* at 63.

As the Appellate Court stated:

> Relative to the loss causation issue, Coopers argues that there was no competent evidence of loss causation and that it was unreasonable for the jury to conclude that City Colleges' losses were foreseeable. Coopers relies on *Martin v. Heinhold Commodities, Inc.*, 163 Ill.2d 33, 60, 205 Ill.Dec. 443, 643 N.E.2d 734 (1994), for the proposition that a tort plaintiff must prove that he would not have suffered a loss if the facts were what he believed them to be or that the negligent conduct was in some reasonably direct, or proximate, way responsible for his loss. *Martin*, 163 Ill.2d at 60, 205 Ill.Dec. 443, 643 N.E.2d 734. Coopers contends that two important facts undisputed at trial require that this court grant Coopers' request for judgment *n.o.v.* First, City Colleges engaged Coopers to audit its financial statements until June 30, 1993, and second, City Colleges did not suffer any out-of-pocket losses on the investments it owned on that date. Coopers' argument is that the composition of City Colleges' portfolio substantially changed after the date on which Coopers was obligated to audit the investments and therefore, the losses were a result of the investment change and not negligence in conducting the audit. We disagree.

*Id.*

The Appellate Court rejected this argument, concluding that "there was sufficient evidence for the jury to determine that Coopers' failure to detect the treasurer's violation of investment policy, and City Colleges not acting to correct the violation, could lead to the financial injury City Colleges alleges. The question of foreseeability of injury is a factual question for the jury to decide (citations omitted)." *Id.*

The Supreme Court of Illinois granted Coopers' petition for leave to appeal and affirmed the Appellate Court's decision except with respect to the trial court's refusal to apply the

---

[2] As did KPMG in the instant case, Coopers relied on *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734 (1994) and the *Movitz v. First Nat'l. Bank*, 148 F.3d 760 (7th Cir. 1998) line of federal cases to argue that proof of loss causation was required.

Anderson settlement as a set-off against the amount otherwise recoverable against Coopers. The Supreme Court decision in *City Colleges* does not address the loss causation issue directly, focusing instead on issues relating to comparative negligence. However, in addressing the set-off issue, the Supreme Court did conclude that "if either auditing firm had informed the Board that the securities in the City Colleges' portfolio violated its investment policy, the Board could have ended these investment practices *and the later investments that ultimately resulted in the claimed losses would not have occurred*." 803 N.E.2d at 472 (emphasis added).

That reasoning, and the Appellate Court's holding, provided a reasonable basis to contend that, in order to establish liability in an accounting malpractice action, it would suffice to contend that, had an audit been properly conducted, a subsequent event or transaction would not have happened and losses later sustained as a result of that event or transaction would never have occurred. In its appellate briefs, the Trustee therefore contended that causation principles could be satisfied so long as KPMG's malpractice could lead to marchFIRST's injury, a question of foreseeability. Since under Illinois law foreseeability is virtually always a jury question, the Trustee contended that that issue should not have been resolved on summary judgment. *See Palay v. United States*, 349 F.3d 418, 432-33 (7th Cir. 2003). On this basis, the Trustee and his counsel believed there was an objectively reasonable basis to seek reversal of this judgment.

Respondent Steven J. Roeder, the lead attorney for the Trustee in the instant case, was counsel for the successful plaintiff-appellee in the *City Colleges* case in the Appellate Court. The complaint in the instant case was filed six months after the Appellate Court ruled, and certainly nothing in the Supreme Court's opinion issued nine months after the Trustee's complaint was filed dictated abandonment of the foreseeable negligence standard advanced in this case. We have quoted generously from the Appellate Court's opinion to demonstrate that it

8

would be difficult to argue that the Appellate Court implicitly found that loss causation was established in that case. Not surprisingly, KPMG never argued that *City Colleges* stood for the proposition that loss causation was the controlling standard in accountant malpractice actions based on negligence. Instead, KPMG looked primarily to fraud, fiduciary, and statutory securities cases to support its argument.

Beyond the *City Colleges* case, there were other Illinois state and federal cases involving malpractice claims that objectively supported the Trustee's position that summary judgment should not have been granted in this case. (*See* Trustee's brief, pp. 29-34). For example, in *First Nat'l Bank of Sullivan v. Brumleve and Dabbs*, 539 N.E.2d 877 (Ill. App. Ct. 4th Dist. 1989), the plaintiff bank alleged that the defendant's audit malpractice prevented the bank's management from being informed of its true financial position and thus prevented the plaintiff from taking action to prevent losses made from improvident loans. *Brumleve and Dabbs*, 539 N.E.2d at 880. The defendant auditor moved to dismiss the bank's complaint, arguing that the loan losses were caused by the plaintiff's directors, who had approved insider loans to other directors knowing that the loans were illegal when they were made. *Id.* The trial court granted the auditor's motion to dismiss, finding as a matter of law that the plaintiff could not establish that the defendant's actions proximately caused its damages. *Id.* at 879.

The Illinois Appellate Court in *Brumvele and Dabbs* reversed the trial court, noting that proximate cause is ordinarily a question of fact to be determined from all the pertinent circumstances. *Id.* at 880. Because it found that "there exists the possibility that [plaintiff bank], believing its financial condition to be as reported by [defendant auditor], continued to make loans in a similar manner and, therefore suffered more losses," the *Brumvele and Dabbs* court held that the plaintiff should be given the opportunity to prove its case. *Id.* at 881.

9

In a recent decision subsequent to the decisions in *Movitz, Ryan, and Bastian,* this Court held that "[a] legal malpractice action is similar to any other negligence claim, and traditional principles apply." *TIG Ins. Co. v. Giffin Winning Cohen & Bodewes, P.C.,* 444 F.3d 587, 591 (7th Cir. 2006). The *TIG* opinion described and applied the traditional proximate cause principles under Illinois law, just as the Trustee and his counsel did in their briefs:

> Proximate cause describes two distinct requirements – cause in fact and legal cause. *First Springfield Bank & Trust v. Galman,* 188 Ill.2d, 720 N.E.2d 1068 (1999); *see also Abrams v. City of Chicago,* 211 Ill.2d 251, 811 N.E.2d 670 (2004). Cause in fact exists only if the defendant's conduct was a "material element and a substantial factor in bringing about the injury." *Abrams* at 675. Legal cause, on the other hand, is largely a question of forseeability. The relevant inquiry is whether 'the injury is of a type that a reasonable person would see *as a likely result* of his or her conduct'." (Emphasis in original). *Abrams* at 675, quoting *Galman.*

*TIG,* 444 F.3d at 591.

Pursuant to the decision in the *City Colleges* case and other Illinois state and federal cases, which suggested that the traditional foreseeability test for proximate cause applied in malpractice actions, counsel respondents respectfully submit that it was objectively reasonable to argue that loss causation principles did not apply to the auditor malpractice action brought by the Trustee.

The issue, of course, is not whether the Trustee was right or wrong in his legal position. *See e.g. NLRB v. Lucy Ellen Candy Div. of F&F Lab., Inc.,* 517 F.2d 551, 555 (7th Cir. 1975) (where the court held that "[a] frivolous appeal means something more to [the Court] than an unsuccessful appeal."). Thus, the Trustee's lack of success on appeal is not grounds for sanctions, particularly where, under the existing Illinois law, there was a colorable argument to be advanced on the issue of causation.

10

1.    **Misinterpretation of the Law is Not Grounds for Rule 38 Sanctions.**

KPMG contends that the Trustee misconstrued the law, misread the *Martin* case, and failed to properly apply the law. But misinterpretation of the law is not a basis to impose sanctions. *See e.g. Magnus Electronics, Inc. v. La Republica Argentina*, 830 F.2d 1396, 1405 (7th Cir. 1987) (finding that the district court abused its discretion in imposing Rule 11 sanctions, in part because appellant's "confused presentation of the issues in this case was due to its misreading of the relevant case law rather than to an attempt to mislead this court...."); *see also Allinder v. Inter-City Products Corp.*, 152 F.3d 544, 552-53 (6th Cir. 1998) (where the court denied the appellee's Rule 38 motion, holding that appellant had "put forward a cognizable, albeit strained, interpretation of [the relevant statute] to support her position."); *Mohamed v. Marriott Int'l., Inc.*, 905 F. Supp. 141, 159 (S.D.N.Y. 1995) (denying Rule 11 sanctions where "[t]he parties have raised legal issues sufficient to constitute a differing interpretation of the law."). Therefore, even accepting KPMG's arguments that the Trustee and his counsel misinterpreted the law with respect to causation, the law is clear that such a misreading of the applicable caselaw is not grounds for imposing sanctions.

Further, if the law is not settled on an issue, it is "not 'objectively unreasonable as a matter of law' for plaintiff's counsel to take a different position because that position would not be 'contrary to existing law in this circuit.'" *Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co., Inc.* 8 F.3d 441, 449 (7th Cir. 1993) (reversing Rule 11 sanction). The cases cited by KPMG and by the district court, specifically *Movitz v. First Nat'l. Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998), *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991 (7th Cir. 2007), *Ryan v. Wersi Elec. GmbH & Co.*, 59 F.3d 52 (7th Cir. 1995) *(per curiam)*, *Bastian v. Petren Res. Corp.*, 892 F.2d 680 (7th Cir. 1990), *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824

11

(7th Cir. 2007), *Cleveland v. Rotman*, 297 F.3d 569 (7th Cir. 2002), and *Dura Pharm, Inc. v. Broudo*, 544 U.S. 336 (2005), all dealt with the issue of loss causation in the context of claims for securities fraud, fraud or breaches of fiduciary duty. None of those cases dealt with a claim for malpractice, as was the case here. Since those cases did not deal with the issue of whether loss causation applies to an auditor malpractice claim, and since the *City Colleges* decision involved a claim of auditor malpractice, the law on this issue could not fairly be said to be completely settled when this appeal was taken.

Moreover, contrary to KPMG's argument in its motion, the Illinois Supreme Court's decision in *Martin v. Heinold Securities, Inc.*, 643 N.E.2d 734 (Ill. 1994), does not compel the conclusion that loss causation principles apply to an auditor malpractice claim based on negligence. In *Martin*, the court found "Illinois law to be similar to the analysis used by these federal courts which require both transaction causation and loss causation *in order to recover for misrepresentation in securities cases*." 643 N.E.2d at 747 (emphasis added). Indeed, defendant Coopers relied on *Martin* in *City Colleges* to no avail.

### 2. The Complexity of Causation Arguments in this Case Suggests that this Issue Was Not Frivolous.

"An appeal, though based upon a questionable legal position, may not be deemed frivolous if, *inter alia*, the underlying litigation is complex or confusing." *See Coghlan v. Stavkey*, 852 F.2d 806, 812 (5th Cir. 1988) citing to *Nat'l. Acceptance Co. of Am. v. Frigidmeats, Inc.*, 627 F.2d 764 (7th Cir. 1980); *see also Lyall v. Airtran Airlines, Inc.*, 109 F. Supp. 2d 365, 368 (E.D. Pa. 2000) (finding, in considering issue of fraudulent joinder, that "if we must make a penetrating or intricate analysis of state law in order to determine if the claim is colorable then it is likely that the claim is indeed colorable and not frivolous.").

12

The sophistication of the causation issues in this case, including the extent to which the *City Colleges* case, in particular, impacted the Trustee's argument, is reflected in KPMG's response to the Trustee's liability case. KPMG did not file a Rule 12(b)(6) motion to dismiss arguing that the complaint failed to allege the existence of loss causation. Nor did KPMG (or, for that matter, either District Judge Gottschall or Magistrate Judge Denlow) ever suggest during the district court proceedings that it was sanctionable for the Trustee to argue that loss causation was not applicable to auditor negligence actions. Certainly, if KPMG had believed that the law was as straightforward and obviously contrary to the Trustee's position as KPMG now contends, it would have filed a sanctions motion before the district court.

**B.      The Trustee and His Counsel Did Not Ignore Controlling Authority.**

KPMG claims that appellant was "ostrich-like" by ignoring controlling legal authority, and in particular, KPMG criticizes the purported failure to cite, in either of the Trustee's briefs, the cases of *Movitz, Ray, Ryan, Bastian, Tricontinental, Cleveland* and *Dura Pharm.* (KPMG's Rule 38 Motion, p. 5). First, as a matter of clarification, the Trustee's reply brief expressly cited to *Ray, Ryan, Bastian* and *Movitz,* noting that they did not involve auditor malpractice actions and thus the application of loss causation in those cases did not resolve the issue here.[3] (*See* Reply Brief, p.8, n.2). Moreover, in the Statement of Facts of his opening brief, the Trustee cited to pages 11 and 12 of the district court opinion regarding the court's finding that the Trustee could not show that KPMG either caused the merger to fail or should have foreseen the poor merger. (*See* Trustee's Brief, p. 24). Pages 11 and 12 of the district court opinion cited two of the cases that KPMG contends should have been cited: *Ryan* and *Movitz,* and a few pages earlier

---

[3] *See Indep. Lift Truck Builders Union v. Nacco Materials Handling Group, Inc.,* 202 F.3d 965, 969 (7th Cir. 2000) (denying Rule 38 sanctions where appellant did not address controlling precedent in opening brief but did "attempt to distinguish these cases in its reply brief.").

the district court also cited *Martin*, *Ray* and *Bastian*. (*See* Trustee's Brief, A11-A14). In an entire section of his appellate brief (VII(C)(2)), the Trustee contended that "[t]he district court erred when it held that the Trustee must prove that KPMG caused the merger to fail." (*See* Trustee's Brief, p. 30-35). Trustee's argument was that loss causation, which typically applied in the securities/fraud context, was inapplicable in a professional negligence case. Since the underlying basis for the cases cited by the district court did not (in Trustee's view) apply at all, there was no reason to address each specific case that fell within that category. Rather, the Trustee addressed why that entire category of cases did not apply.

The present situation is different than those in the cases cited by KPMG in its Rule 38 Motion (*Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192 (7th Cir. 1987); *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928 (7th Cir. 1989) (*en banc*); *Hartz v. Friedman*, 919 F.2d 469 (7th Cir. 1990)). There is no basis here to contend that the Trustee was trying to hide or ignore these cases, or that the brief could have led this Court astray, since the Trustee attached and referred to the district court opinion which cited those very same cases. Finally, this Court has held that the failure to cite relevant authority does not alone justify the imposition of sanctions. *Thompson v. Duke*, 940 F.2d 192, 198 (7th Cir. 1991).

## C.    Even if the Appeal Is Considered "Frivolous," No Sanctions Should Be Imposed.

"Determining whether sanctions should be issued under this rule [38] is a two-step process: [the Court] must first determine that the appeal is frivolous, and then determine that this is an appropriate case for the imposition of sanctions." *See Williams v. U.S. Postal Service*, 873 F.2d 1069, 1075 (7th Cir. 1989). Furthermore, this Court has discretion to decide whether to award sanctions even if an appeal is deemed frivolous. *See Flaherty v. Gas Research Inst.*, 31

14

F.3d 451, 459 (7th Cir. 1994) (where the court held that it may refuse to impose sanctions under Rule 38 even where a sanction may have been justified).

Although counsel respondents maintain that the appeal was not frivolous, even if this Court were to disagree, sanctions under Rule 38 are still not appropriate. KPMG acknowledges that the standard for the imposition of sanctions requires both that there is no reasonable expectation of altering the judgment *and* an improper purpose, such as "delay or harassment or sheer obstinacy." (KPMG's Rule 38 Motion, p. 4). KPMG offers no evidence of such improper purpose by the Trustee or his counsel. Perhaps the closest it comes to suggesting an improper purpose is in the motion's reference to this Court's discussion of whether trustees in bankruptcy have the same "inhibition" to prosecuting frivolous claims as other litigants. (KPMG's Rule 38 Motion, p. 7-8). But the record in this case does not demonstrate that the Trustee failed to reasonably exercise litigation judgment. Instead, the-prelitigation facts show that the Trustee made an informed decision to sue only after a reasonable investigation and expert consultation. (*See* Affidavit of Steven J. Roeder ("Roeder Aff.") attached hereto as Exhibit 1).

In this regard, the Trustee retained special counsel to investigate potential claims against various professionals who provided services to Whittman-Hart, US Web, and marchFIRST. (*Id.* at ¶ 7). Following issuance of subpoenas to and receipt of documents from KPMG (the Whittman-Hart auditor) and PricewaterhouseCoopers (the US Web auditor), the Trustee's expert found no substantial auditing or other deficiencies in PricewaterhouseCoopers' work and no claim against that firm was recommended or brought. (*Id.* at ¶¶ 9-12). However, the expert did find negligence on the part of KPMG. (*Id.* at ¶¶ 12-13).[4]

---

[4] Trustee's counsel respondents also investigated whether there were claims against Credit Suisse First Boston. (*Id.* at ¶ 12, fn 1). The Trustee was not urged to pursue any claims against that entity and no such claims were brought. (*Id.*)

Based upon the expert's review, the Trustee decided to sue KPMG and prepared a detailed adversary complaint, which was reviewed and supported by the expert before it was filed. (*Id.* at ¶ 14). The issue of causation in this case was informed in significant part by Mr. Roeder's recent experience in the *City Colleges* case, where neither the trial court nor the appellate court required the plaintiff to show that its investment losses were directly caused by the auditor's negligence. (*Id.* at ¶ 14).

Although this Court has rejected the Trustee's legal position and criticized the damages computation, there is no evidentiary basis in the record of this case to conclude that the Trustee or his counsel pursued this litigation recklessly, and certainly no basis to find that he did so with an improper purpose. To the contrary, the Trustee and his counsel carefully considered who, if anyone, was potentially liable for marchFIRST's damages and exercised reasonable judgment in deciding whether to sue KPMG and other potential defendants.

Nor is there a basis to find that the Trustee acted with "sheer obstinacy." This is not a case where the plaintiff forged ahead, obstinately refusing to heed warnings that pursuing the case would be sanctionable. Until this Court's March 21, 2008 Opinion, no one -- not the district court and not KPMG -- ever suggested that this case was frivolous or warranted sanctions. (*See* Roeder Aff. ¶ 16).[5] There has been no contention that the appeal was taken for purposes of delay. As the plaintiff, the Trustee had the opposite motivation -- to achieve as prompt a resolution for the Estate as possible.

---

[5] KPMG never raised the specter of sanctions: it did not file a motion for sanctions in the district court; it did not serve the Trustee or his counsel with a sanctions motion; it did not send any correspondence alleging a Rule 11 violation; it did not demand that the Trustee withdraw the adversary complaint or any allegations in the complaint. (*Id.* at ¶ 16). Nor did KPMG ever assert that the complaint failed to state a cause of action. It did not move to dismiss the complaint under Rule 12(b)(6); instead it filed an answer and affirmative defenses. (*Id.* at ¶ 15). None of KPMG's affirmative defenses specifically attacked the Trustee's proximate cause theory. (*Id.*)

This Court typically looks for some indication of bad faith before awarding sanctions. In *Depoister*, the Court "rejected most of [debtor-appellant's] arguments...." 36 F.3d at 588. Nevertheless, it concluded that the contentions were reasonable and there was no evidence that the appeal was pursued in bad faith. For that reason, the Rule 38 motion was denied. *Id.* Similarly, in *Flaherty* this Court found that the substantive issues on appeal were not a particularly close call, but in the absence of any evidence of bad faith it declined to impose sanctions under Rule 38. 31 F.3d at 459.

KPMG argues that "[g]ood reason" exists to award sanctions because not only did the claim fail on "evident" grounds but the damages claim was groundless and intimidating. In the context of KPMG's Rule 38 motion, this contention, while disputed, provides no grounds for contending that the Trustee filed and pursued a frivolous appeal. The summary judgment entered by the district court was not based on a determination that damages were groundless or unprovable. The Trustee appealed from a summary judgment based on the legal conclusion that loss causation had to be, and could not be, proved. The issue of whether the Trustee's damages case was sustainable was raised by KPMG and was not the basis for either the district court's summary judgment or the Trustee's appeal.

Whether KPMG could have sought sanctions in the district court based on this aspect of the Trustee's case is not the issue. The question for purposes of Rule 38 is whether the appellant sought reversal on frivolous grounds. The basis for the appeal related solely to the basis for the district court's order -- the issue of loss causation -- and for the reasons heretofore discussed, that appeal was not frivolous. Thus, the damages claim does not provide a basis to impose sanctions.

17

### D.    KPMG's Motion is Untimely and/or Waived.

KPMG's counsel's fee records, attached to its Rule 38 Motion, indicate that at least by August 1, 2007, before it even began working on its appellee's brief, KPMG's counsel began considering the issue of sanctions on appeal. The August 1st entry states: "Review sanction issue re appeals." Subsequent entries (August 16 and August 17) describe "[r]esearch into frivolous appeal issues" and "[r]esearch into FRAP 38 issues, draft of memo on rule 38 issues." Despite analyzing these issues, KPMG never filed a Rule 38 motion or threatened to seek sanctions pursuant to Rule 38 before this Court's March 2008 Opinion.

Two possibilities exist. First, KPMG may have concluded that the appeal was not a frivolous appeal. In that case, KPMG should not now take the position that it was frivolous, merely because it received a strongly worded, favorable ruling. Alternatively, KPMG may have concluded that the appeal was frivolous, but, for strategic reasons, decided not to seek sanctions. If so, its decision to not file a motion for sanctions should be deemed a waiver.

### E.    The Sanctions KPMG Requests Are Excessive and the Amount of Fees Should Be Remanded For an Evidentiary Hearing.

KPMG's motion seeks as sanctions every dollar it has paid in defense costs for the appeal: $233,327 in attorneys' fees and $1,001.99 in costs. Even where fees are awarded as sanctions, the fees must be "reasonable." *See e.g. Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 614-15 (7th Cir. 2006). And, of course, even if fees are reasonable, it does not follow that any sanction must be equal to the fees incurred.

In determining the reasonableness of a sanctions award, courts have looked at four factors: (1) the deterrence effect of the award; (2) whether the award will compensate the movant for expenses incurred in litigation; (3) whether the movant mitigated its expenses; and (4) the

18

respondent's ability to pay. *In re Lane*, 991 F.2d 105, 108 (4th Cir. 1993) (remanding issue of amount of Rule 38 sanctions to district court for fact finding based upon these factors).

Here, KPMG's requested sum fails to satisfy any of the four requirements in varying degrees on all of these factors. A sum far below a quarter of a million dollars would have a deterrence effect on counsel respondents and on future litigants. This Court's opinion, in itself, will cause bankruptcy trustees and their counsel to be particularly cautious -- possibly too much so -- in deciding whether to pursue litigation claims on behalf of bankrupt estates. The message has been sent and further monetary sanctions are not necessary to deliver an even stronger message. Indeed, in terms of deterrence, it is submitted that some consideration must be given to the Hobson's Choice that may confront other trustees. The extent of any sanction here may well create an overreaction in terms of deterrence. Trustees in bankruptcy and their counsel should not be rendered so reluctant to pursue claims, out of fear of possible sanctions if they are wrong on the law, that only the safest of claims are asserted. A trustee should not be so encouraged to play it safe that he or she abandons opportunities to recover assets and seek damages which the estate and its creditors are entitled to pursue.

As to the compensation element, the fees incurred have not yet been determined to be reasonable. That is not to say that the fees claimed can be said to be unreasonable *per se*. But the process of determining whether fees and costs well in excess of $200,000 are reasonable is a fact-based procedure, bearing in mind that much of what was presented on appeal had already been presented to the district court in summary judgment papers.

Regarding mitigation, KPMG has made no efforts during the course of this litigation to mitigate its fees. It never before asserted that the Trustee should abandon this suit or else face a post-judgment/post-appeal request for fees incurred from the inception of the suit. "The duty to

19

mitigate is already recognized in cases under Fed. R. Civ. P. 11, and the same principles govern sanctions proceedings under Fed. R. App. P. 38 as govern those under Rule 11." *Brooks v. Allison Div. of GM Corp.*, 874 F.2d 489, 490 (7th Cir. 1989) (denying "otherwise meritorious" sanctions motion because of appellee's failure to file a motion to dismiss the appeal rather than filing a brief on the merits).

Finally, the Trustee and counsel respondents should be given the opportunity to develop the evidence of what impact an award of $234,000 would have on them. The matter should not be summarily disposed of based upon a motion and respondents' papers. Accordingly, should this Court determine that sanctions of one kind or another should be assessed, counsel respondents request that this Court remand the matter to the district court for the development of evidence, through an evidentiary hearing or otherwise, on this issue. *See e.g.*, *In re Lane*, 991 F.2d at 108 (where the case was remanded to determine the amount of sanctions under the relevant factors relating to the imposition of sanction).

## IV.    CONCLUSION

Counsel respondents respectfully request that this Court deny KPMG's motion for Rule 38 sanctions.

<div style="margin-left:40%">

Respectfully submitted,

STEVEN J. ROEDER, THEODORE J. LOW,
THOMAS C. KOESSL, and ALYSSA M. CAMPBELL

By: _____
    One of Their Attorneys

</div>

Richard J. Prendergast, Esq.
Michael T. Layden, Esq.
RICHARD J. PRENDERGAST, LTD.
111 W. Washington St., Suite 1100
Chicago, Illinois  60602
(312) 641-0881

<div style="text-align:center">20</div>

No. 07-2819

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| Andrew J. Maxwell, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., | ) Appeal from the United States<br>) District Court for the Northern<br>) District of Illinois |
| Plaintiff-Appellant, | ) Case No. 03 C 3524 |
| v. | ) Honorable Joan B. Gottschall<br>) Magistrate Judge Morton Denlow |
| KPMG LLP,<br>Defendant-Appellee. | ) |

### AFFIDAVIT OF STEVEN J. ROEDER

I Steven J. Roeder, being first duly sworn, state as follows:

    A.    Background.

1.    I am an attorney licensed to practice law in the State of Illinois and am a partner in the firm of Williams Montgomery & John, Ltd. I am a member of the bar of the Seventh Circuit Court of Appeals, the United States District Court for the Northern District of Illinois and other district courts. For the past three years I have been an adjunct Professor of Law at Northwestern University School of Law. I am also the Chair for the Alternative Dispute Resolution Committee for the Seventh Circuit Bar Association.

2.    In the 24 years that I have practiced law, I have never been the subject of any disciplinary action. I have never had an order of sanctions entered against me in any court. Indeed, until now, no motion for sanctions under Rule 11, Rule 38, 28 U.S.C. § 1927, or Illinois Supreme Court Rule 137 has even been brought concerning any matter in which I have been involved substantively.

B.    Participation in the *City Colleges* Litigation.

3.    With my former partner Rueben L. Hedlund, I represented the Board of Trustees of the City Colleges of Chicago in an audit malpractice action it brought against Coopers & Lybrand, LLP and Arthur Andersen, LLP in the Circuit Court of Cook County, Illinois, entitled *Board of Trustees of Community College District No. 508 v. Coopers & Lybrand, LLP*. After Arthur Andersen settled with the Board shortly before trial, I tried the case with Mr. Hedlund in November and December 2000 against Coopers & Lybrand only. The jury returned a verdict for the plaintiff against Coopers & Lybrand.

4.    I participated in the jury conference in that case. Attached as Exhibit A is a true and correct copy of the instruction on proximate cause that Judge Richard Billik gave to the jury. It is the standard IPI 15.01 instruction.

5.    I was also involved in the post-judgment briefing after which Judge Billik denied Coopers & Lybrand's motion for judgment not withstanding the verdict. In particular, although Coopers & Lybrand argued that this Court's loss causation opinions barred recovery, Judge Billik overruled the defendants' loss causation arguments on the grounds that the injury was "foreseeable." A copy of Judge Billik's order is attached as Exhibit B.

6.    Because I did not practice with Mr. Hedlund in the same firm, I was listed as "of counsel" on the briefs involving Coopers & Lybrand's appeal of the verdict to the First District Appellate Court. I was aware of Coopers & Lybrand's arguments in the appeal, based in large part on this Court's loss causation decisions, and was also satisfied that the appellate court's decision affirming the jury's verdict in July 2002 did not follow these decisions.

2

C.    Investigation of Claims Against Professionals for the Trustee.

7.    Based in part on my experience in *City Colleges*, my name was given to the Chapter 7 Trustee of the bankruptcy estates of marchFIRST, Inc. to investigate potential claims the Trustee might be able to assert against various professionals. These professionals included (1) KPMG, LLP, ("KPMG") the auditor for Whittman-Hart, Inc. and subsequently marchFIRST, Inc.; (2) PricewaterhouseCoopers LLP ("PwC"), the auditor for US Web/CKS, Inc., and subsequently a consultant to marchFIRST, Inc.; and (3) Credit Suisse First Boston, Whittman-Hart's investment banker. I was retained by the estate in April 2002. As part of my retention, I requested and the bankruptcy court approved a $50,000 retainer so that experts could participate in these investigations.

8.    As part of the investigation process, I sent correspondence to KPMG in the Summer of 2002 asking for, among other things, copies of KPMG's workpapers for Whittman-Hart, Inc. for the audit for the year that ended December 31, 1999. KPMG, however, refused access to its workpapers.

9.    On October 16, 2002, I issued a subpoena for KPMG's workpapers pursuant to Bankruptcy Rule 2004; on October 21, 2002, I issued a similar subpoena to PwC. In late December 2002 and early 2003, KPMG produced the workpapers that I had subpoenaed.

10.    In response to my subpoena, PwC subsequently produced its workpapers.

11.    I made all the workpapers from both auditing firms available to Harvey Moskowitz, the expert I had retained. Among other accomplishments, Mr. Moskowitz was formerly the National Director of Professional Services for BDO Seidman, a member of the AICPA auditing standards board, and a member of the New York State Board for Public Accountancy.

3

12.    Mr. Moskowitz did not find much to criticize with respect to PwC's work and I did not recommend that the Trustee consider pursuing or asserting any claims against PwC. No such claims were asserted. Mr. Moskowitz had a much different view of KPMG's work.[1]

C.    The Adversary Complaint against KPMG.

13.    Because of Mr. Moskowitz's view of KPMG's work, I began preparing a complaint against KPMG. Before the complaint was filed, however, I made sure that Mr. Moskowitz read the pleading and agreed that my substantive allegations were well grounded in fact based, among other things, on his review of KPMG's workpapers.

14.    With respect to my allegations regarding proximate cause, I relied on the First District Appellate Court's decision in *City Colleges* and my awareness of the loss causation arguments that Coopers & Lybrand had made in that case without success. As a result, I drafted the complaint with the understanding that the proximate cause standard in an audit malpractice case, as in other negligence cases under Illinois law, presented essentially a foreseeability issue that Illinois law primarily reserved for the jury to decide.

15.    KPMG did not move to dismiss the adversary complaint to test any of the theories we had alleged. Instead it filed an answer and affirmative defenses. After the close of discovery, KPMG sought leave to file additional affirmative defenses of assumption of risk, *in pari delicto* and equitable estoppel. The district court, however, denied KPMG's motion. Until it filed its motion for summary judgment, KPMG did not file any pleading or motion that directly contested plaintiff's proximate cause theory.

---

[1]    The firm of Williams Montgomery & John Ltd. also investigated potential claims against the investment firm of Credit Suisse First Boston and did not recommend that any such claims be brought.

4

D.    No Rule 11 objection.

16.    Although this dispute had been closely and actively contested since even before it was filed in 2003, at no time did KPMG or its counsel file a motion that contended that the Trustee or his counsel had violated Rule 11 or 28 U.S.C. § 1927. Nor did I receive from KPMG or its counsel a letter threatening Rule 11 sanctions or claiming violations of 28 U.S.C. § 1927.

E.    The Decision to Appeal.

17.    After the district court granted summary judgment in favor of KPMG, counsel representing the Trustee in this case considered whether good grounds existed for filing a notice of appeal. In this connection, I believed that under Illinois law it was incorrect to apply in a professional malpractice setting the loss causation test of "causing the transaction to fail." Supporting this interpretation was my view that Illinois malpractice cases against doctors did not require that a plaintiff prove that a doctor accused of malpractice caused the patient to die. Similarly, I did not read Illinois cases on legal malpractice to require a plaintiff to prove that a lawyer who committed malpractice by failing to document a transaction caused his client's transaction to become a losing one. In addition to the difficulties of applying this loss causation test to a claim against a professional service provider, I understood the prevailing Illinois cases on legal cause in negligence actions in general, and in audit malpractice actions in particular, as supporting the position that a foreseeability standard applied and that that issue would normally

5

be left for the jury to decide. For the reasons previously discussed, I also had what I believed to be a reasonable expectation that the summary judgment would be reversed.

FURTHER AFFIANT SAYETH NOT.

_Steven J Roeder_

SUBSCRIBED & SWORN to before
me this 22 day of April, 2008
_Denise E. Mathauser_
NOTARY PUBLIC

♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦
♦    "OFFICIAL SEAL"    ♦
♦  DENISE E. MATHAUSER  ♦
♦ Notary Public, State of Illinois ♦
♦ My Commission Expires 08/20/11 ♦
♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦

6

(MODIFIED 12-04-2000)

PLAINTIFF'S PROPOSED INSTRUCTION NO. 10
Definition of Proximate Cause
IPI 15.01

When I use the expression "proximate cause," I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.

Given        _____
Refused      _____
Modified     _____
Withdrawn    _____
Agreed       _____

C061073

**ORDER**                                                                 CCG-N002

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
County Department, Law Division

Board of Trustees of
C.C.Dist. No 508,
Plaintiff,

v.                                      NO.  95 L 9862

Coopers & Lybrand, L.L.P.,
Defendant.

**ORDER**

The cause having come before the Court for ruling on the
parties' respective post-trial motions, it is hereby ORDERED
That

1. Plaintiff's post-trial motion is denied, in accordance with
the Memorandum Opinion attached hereto.

2. Defendant's post-trial motion is denied, in accordance with
the Memorandum Opinion attached hereto.

**ENTERED**
JUL 2001
JUDGE BILLIK - 1585

Atty No.  38315
Name  Linton Childs
Attorney for  Defendant
Address  10 South Dearborn Street
City / Zip  Chicago, Illinois 60603
Telephone  (312) 853-7000

ENTER: _____
                    Judge        Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

CCG-N002-150M-11/30/00(13460655)

App. 13

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

BOARD OF TRUSTEES OF COMMUNITY,     )
COLLEGE DISTRICT NO. 508, COUNTY    )
OF COOK AND STATE OF ILLINOIS,      )
                                    )
                Plaintiff,          )
                                    )   No. 95L 09862
        v.                          )
                                    )
COOPERS & LYBRAND, L.L.P.,          )
                                    )
                Defendant.          )

## MEMORANDUM OPINION

This cause coming on to be heard on post-trial motions filed both by plaintiff, Board of Trustees of Community College District No. 508, County of Cook and State of Illinois, ("City Colleges") and defendant, Coopers & Lybrand, L.L.P ("Coopers"); the matter having been fully briefed and a hearing have been had; and the court being fully advised in the premises states and/or finds as follows:

This case was on this court's call for a jury trial on November 13, 2000. The matter was tried before a jury and on December 7, 2000, the jury returned a verdict in favor of City Colleges on its breach of contract claim (Count 2) and awarded damages of $378,000. The jury also returned a verdict in favor of City Colleges on its professional negligence claim (Count 1) and found that City Colleges' total damages were $23,000,000 which the jury then reduced by 45% . for City Colleges' contributory negligence resulting in a verdict of $12,650,000. This court entered judgment on the jury's verdict on December 7, 2000. Prior to the expiration of the time for filing post-trial motions, this court entered an order extending the time for filing post-trial motions until January 22, 2001. Subsequently, the parties entered into a briefing schedule on the pending motions.

City Colleges filed this lawsuit against Coopers as a result of services rendered in connection with an audit prepared by Coopers for City Colleges' fiscal year 1993. In its post-trial motion, Coopers requests that this court enter an order for (1) judgment n.o.v.; (2) in the alternative, if judgment n.o.v. is denied, (a) a new trial, (b) remittitur, and (c) setoff.

-1-

There are standards to be applied in determining whether a directed verdict or a judgment n.o.v., should be granted. A directed verdict or a judgment n.o.v., may be entered in those limited cases where "all evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based upon the evidence could ever stand." Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510 (1967). In ruling on a judgment n.o.v., a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather, the court may only consider the evidence, and reasonable inferences therefrom, in the light most favorable to the party resisting the motion, and a judgment n.o.v., may not be granted merely because a verdict is against the manifest weight of the evidence. Maple v. Gustafson, 151 Ill. 2d 445, 453 (1992). If there is any evidence, together with reasonable inferences that supports the verdict, or material issues involving the credibility of the witnesses, or where the determination regarding conflicting evidence is decisive to the outcome, then a judgment n.o.v., should not be granted. See Maple v. Gustafson, 151 Ill. 2d at 454, Aguinaga v. City of Chicago, 243 Ill. App. 3d 552, 560 (1st Dist. 1993).

There are also standards under the caselaw to be applied to the evidence in determining whether a motion for a new trial should be granted. The trial court can make an inquiry into whether the jury verdict is contrary to the manifest weight of the evidence. See, Jordan v. National Steel Corp., 183 Ill. 2d 448, 456 (1990); Maple v. Gustafson, 151 Ill. 2d 445, 455 (1992). A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable or arbitrary and are not based on the evidence. Taluzak v. Illinois Central Gulf R.R., 255 Ill. App. 3d 72 (1st Dist. 1993). As stated in Kim v. Evanston Hospital, et. al, 240 Ill. App. 3d 881, 893 (1st Dist. 1992), "the question is not whether the evidence could have supported a verdict for the movant, but rather whether a contrary verdict is clearly evident." (See also, Netzel v. United Parcel Service Inc., 181 Ill. App. 3d 808, 813 (1st Dist. 1989)), where the Court indicates that the trial court should not sit as a second jury to consider the nuances of the evidence or the demeanor and credibility of the witnesses, and Moran v. Erickson, 297 Ill. App. 3d 342 (1st Dist. 1988)). It has been held to be an abuse of discretion for the trial court to substitute its judgment for that of the jury by granting a new trial where the evidence supports the verdict and it does not appear that the moving party was denied a fair trial. Lagoni v. Holiday Inn Midway, 262 Ill. App. 3d 1020, 1028 (1st Dist. 1994); Suttle v. Lake Forest Hospital, 315 Ill. App. 3d 96 (1st Dist. 1999).

As the trier of fact, the jury is the sole judge of the credibility of the witnesses and of the weight to be given the testimony of each of them. Illinois Pattern Jury Instructions, Civil, 2000 Edition, ("I.P.I."), 1.01(4). In determining the credit to be given any witness, the jury may take into account his or her memory, any interest the witness has in the litigation, the manner or demeanor of the witness while testifying, the reasonableness of the testimony considered in light of all the evidence in the case and any prior inconsistent statements the witness may have made. See I.P.I 1.01(4). The jury was further instructed to return a verdict based upon the evidence and not based upon speculation, prejudice or sympathy. (See I.P.I. 1.01). The jurors are permitted to rely upon their own personal experiences and observations in life in reviewing the evidence.

-2-

(See I.P.I. 1.01(3). The jury can also consider whether a fact was proved by circumstantial evidence, as well as by direct evidence. (I.P.I. 3.04).

The parties presented at trial the testimony of numerous witnesses to support the claims and defenses raised in the case. A significant number of exhibits were also offered into evidence, including the parties' written contract for the performance of the auditing services, the written investment policy originally enacted by resolution adopted in 1988, amended in 1990 and on March 3,1992; the investment register of portfolio transactions during the relevant period; the financial statements and notes for fiscal year 1993; and Coopers' working papers used by its auditing staff in reviewing the investment register and portfolio. In addition, certain exhibits were enlarged for demonstrative purposes during the testimony of the witnesses. It is important to note that the jury heard conflicting testimony presented on the material issues, which required the jury to weigh the evidence presented taking into consideration a number of relevant factors, including the credibility and demeanor of the witnesses testifying.

Initially, defendant argues in its motion that this court should enter a judgment n.o.v. because evidence was insufficient to prove that Coopers owed City Colleges a professional duty to review its investment portfolio for compliance with its internal investment policy and that Coopers was negligent in failing to adhere to applicable professional standards. (Motion at para. 3a,b). The applicable law and evidence supports a finding that Coopers owed such a professional duty to City Colleges as its selected independent financial auditor based upon the language of the written contract itself, the evidence presented on the proposals made by Coopers to City Colleges, the testimony of the opinion witnesses offered by both parties and the testimony of Coopers's own former and current accountants, who testified that they did review the investments in City College's portfolio for compliance with the law. City Colleges, as a public entity, was legally required to retain an accounting firm to perform an audit of its books and records at the end of each fiscal year. 110 ILCS 805/3-22.1. An explicit provision in City Colleges' investment policy provides that an independent auditor be engaged to monitor compliance with the policy and its related procedures as part of the annual audit process. (Emphasis supplied).

Coopers did review the investments, but claimed at trial that one of the reasons it had reviewed the investments was to confirm compliance with the state investment statutes applicable to a public entity using public funds. (e.g. the Illinois Public Funds Investment Act "Investment Act", 30 ILCS 235/.01 et seq., 110 ILCS 805/3-47). City Colleges' internal written investment policy tracks substantially the language in the Investment Act. City Colleges argued at trial that Coopers did not advise City Colleges that the express provision of the investment policy of "holding investments until they mature, to minimize risks" had been repeatedly violated. (See amended complaint at para. 37). There is a reference in the notes to the financial statements that City Colleges "intends to hold its investments until they mature". (See notes at p. 8). The evidence presented at trial was more than sufficient to prove that Coopers owed a professional duty to City Colleges to review the investment portfolio for compliance with the

-3-

internal investment policy and that it failed to exercise due care or adhere to professional standards in performing its review and/or notifying City Colleges of the lack of compliance therewith. In support, this court refers to the testimony of the members of the board who testified about their reasonable expectations of the services of the auditors, Coopers' own auditors, who testified about the nature of the services that were performed for City Colleges and the opinion witnesses who testified about the applicable standard of care for auditing services for public entities using public funds.

For example, the jury heard testimony from the auditors and observed enlarged exhibits of the auditors' working papers on the audit that was performed. Witness Frey, Coopers' on-site supervisor of City Colleges' audit, testified about her qualifications to perform an audit on a public entity. She indicated that she was aware that a public entity is limited under the law in the nature of the investments it can make. (Tr. 1726-1736). She also testified about her knowledge of City Colleges' written investment policy prior to the audit. The jury heard testimony that the auditors had referred to City Colleges' audit as one "going to be an audit by the seat of your pants". (Tr. 1725). This comment is contained in one of the documents displayed to the jury.

Frey also testified about her communications with the former treasurer, Luhmann, during the audit. She did not recall asking Luhmann directly whether he intended to hold the investments to maturity, but she did recall generally that her supervisor, Mr. Swanson, may have told her at some time that City Colleges intended to hold the investments to maturity. (Tr. 1760-1761). While Frey and Swanson testified, the jury was permitted to observe enlarged exhibits that showed some of the investments made by City Colleges immediately prior to, during and immediately after the period of the audit. The documents indicated that Luhmann was engaged in buying and selling investments that were not being kept to maturity. Frey discussed City Colleges' "intent" to hold investments to maturity. She explained the reasons why she had considered the investments were permitted investments under the Investment Act and acknowledged that the investment policy "mirrors" the language of the state statute. (Tr. 1710-1719).

Swanson indicated during his testimony that he was aware that City Colleges was buying and selling investments, but he believed that City Colleges could have held the investments to maturity. He acknowledged that the record presented to the jury indicated that investments had been sold well prior to maturity. He explained his discussions with Luhmann regarding his investment intentions. His recollection of those discussions, in view of the documentation of the investment transactions, were additional matters for the jury to evaluate in weighing the evidence.

Witnesses Seidelman and Swanson also testified about the proposal made to City Colleges to secure its auditing business. Seidelman indicated during his adverse examination that the working papers and investment register showed that City Colleges was not holding investments to maturity during the audit term. The evidence at trial indicated that, generally, a fixed instrument with a longer term has a greater interest rate risk. In limiting City Colleges'

-4-

investment options, the investment policy provided that securities shall generally be purchased with the intention that they will be held to maturity to minimize interest rate risk.

The records of Coopers indicated that its auditors reviewed the investments and the investment register of City Colleges. City Colleges documented its investment transactions during the audit period. Coopers, as the retained financial independent auditors for City Colleges, a public entity, did have a duty to review the investments for purposes of determining compliance with the investment policy as it related to their services and the financial statements. Coopers also had a duty to report on noncompliance after such a review. In addition, the parties presented conflicting evidence on whether Coopers complied with its contractual obligations to advise City Colleges of any "business risks" and whether it exercised due care in adhering to applicable professional standards. The evidence also indicated that Coopers has never issued a final management letter to City Colleges relating to the audit of the 1993 financial statements, including any recommendations on City Colleges' internal control system. For purposes of ruling Coopers' motion for a judgment n.o.v., under the applicable legal standards, there was sufficient evidence presented at trial to preclude this court from reversing the jury verdict based upon defendant's contention in paragraphs 3a and 3b of its motion.

Coopers also alleges in its motion that the evidence was insufficient to prove that any failure on its part caused City Colleges to act under its but-for causation argument or caused City Colleges' losses or damages. (See Motion 3c,d,e). Coopers argues in its memorandum that the testimony offered by the witnesses, who served as board members, was far too vague to sustain a verdict against Coopers. (Memorandum at 17-18). According to defendant's argument, the testimony offered by three of City Colleges' six board members was inadequate and does not even rise to the level of speculation as to what board action would have been taken, how such action would have prevented any losses, and what portion of those losses would have been prevented. (Memorandum at 18-20). In connection with its causation argument, Coopers also contends in its motion that City Colleges' board already was aware of the former treasurer's investment practices and that the evidence was insufficient that Coopers caused City Colleges' financial losses and damages. (Motion 3d).

However, the jury was permitted to rely on direct as well as circumstantial evidence to resolve the disputed material issues of fact, use their common sense to evaluate the evidence presented and weigh the conflicting testimony while considering the demeanor of the witnesses who testified. (See Tr. 2833; see also, I.P.I. 1.01,3.04). There was testimony from the board members that they would have taken corrective action if they had known that a possible violation of the investment policy was occurring. Although the board members were professionally trained in their respective fields, they served on the board on a limited, part-time basis and without compensation. They all had other careers. They testified generally about their responsibility to the school and to the public, and that the board relied upon the services of the independent financial auditors. The jury could assess the weight of their testimony. In addition, the undisputed evidence is that the board did act within a reasonable time of learning, in February 1994, of the financial problems with the investment portfolio. Witness Gidwitz

-5-

testified that he was awakened in the middle of the night in Germany in February of 1994 and interrupted a business trip there in order to return to Chicago to address City College's investment portfolio losses. The evidence indicates that the board responded in a timely manner to what was described as a potential financial crisis in the making in February and in the following months in 1994.

An inference can be drawn from the evidence that if Coopers had advised the board that there were questions regarding compliance with the investment policy, reasonable action could have been taken to avoid or substantially lessen the risk of the financial losses. It is also reasonable to further infer that the board could have assigned the former treasurer different responsibilities or simply relieved the former treasurer from responsibility for making investments and, therefore, avoided the risk completely. Coopers did not present any evidence to indicate that the board would not have taken any corrective action if Coopers had advised them of possible violations of investment policy.

Coopers also argues in its submissions that not only did City Colleges offer no evidence that it suffered any losses in connection with defendant's audit of financial statements for the fiscal year ending on June 30, 1993, there was a lack of evidence that Coopers could have foreseen that City Colleges would suffer losses on investments purchased after June 30, 1993. (Memorandum at 25-27). Coopers further argues that City Colleges' investment losses were unforeseeable because they were sustained solely on investments which were purchased after June 30, 1993 and subsequently sold at a loss. (Memorandum at 28).

However, Coopers did not finish its audit until about October 15, 1993 when it submitted its unqualified opinion on the financial statements of City Colleges after having conducted its post-audit review with Luhmann only about one week earlier. The auditors and Luhmann testified about the discussions they had at that time regarding investment intentions and the status of the investments. In evaluating the causation issue, the jury could consider the testimony on those communications, in view of all the evidence.

The jury was asked to decide whether Coopers' failure to detect and/or report that the investments did not comply with City Colleges' investment policy was a proximate cause of its financial injuries. It need not be the "sole" cause but merely a proximate cause. (See I.P.I. 12.04, 12.05, 15.01). The evidence indicates that the jury could have found that when the treasurer paired-off trades to speculate on changes in interest rates, the treasurer was not complying with the "hold-to maturity" provision of the investment policy. Based upon the evidence and reasonable inferences therefrom, the jury could have inferred that it was likely that the former treasurer would continue to engage in this type of investing in the coming year. The former treasurer testified on his intentions and the evidence indicates that he did not intend to change his investment style. At that time, the investments were not losing significant value because interest rates had not yet turned substantially upward. Thus, in view of this evidence the jury was more than justified in finding that Coopers could have foreseen that the treasurer's practice of investing funds to secure a higher interest rate, but with increased risk, could

-6-

reasonably likely lead to the type of financial risk of injury that City Colleges ultimately suffered. The question of foreseeablity presented a factual issue for the jury to determine.

Defendant also argues in its motion that the collateral estoppel effect of the Fifth Circuit's opinion in In re Westcap Enterpices, 230 F. 3d 717 (5th Cir. 2000), ("Westcap"), also requires a judgment in Coopers' favor. (Motion at para. 3e). According to Coopers, the Fifth Circuit determined that City Colleges had fully understood the nature and risk of the investments that caused it to lose money. Id at 719-720. It is Coopers' position that the board, which was composed of "individuals with sophisticated legal, accounting and financial backgrounds," is estopped from disputing that it already knew what it now claims it should have been told by the auditors about Luhmann's investments. (Id at 732; see also defendant's memorandum at 29-32).

Coopers has not demonstrated that estoppel applies. As pointed out in City Colleges' submissions, Coopers was not a party in the Westcap litigation, and Coopers had a duty as an independent auditor to City Colleges, a public entity, that is different from the duties owed by the parties to each other in the Westcap litigation. City Colleges also comments that there is an absence of any "fact" found in the opinion in Westcap, directly addressing the issue of what City Colleges would have done if they had known or been warned by Coopers of the treasurer's practices specifically under the investment policy. Further, the board's knowledge of the "riskiness" of certain investments is different from knowing of possible violations of the investment policy. Since it was not litigated in Westcap what the board would have done if they were apprised of possible violations of the investment policy, it cannot be determined that the issue had been "fully and fairly" litigated. This court also believes that the Fifth Circuit's findings with respect to the board's and the treasurer's knowledge were relevant to a specific issue pertaining to reliance for purposes of proving a different cause of action. The legal standards and issues in this case are different from those raised by the causes of action in Westcap, where there was a statutory fraud claim against a stockbroker for misrepresentation in connection with the sale of securities. In the instant matter, there are allegations of common law breach of contract and professional negligence claims against an auditor for a failed audit performed for a public entity. The legal theories, causes of action, injuries, and affirmative defenses are not the same in the two cases.

Coopers also contends that this court's incorrect adoption of the so-called audit interference doctrine warrants a new trial. (Motion at para. 5a,b). Coopers claims that the audit interference rule severely restricted its ability to argue contributory negligence that did not affect the audit. (See memorandum 33-38, but see Cereal Byproducts Co., v. Hall, 8 Ill App. 2d 331 (1st Dist. 1956), a case cited in the I.P.I. Civil 2000 Edition at page 288, where the Court discussed the negligence of an employer as a valid contributory negligence defense in an action against an accountant; Holland v. Arthur Andersen & Co., 127 Ill. App. 3d 854, 867 (1st Dist. 1984).

The jury did assess comparative negligence against City Colleges based upon the evidence and the instructions so tendered to them. The jury found City Colleges to have been 45% at fault for its own injuries and damages. The instructions given to the jury and the

-7-

evidentiary rulings cited in defendant's motion did not unduly prejudice Coopers.  In addition, as already noted above, the Appellate Court in this case indicated that plaintiff had alleged injuries arising from any breach of duty by the auditors that are different from duties owed by members of the board and presumably any injury resulting from a breach. (See Board of Trustees v. Coopers & Lybrand, 296 Ill. App. 3d 538, 549 (1st Dist 1998) where the Court commented that the failed audit is "entirely separate and independent" from the alleged negligence of the board).

This court is not convinced by Coopers' citation to the Illinois Public Accounting Act as amended in 1992, to support the abrogation of the audit interference rule. First, the statute does not address what sort of conduct constitutes contributory negligence.   Secondly a statute does not abolish aspects of the common law unless it explicitly states the legislature intent to do so. Maksimovic v. Tsogalis, 177 Ill. 2d 511 (1997). Finally, the so-called audit interference rule purports to focus on conduct that contributes to the proximate cause of an injury caused by the defendant/auditor. That injury is the failed or defective audit. The defendant's argument does not persuade this court that the so-called audit interference doctrine contravenes traditional tort law because it allows the victim to benefit from its own negligence. The cases cited by the parties do not suggest that the audit interference rule has been applied to assigning fault for a negligently run business. Fault can be assigned  for only a negligently performed audit, which involves duties of care between the auditor and its client. The cases cited suggest that the auditor owes the client a duty to perform an audit according to a professional standard of care and the client owes a duty not to engage in conduct to affect adversely or prevent the audit. The auditor is retained for the very reason of reporting accurately about its client's financial condition, even if the client has committed negligence or may be acting improperly, which could impact its partners, stockholders or the public.

Coopers alleges in its motion that City Colleges has failed to present evidence to support a verdict on its breach of contract claim. (Motion at para. 4). However, the evidence presented at trial does not support a finding by this court that would overturn the jury verdict. For the additional reasons stated herein above, Coopers has failed to convince this court it is entitled to a judgment n.o.v. for the reasons cited in paragraph 4 of its motion based upon the evidence presented at trial.

The defendant in its post-trial motion also argues that it is entitled to a new trial because of certain evidentiary rulings, including permitting speculative testimony, permitting undisclosed opinion testimony, for refusing to give a 60.01 instruction on matters conclusively determined against City Colleges and that the verdict was against the manifest weight of the evidence. (Motion para. 5c-e).

For example, Coopers claims that the court erred when it allowed Michael Mayo, a City College board member, who left the board on August 6, 1993, two months before defendant issued its audit report  to testify about what he would have done had Coopers reported to him about the violations of the investment policy. This court finds that Mayo had a sufficient basis to

-8-

offer causation testimony given his duties and experience as a trustee of City Colleges; given his role in retaining Coopers to confirm compliance with the law and City Colleges' investment policy; and given the board's reliance on its auditors for oversight and recommendations. The jury could evaluate the testimony from Mayo and the other board members and give that testimony the weight the jurors believed it deserved in view of all the evidence in the case.

Further, Coopers contends that additional prejudice resulted from plaintiff's damages expert. However, the opinions she testified about were disclosed. In addition, the defense during cross-examination may have opened up the door to responses that are now claimed to be undisclosed opinions. (Tr. 1649-50). Objections must also be timely made. The witness can explain that her disclosed opinions have not changed because of specified trial testimony, Wilson v Clark, 84 Ill. 2d 186 (1981). There was sufficient evidence in the record that the board would have taken action if Coopers had advised the board of possible violations of the investment policy. No undue prejudice has been demonstrated by Coopers to support a request for a new trial because of the testimony of plaintiff's expert.

Coopers also maintains that it was denied a fair trial because this court allowed City Colleges' accounting expert, Harvey Moskowitz, to render an undisclosed opinion. The defendant claims that Moskowitz testified at trial that there is a "requirement in the auditing literature that ...if auditors are aware of ...an audit requirement, that needs to be met, and [the auditors are] not going to be doing it, they should inform the board." Copeland v. Stebco Products Corp., 316 Ill. App. 3d 932 (1ª Dist. 2000). This court is not convinced that the defense timely objected to this testimony because of the witness's earlier answers to questioning. (Tr. 1281-83, 1345-46). Notwithstanding, it was permissible for Moskowitz to make a general statement referencing the literature as an additional basis for his opinion since the subject matter was in fact disclosed in the discovery deposition and rule 213 interrogatory responses (Tr. 1362-66).

Finally, Defendant also contends that the court committed error in giving plaintiff's jury instruction I.P.I. 60.01. This court finds that the instruction is proper in form, is neither argumentative nor misleading and is supported by the evidence. Contrary to defendant's assertion, the instruction does not suggest that the standard of care of the treasurer under the investment policy is the same for the auditors. The evidence clearly showed that Coopers' obligations and duties are distinct from those of the treasurer. Further, it was Coopers' failure to detect the lack of compliance with the written investment policy and to advise the board of that noncompliance that constituted Coopers' negligence. Administrative rules, regulations and orders may have the effect and force of law. Davis v. Marathon Oil Co., 64 Ill.2d 380 (1976); Darling v. Charlston Community Memorial Hospital, 33 Ill. 2d 326 (1965), cert denied, 383 U.S. 946 (1966). The investment policy, which tracks the language of the state's investment statute, is a self-imposed regulation that is designed to protect against the type of injury and damages complained of in the case.

-9-

Morever, a reading of that entire instruction obviates any concern of unfair prejudice because the last paragraph provides for the jury to consider all facts and circumstances in evidence in determining whether the defendant was negligent. (See Tr. 2601-02). In addition, even though the instruction was given, plaintiff still had to prove proximate cause and confronted defendant's affirmative defenses. Tenenbaum v. City of Chicago, 60 Ill.2d 363 (1975); Ney v. Yellow Cab Co., 2 Ill. 2d 74, 78-79 (1954).

The defendant also argues that it is entitled to a new trial because the court rejected Coopers' proposed Instruction B under which the jury would have been instructed that certain findings made by the Fifth Circuit in the Westcap litigation were binding against City Colleges. This court refers to the comments herein above that the Westcap case is not dispositive of the claims made herein. In addition, the proposed non-I.P.I. instruction was not supported by the evidence in this case, was argumentative in form and misleading, especially when referencing the "size" and "purpose" of the investments. The non-I.P.I. instruction was properly refused.

For the reasons above stated, this court finds that Coopers has made an insufficient showing that it is entitled to a new trial because the jury verdict was against the manifest weight of the evidence. This court is mindful of the legal standards applicable to such post-trial relief, and notes that there was conflicting evidence presented on the material issues of fact for the jury to evaluate, including on the credibility of witnesses.

Coopers argues that it is entitled to is entitled to a remittitur because the jury verdict is excessive and that City Colleges is achieving a double recovery. (Motion at para. 6a,b). This court does not find that the verdict was excessive based upon the evidence submitted. The opinion testimony of plaintiff's damages expert provides a factual basis for the damages that were awarded. The jury award was actually substantially less than that recommended by plaintiff's expert. In addition, the exhibits containing financial information on the relevant transactions provides support for the calculation of the financial losses.

Coopers argues that plaintiff is not entitled to receive a double recovery of damages for the same injury under count 1 and count 2 of the amended complaint. (See Memorandum at 52; Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 224 Ill. App. 3d 559 (1991)). Coopers refers to the testimony of plaintiff's damages expert to supports such an argument. There was also discussion of this matter during the instruction conference. (Tr. 2588,2593-2595). However, in view of the jury's award on count 2 for the breach of contract claim when compared to the amount awarded on count 1, it does not appear that the jury awarded duplicative damages. Rather, the jury considered other factors from the evidence in awarding damages on the breach of contract claim separate from the damages that the jury awarded on the tort claim. This finding is further supported by the disparity in the amounts awarded and the arguments made by the defense on the issue in its response to plaintiff's post-trial motion.

Coopers contends that it is entitled to a set-off in the full amount of City Colleges' settlement with Arthur Andersen because the claims are identical. (Motion at para. 7). However,

-10-

this court finds that Coopers is not entitled to a set-off from the settlement involving Arthur Andersen. The Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/2 (c), authorizes a non-settling defendant to obtain a set-off only for settlement amounts "arising out of the same injury." The injury inflicted on City Colleges by Coopers was its failed or deficient audit for fiscal year 1993, whereas the injuries inflicted by Andersen were the alleged failed audits for fiscal years 1991 and 1992 under its contract and professional duties. The injuries are not the same, because the claims of injury are distinct. See also Board of Trustees v. Cooper & Lybrand, 296 Ill. App. 3d at 549-550. The parties entered into separate contracts for auditing services. Defendant also did not file a contribution action against Arthur Andersen.

In addition, after settling with Arthur Andersen, plaintiff submitted a revised damage report from its expert that was used at trial. This was done without objection from the defense. Plaintiff claimed that the amended report and the damages sought were limited to fiscal year 1993, only. (See plaintiff's memorandum at 28-29).

Plaintiff has also filed a post-trial motion. Plaintiff maintains that the jury's verdict on liability and proximate cause on both counts is fully supported by the evidence. However, the plaintiff contends that it is entitled to a new trial on the issue of damages only. (Motion at page 1). This court is not convinced by the submissions that plaintiff is entitled to a new trial on damages only under either count 1 or count 2. Such a request for a new trial on damages is not supported by the record, in view of the conflicting evidence presented and the jury's assessment of the weight of that evidence.

Plaintiff also requests in its post-trial motion that this court enter a judgment n.o.v. for $23 million on count 1. (Motion at page 1). Plaintiff has not made a sufficient showing in its submissions under the evidence presented at trial that it is entitled to such post-trial relief. There is evidentiary support in the record under the applicable law for the finding of comparative negligence by the jury.

Plaintiff also argues in its motion that it is entitled to a new trial on count 2 for damages only. (Motion at page 2). It contends that there is no evidence in the record that City Colleges sustained contractual damages of only $378,000. (Motion at page 2, memorandum at 8-10; See Churchill v Norfolk & Western Railway Co., 73 Ill. 2d 127 (1978)).

However, this court finds that the amount of losses sustained by the plaintiff and what portion of losses resulted from the breach of contract claim were contested by the parties. Conflicting evidence on the amount of damage was presented to the jury, and plaintiff's damage expert was subjected to vigorous cross-examination. Defendant also offered conflicting evidence on the issues on damages. It also offered an expert, who testified about plaintiff's investments in fiscal year 1994, and plaintiff's failure to mitigate damages. Counsel also argued those defenses to the jury.

-11-

There was evidence that the plaintiff paid defendant $252,000 for its services, pursuant to the parties' contract, and that amount was referred to during closing argument. City Colleges' opinion witness also testified that there was $307,443 in "total damages" for fiscal year 1993 and estimated an amount of $386,721 for "transaction damages". As defendant suggests in its memorandum in response to plaintiff's post-trial motion, the jury might have awarded the plaintiff 1 ½ times the contract price reflecting the amount of the contract plus the cost of replacing the plaintiff as auditors half-way through the next year. (See defendant's memorandum at page 2-5). In addressing the damages on the breach of contract claim, the jury did not ignore an element of damages presented to them for consideration, but rather returned an amount less than requested.(See Gruidl v. Schell, 166 Ill. App. 3d 276, 283 (1st Dist. 1988) where the Court commented that in "awarding a small amount of damages is not the same as disregarding proven elements of damages and it has never been a reason for reversal as such...an award of damages is not palpably inadequate just because it was less than generous." See also Nilsson v. WBD Bank of Illinois, 313 Ill. App. 3d 751, 762 (1st Dist. 1999)).

The jury did not ignore the instructions in awarding plaintiff's contractual damages. The jury was instructed on damages for the breach of contract claim and for the professional malpractice claim. The jury could consider whether plaintiff proved its requested damages on each claim. There is a basis in the record for compensatory damages in the amount paid to Coopers for the audit and then the amount they inferred from the evidence that Coopers would have earned for their work for one-half of the next year, until the auditors were terminated. In addition, there was testimony on the damages for fiscal year 1993 and transactional damages of $307,443 and $386,721 , respectively.

In its post-motion, City Colleges also argues that (1) the instructions that the jury were given to determine contributory negligence did not accurately state the law; (2) there was no evidence to support the jury's finding of comparative negligence; and (3) the Court erroneously refused City Colleges' proposed Jury Instruction No. 8 (based on I.P.I. 5.01) regarding Coopers' failure to produce the client misrepresentation letter signed by City Colleges' treasurer, Luhmann. (See motion at page 3).

Plaintiff argues that the jury was improperly instructed on contributory negligence under the so-called audit interference rule. This court finds that the jury instructions were proper. The specific instruction defining contributory negligence tracks I.P.I. 10.03B departing from it only to incorporate language dealing with plaintiff's conduct that affected the preparation of the audit. See Cereal Byproducts Co. v. Hall, 16 Ill. App. 2d 79 (1st Dist. 1958). As stated at the instruction conference, plaintiff's proposed non-I.P.I. instruction is argumentative and misleading. Plaintiff's proposed instruction references the term "proper performance", which is also confusing. Moreover, unlike I.P.I. 10.03(B), plaintiff's proposed non-I.P.I. instruction does not define the term contributory negligence, lacks a reference to ordinary care and omits the element of proximate cause. The definition of contributory negligence for plaintiff's conduct under an ordinary care standard is significant because the jury was instructed on professional negligence under a professional standard of care for defendant's conduct. (I.P.I. 105.01).

-12-

Plaintiff then contends that there is no evidence to show that the plaintiff interfered with, prevented or affected Coopers' audit and therefore, the jury's determination of comparative negligence should be set aside. (Motion at page 3, para, (3)). City Colleges' argues that the evidence on "the client representation letter" was insufficient evidence of plaintiff's contributory negligence. (Memorandum at 20-24).

There was sufficient evidence presented for the jury to find that the plaintiff did affect or interfere with the audit for purposes of an assessment of comparative negligence. The representation letter by acting controller Wagner, which is referred to in plaintiff's submissions, raised an issue on whether City Colleges used due care in furnishing Coopers with information to prepare the audit and whether any inaccurate information affected the audit. There was testimony that Coopers relied on the letter and that it was necessary to complete the audit. The letter indicated to Coopers that the investment strategy had not changed. The representations in the management letter further states that no matters had come to City Colleges' attention that would materially affect the June 30, 1993 financial statements. Also, it is indicated that there had been no violations of possible violations of law or regulations whose effects should be considered for disclosure in the financial statements. It is also this court's recollection that the jury while they were deliberating requested an opportunity to review the document. Luhmann also testified that he was interviewed in Oct. 1993 when Coopers was concluding its audit. He indicated to Coopers that he did not alter his investment strategy. There was evidence by Coopers' expert that the funds in fiscal year 1994 were placed into so-called "riskier" investments. Luhmann testified that he eventually "lost track" of the investments, although he testified he had an opportunity, which he did not exercise, to sell the investments in October of 1993 for about a $2 million loss.

In addition, evidence was presented, without objection, on the board's knowledge of the nature of the investments being made and of the investment policy. (See testimony on cross-examination of Gidwitz and Mayo). The issue of the board's familiarity with the manner that the investments were being made under the investment policy and the information furnished to the auditors were matters for the jury to consider on the credibility of the evidence on what, if anything, affected or interfered with defendant's preparation of the audit. The investments made in fiscal year 1994, the action taken by the board after February of 1994 to address the portfolio matters and the decisions to sell the investments at the claimed losses later were matters for the jury to consider insofar as the impact, if any, on the damages caused by Coopers' negligence. The defense of contributory negligence was pled as an affirmative defense. The jury was allowed to assess the credibility of witnesses and weigh all the evidence to determine whether Coopers proved its defense. The plaintiff's contributory and comparative negligence were properly submitted to the jury, who were instructed on the issues under the law.

It has not been demonstrated by the submissions that the jury's assessment of comparative negligence lacked evidentiary support.

-13-

Plaintiff also argues in its motion that the court erred by not submitting to the jury I.P.I. 5.01, which basically states that an adverse inference may be created by the failure of a party to produce at trial evidence within the party's control. The inference may only be drawn if the following four conditions are met: (1) the evidence was under the control of the party and could have been produced by the exercise of reasonable diligence; (2) the evidence was not equally available to an adverse party; (3) a reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed it to be favorable to him; and (4) no reasonable excuse for the failure has been shown. Koonce v Pacilio, 307 Ill. App. 3d 449 (1ˢᵗ Dist. 1999).

As with other jury instructions, the decision whether to give I.P.I. 5.01 is within the sound discretion of the trial court, who can consider the evidentiary support for giving the instruction under the applicable law. Simmons v Chicago Hospitals & Clinics, 162 Ill. 2d 1 (1994); Koonce, 307 Ill. App. 3d at 461.

In this case, the document at issue consists of the representation letter that Coopers claimed it had received in October of 1993 from City Colleges. However, there was testimony in the record that the letter was missing and lost. Luhmann testified generally about signing representation letters, but he could not recall signing this particular one in 1993. The defense showed a reasonable excuse for not producing it at trial. It had not been produced during discovery. Defendant has not shown that the document was under control of the party at the time of trial and could have been produced with reasonable diligence. (See testimony of Susan Frey (Tr. 1724) and Al Swanson (Tr. 816)). Accordingly, this court finds that it did not abuse its discretion in not instructing the jury on I.P.I. 5.01.

Finally, City Colleges contends that it should have been permitted to use a "what if" analysis at trial that its damages expert prepared apparently on the eve of trial and that this court also committed error in denying plaintiff's motion for a directed verdict. (Motion at para. 5). This court finds that City Colleges has not demonstrated that this court erred in response to either of these contentions. This court stands on its in limine ruling with respect to the "what if" analysis, which was produced on the eve of trial and contained undisclosed opinions under Rule 213. It was not disputed that undisclosed opinions appeared in the analysis. Coopers' also convinced this court that it would be unduly prejudiced if City Colleges used the analysis at trial. It argued, among other matters, that it was unfairly surprised by the report and that it had already disclosed its expert witnesses and their opinions based upon the discovery that had taken place over the several years prior to trial.

In addition, based upon the presentation of conflicting evidence and the need for the trier of fact to weigh testimony as well as issues involving the credibility of witnesses, this court did not commit error in denying plaintiff's motion for a directed verdict based upon the applicable legal standards.

-14-

App. 27

IT IS HEREBY ORDERED that based upon the foregoing, the briefs submitted and arguments made therein; as well as all of the parties' post-trial submissions:

Defendant's post-trial motion is, respectfully, denied in all respects. Plaintiff's post-trial motion is, respectfully, denied in all respects.

Dated: July 9, 2001

Entered:

ENTERED

JUL 0 9 2001

Richard J. Billik, Jr., JUDGE BILLIK - 1585

-15-

## CERTIFICATE OF SERVICE

Michael T. Layden, an attorney, certifies that he caused two copies of the foregoing **Response of Counsel Respondents to the Motion of KPMG, LLP for Sanctions Pursuant to Fed.R.App.P. 38** to be served upon:

James R. Figliulo
Michael K. Desmond
James H. Bowhay
Figliulo & Silverman, P.C.
10 S. LaSalle St., Suite 3600
Chicago, Illinois 60603

Steven B. Towbin
Peter J. Roberts
Shaw Gussis Fishman Glantz
      Wolfson & Towbin LLC
321 N. Clark St., Suite 800
Chicago, Illinois 60610

Ronald R. Peterson
Barry Sullivan
Margaret J. Simpson
Jenner & Block LLP
330 N. Wabash Ave.
Chicago, Illinois 60611

Steven J. Roeder
Thomas C. Koessl
Alyssa M. Campbell
Williams Montgmery & John Ltd.
20 N. Wacker Sr., Suite 2100
Chicago, Illinois 60606

by Messenger Delivery, this 22nd day of **April**, 2008.

U.S.C.A.- 7th Circuit
FILED AJB

|APR 2 2 2008

GINO J. AGNELLO
CLERK

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

# EXHIBIT J

U + ンc - うはᴬᴹᴵᵘᵘ

**DATE OF DECISION**

MAR 2 1 2008        Case No. 07-2819

U.S.C.A.- 7th Circuit
RECEIVED LMB

APR 2 2 2008

GINO J. AGNELLO
CLERK

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ANDREW J. MAXWELL, not individually,
but as Chapter 7 Trustee for the
bankruptcy estates of marchFIRST, Inc.,            Plaintiff-Appellant,

v.

KPMG LLP,

Defendant-Appellee.

Appeal From The United States District Court
For The Northern District Of Illinois
Case No. 03 C 3524
The Honorable Judge Joan B. Gottschall

RESPONSE OF ANDREW J. MAXWELL, INDIVIDUALLY,
IN OPPOSITION TO MOTION OF KPMG LLP FOR SANCTIONS
ON APPEAL PURSUANT TO RULE 38

U.S.C.A.- 7th Circuit
FILED AJB

APR 2 2 2008

GINO J. AGNELLO
CLERK

Steven B. Towbin
*(Counsel of Record)*
Peter J. Roberts
SHAW GUSSIS FISHMAN GLANTZ
WOLFSON & TOWBIN LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60610
(312) 276-1333  telephone
(312) 275-0569  facsimile
stowbin@shawgussis.com
proberts@shawgussis.com

Attorneys for Andrew J. Maxwell, Individually

{00D RESP A0204940.DOC}

This is the response of Andrew J. Maxwell, in his individual capacity ("Maxwell"), in opposition to the Motion Of KPMG LLP ("KPMG") For Sanctions On Appeal Pursuant To Rule 38 ("Rule 38 Motion").[1]  For the reasons set forth below, the Rule 38 Motion should be denied or, alternatively, it should be deferred until the district court rules upon the Rule 11 Motion and Maxwell has an opportunity to develop a corresponding factual record in that context.  In support of this response, Maxwell respectfully refers this Court to the Declaration of Andrew J. Maxwell attached hereto as Exhibit A, and he also respectfully represents as follows:

## INTRODUCTION

As stated in the Trustee's separate response, the Rule 38 Motion should be denied because the Trustee's appeal was not frivolous and does not warrant the imposition of any sanctions in favor of KPMG.[2]  As further stated below, to the extent that the Motion is directed against Maxwell, it should also be denied, or at least deferred pending the district court's determination of the Rule 11 Motion, for the following reasons:

---

[1] Although Maxwell is currently a party to this appeal only in his official capacity as the Chapter 7 Trustee (in such official capacity, the "Trustee") for the bankruptcy estates (the "Estates") of marchFIRST, Inc., he has filed a motion to intervene in his individual capacity in order to respond to the Rule 38 Motion and KPMG's motion for leave to file a motion for sanctions ("Rule 11 Motion") in the district court pursuant to Fed. R. Civ. P. 11 ("Rule 11") and 28 U.S.C. § 1927. The motion to intervene is pending, and Maxwell submits this response subject to this Court's allowance of his motion to intervene.

[2] Through this reference, Maxwell hereby incorporates and joins in the arguments made in the Trustee's separate response in opposition to the Rule 38 Motion as though fully set forth herein.

{DDD RESP A0204940.DOC}

- Though this Court has not prejudged the issue of sanctions, it has nevertheless suggested that any sanctions award be paid by Maxwell personally. However, the record suggests no willful or deliberate fiduciary misconduct or bad faith on Maxwell's part that would rise to the level required for a personal sanction against him under the standard of trustee liability articulated by this Court in *In re Chicago Pac. Corp.*, 773 F.2d 909, 915 (7th Cir. 1985). Therefore, on the basis of the existing record, sanctions against Maxwell in his individual capacity should be denied. Absent misconduct or bad faith, no basis exists to pierce the official capacity of the Trustee and reach Maxwell personally with an imposition of sanctions.

- Given the extraordinary factual circumstances required for the imposition of sanctions against a bankruptcy trustee in his individual capacity, a deferral of the Rule 38 Motion is appropriate in the event that this Court is not inclined to deny it on a summary basis. The deferral would allow Maxwell an opportunity to develop the factual record on relevant matters such as the course of the litigation, the respective roles of the Trustee and his professionals, and the good faith of the Trustee in pursuing the litigation.

- In light of KPMG's express intention of filing the Rule 11 Motion in the district court, a deferral of the Rule 38 Motion would also (i) eliminate any unnecessary duplication of judicial resources on the determination of common issues, and (ii) ensure that the district court's determination of the Rule 11 Motion is subject to review in this Court, if necessary, in the most efficient way possible.

## BACKGROUND

This appeal arose from an order of the district court granting summary judgment in favor of KPMG on certain accounting malpractice claims that the Trustee had asserted on behalf of the Estates. The Trustee timely appealed from the district court's order and thereby became the appellant in this appeal. Maxwell in his individual capacity

was neither a party to the district court lawsuit nor a party to this appeal.

On March 21, 2008, this Court issued an opinion affirming the district court. *Maxwell v. KPMG LLP*, No. 07-2819, slip op. at 10 (7th Cir. March 21, 2008). Without prejudging the matter, this Court suggested that KPMG could file a motion in the district court for an award of reasonable attorney's fees and a corresponding motion in this Court under Fed. R. App. P. 38 ("Rule 38"). *Id.* It further noted that the award would "be paid by the trustee personally, not by the bankruptcy estate." *Id.*

Shortly after the issuance of this Court's opinion, KPMG successively filed the Rule 38 Motion and a motion for leave to file the Rule 11 Motion in the district court. On the basis of this Court's suggestion in its opinion that an award of KPMG's attorneys' fees could be levied against him personally, Maxwell has sought to intervene in his individual capacity in order to respond to the pending KPMG motions. Maxwell's intervention motion is pending.

<div align="center">ARGUMENT</div>

I.   The Rule 38 Motion Should Be Denied To The Extent It Is Directed Against Maxwell Individually.

In the absence of willful and deliberate acts of fiduciary misconduct or bad faith, an award of sanctions against Maxwell in his individual capacity would be inconsistent with the standards established by this Court for the imposition of personal liability upon bankruptcy

trustees. *See In re Chicago Pac. Corp.*, 773 F.2d 909, 915 (7th Cir. 1985).
Therefore, the Rule 38 Motion should be denied to the extent it seeks to
impose sanctions on Maxwell in his individual capacity. Maxwell is
entitled to personal immunity from actions taken in his official capacity
as Trustee, including the pursuit of this appeal on behalf of the Estates.

Bankruptcy trustees are the statutory successors to equity
receivers, and there is no relevant difference between them. *In re Linton*,
136 F.3d 544, 545 (7th Cir. 1998) (citing *McNulta v. Lochridge*, 141 U.S.
327, 330 (1891)). "Just like an equity receiver, a trustee in bankruptcy
is working in effect for the court that appointed or approved him,
administering property that has come under the court's control by virtue
of the Bankruptcy Code." *Id.* at 545. Just as an equity receiver could be
sued as the representative of the receivership (*see McNulta*, 141 U.S. at
331-32), a bankruptcy trustee may sue or be sued in his capacity as the
representative of the estate. *See* 11 U.S.C. § 323.

In light of the succession of bankruptcy trustees from equity
receivers, courts have applied the same rules of official liability and
personal immunity to trustees as they did to receivers. In *McNulta*, a
railroad bankruptcy case involving an equity receivership, the Supreme
Court articulated those rules, stating that "[a]ctions against the receiver
are in law actions against the receivership, or the funds in the hands of
the receiver, and his contracts, misfeasances, negligences and liabilities

are official and not personal, and judgments against him as receiver are payable only from the funds in his hands." *McNulta*, 141 U.S. at 331-32. Consequently, a bankruptcy trustee is similarly viewed "as the representative of a separate legal entity, the estate, and the trustee's 'misfeasances, negligences and liabilities' on behalf of the estate give rise to liability only in an official capacity; as an individual, the trustee is immune." *Schechter v. State of Illinois, Dep't of Revenue (In re Markos Gurnee P'ship)*, 182 B.R. 211, 224 (Bankr. N.D. Ill. 1995) (quoting *McNulta*, 141 U.S. at 327).

As this Court has previously stated in circumscribing the limits of a bankruptcy trustee's personal liability, "[a] trustee may be held personally liable only for a willful and deliberate violation of his fiduciary duties." *See Chicago Pac. Corp.*, 773 F.2d at 915 (citing *Moesser v. Darrow*, 341 U.S. 267, 272 (1951), and related authorities). After all, "[e]quity tolerates in bankruptcy trustees no interest adverse to the trust." *Moesser v. Darrow*, 341 U.S. 267, 271 (1951). Therefore, the personal immunity of bankruptcy trustees is appropriately subject to the usual common law trust duties owed to the beneficiaries of an estate such as the duty of loyalty, which proscribes self-dealing. *Markos Gurnee*, 182 B.R. at 219. However, trustees are "'not liable in any manner for mistakes in judgment where discretion is allowed.'" *Id.* (quoting *In re Hutchinson*, 5 F.3d 750, 753 (4th Cir. 1993)). To the extent

that trustees or their professionals err in their judgment at the expense of their estates, the compensation procedures of the Bankruptcy Code and their enforcement by the bankruptcy courts ensure that the bankruptcy estates are made whole. *See* 11 U.S.C. § 330.[3]

The personal immunity of bankruptcy trustees serves a number of important public policy objectives, including the efficient administration of bankruptcy estates. If a trustee is "burdened with having to defend against suits by litigants disappointed by his actions on the court's behalf, his work for the court will be impeded." *Linton*, 136 F.3d at 545. Such potential risks and liability would present tremendous disincentives for qualified individuals to serve as trustees. *In re Kids Creek Partners*, 248 B.R. 554, 559-60 (Bankr. N.D. Ill. 2000).

Indeed, as this Court noted in *Linton*, the more irksome duty a trusteeship becomes, the harder it will be "for courts to find competent people to appoint as trustees. Trustees will have to pay higher malpractice premiums, and this will make the administration of the bankruptcy laws more expensive (and the expense of bankruptcy is already a source of considerable concern)." *Linton*, 136 F.3d at 545.

___

[3] The compensation procedures and standards set forth in § 330 of the Bankruptcy Code were amended in 2005 by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"). However, since the underlying bankruptcy case was filed long before the effective date of BAPCPA, its provisions are inapplicable to this appeal. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 1501, 119 Stat. 23 (2005).

That administrative expense would also multiply considerably if bankruptcy trustees were forced to seek constant outside legal advice on their own personal liability in connection with their intended courses of action on behalf of their estates. Trustee immunity therefore allows bankruptcy trustees to rely upon estate professionals to guide them in their duties without the need or associated expense of having to hire separate personal counsel to represent their personal interests and essentially oversee the estate professionals on that basis.

These well established principles and policies regarding trustee liability in an official capacity and personal immunity in an individual capacity apply with equal force to KPMG's request for sanctions in connection with the Rule 38 Motion. In his official capacity as Trustee, Maxwell pursued this appeal in the exercise of his fiduciary duty to the Estates. Even if his exercise of judgment in pursuing this appeal was erroneous, he is nevertheless entitled to personal immunity in his individual capacity from any liability to KPMG. To the extent that Maxwell has caused any harm to the Estates in his exercise of judgment as Trustee, the bankruptcy court will certainly take that harm into account in his final compensation request so that the Estates are made whole. However, the record suggests no willful or deliberate fiduciary misconduct or bad faith on Maxwell's part that would provide a legal

basis to pierce the official capacity of the Trustee and reach Maxwell personally with an imposition of sanctions in favor of KPMG.

In that sense, Maxwell is similar to a corporate officer that directs and supervises litigation on behalf of a corporation. Absent a finding of bad faith or similar circumstances that would justify the exercise of inherent judicial power, courts have generally declined to impose sanctions against corporate officers in connection with their ill-advised pursuit of actions in the name of the corporation. *See, e.g., Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd., Inc.)*, 40 F.3d 1084, 1087-90 (10th Cir. 1994) (though corporate president could not be liable under Fed. R. Bankr. P. 9011 for signing bankruptcy petitions on behalf of corporation, court's inherent power was broad enough for sanction upon a finding of bad faith); *Gelt v. Janowitz (In re Chisholm Co.)*, 166 B.R. 706, 715 (D. Colo. 1994) (reversing imposition of sanctions against company's president under Fed. R. Bankr. P. 9011). *See also PaineWebber, Inc. v. Can Am Fin. Group Ltd.*, 121 F.R.D. 324, 335-36 (N.D. Ill. 1988) (corporation, not its president, held liable under Fed. R. Civ. P. 11 for president's lies to attorneys leading to filing of improper pleading), *aff'd*, 885 F.2d 873 (7th Cir. 1989). *But see Project 74 Allentown, Inc. v. Frost*, 143 F.R.D. 77, 83 n.7 (E.D. Pa. 1992) (Rule 11 permits a court "to sanction the individual who signed a paper on behalf of a corporation, as well as the corporation itself."), *aff'd*, 998 F.2d 1004 (3d Cir. 1993)).

{000 RESP A0204940.DOC}                    8

Though these cases arise in Rule 11 contexts as opposed to a Rule 38 context, they are nevertheless instructive. *See Sparks v. NLRB*, 835 F.2d 705, 707 (7th Cir. 1987).

As the *Chisholm* court noted, the declination of sanctions against a corporate officer is a corollary to the Supreme Court's holding in *Business Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533 (1991). *See Chisholm*, 166 B.R. at 714. In *Business Guides*, the Supreme Court affirmed the imposition of sanctions against a corporation in connection with a motion and supporting materials signed by the corporation's attorneys and its president on behalf of the corporation. *Business Guides*, 498 U.S. at 535-540, 554. Reacting to the dissent's criticism that the signature of the corporate president should not have been treated as the corporation's signature, the Court explained:

> A corporate entity, of course, cannot sign anything; it can act only through its agents. It would be anomalous to determine that an individual who is represented by counsel falls within the scope of Rule 11, but that a corporate client does not because it cannot itself sign a document.

*Id.* at 547-48. This rationale persuaded the *Chisholm* court that "sanctions in this case, if appropriate at all, must fall on the [corporate debtor] and not on the [corporate officer]." *See Chisholm*, 166 B.R. at 714.

Like the corporate officer in *Chisholm*, Maxwell initiated this appeal and its underlying litigation solely in his official capacity as Trustee on

behalf of the Estates. The Estates are the real party in interest, with Maxwell serving merely as their representative in his official capacity as Trustee. *See Markos Gurnee,* 182 B.R. at 215. Just as a corporate officer should not be sanctioned for participating in a corporation's lawsuits in the absence of findings of bad faith or similar misconduct, Maxwell should not be sanctioned personally for his initiation of this appeal in the event that this Court finds that sanctions in favor of KPMG are appropriate. Consequently, the Rule 38 Motion should be denied to the extent that it is directed at Maxwell in his individual capacity.

II.    In Lieu Of Denial, The Rule 38 Motion Should Be Deferred To Allow Maxwell To Develop A Factual Record In The Context Of The Rule 11 Motion.

Sanctions against bankruptcy trustees in their official capacities are relatively rare given the policy considerations that "distinguish [b]ankruptcy [t]rustees from the generality of plaintiffs." *See Marky v. Norstar Bank, N.A.,* 143 B.R. 989, 990 (Bankr. W.D.N.Y. 1992) (listing distinguishing considerations in context of Rule 11 motion). Sanctions against bankruptcy trustees in their individual capacities are even rarer. As detailed above, to the extent that the Rule 38 Motion is directed against Maxwell in his individual capacity, it seeks extraordinary relief for two reasons.

First, except for willful and deliberate violations of their fiduciary duties, bankruptcy trustees have personal immunity from actions taken in the course of their administration of bankruptcy estates. *See In re*

*Chicago Pac. Corp.*, 773 F.2d 909, 915 (7th Cir. 1985). Second, party representatives other than the party's attorneys are not generally subject to personal sanctions based on the merits of the party's lawsuits in the absence of a bad faith finding. *See Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd., Inc.)*, 40 F.3d 1084, 1087-90 (10th Cir. 1994) (recognizing lack of jurisdiction to sanction party principal under Fed. R. Bankr. P. 9011 and only affirming sanctions award under an inherent power theory after discussion of party principal's bad faith). *See also Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999) ("The imposition of sanctions using inherent powers must be accompanied by a specific finding of bad faith").

These subjective considerations of misconduct and bad faith distinguish the Rule 38 Motion from the typical paradigm of most other Rule 38 cases. *Cf. Greening v. Moran*, 953 F.2d 301, 307 (7th Cir. 1992) (Rule 38 sanctions levied against serial appellant who had wrongfully multiplied proceedings); *Hill v. Norfolk W. Ry. Co.*, 814 F.2d 1192, 1201-02 (7th Cir. 1987) (Rule 38 sanctions levied against attorney; "neither the mental state of the attorney nor any other factual issue [was] pertinent to the imposition of sanctions for [his] conduct [in filing groundless briefs]").

An award of sanctions against Maxwell individually on the basis of this appeal, which he undertook solely in his official capacity as Trustee on behalf of the Estates, would have to be premised on willful and

deliberate acts of fiduciary misconduct or bad faith. The current record, as augmented by the Maxwell Declaration attached to this response, reflects no such conduct or ill motives and therefore provides no basis to support the imposition of such an award.

Therefore, in the event that this Court is not inclined to summarily deny the Rule 38 Motion to the extent it is directed at Maxwell, he requests that the Court defer its determination until the district court rules on the Rule 11 Motion. This deferral will provide Maxwell with an opportunity to develop the factual record in the district court on matters relevant to the imposition of personal liability on a trustee, such as the course of the litigation in the district court and this Court, the respective roles that the Trustee and his professionals played in course of that litigation, and the good faith of the Trustee in pursuing the litigation on behalf of the Estates. Having expressly stated its intention to proceed with the Rule 11 Motion in the district court, KPMG will suffer no unfair prejudice from the development of such a record.

Moreover, since the Rule 38 Motion and the Rule 11 Motion will share common issues, a deferral will also eliminate any unnecessary duplication of judicial resources by this Court and the district court. It will likewise ensure that the district court's determination of the Rule 11 Motion is subject to review in this Court, if necessary, in the most efficient way possible. *See Seymour v. Hug*, 485 F.3d 926, 930 (7th Cir.

2007) (noting the concurrent pendency of a Rule 38 motion for sanctions and a related motion for sanctions in the district court and concluding that "it is better to allow [the district court] to evaluate the [latter] motion first. . . .").

## CONCLUSION

WHEREFORE, Maxwell respectfully requests that this Court enter an order (i) denying the Rule 38 Motion, or, (ii) alternatively, deferring further determination of the Rule 38 Motion until the district court rules upon the Rule 11 Motion and Maxwell has an opportunity to develop an adequate factual record in that context.

Respectfully submitted,

Andrew J. Maxwell, Individually

By: _____

One of his attorneys

Steven B. Towbin
*(Counsel of Record)*
Peter J. Roberts
Shaw Gussis Fishman Glantz
  Wolfson & Towbin LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60610
(312) 276-1333

CERTIFICATE OF SERVICE

Peter J. Roberts, an attorney, certifies that he caused a copy of the foregoing papers to be served by electronic mail and U.S. Mail postage prepaid on this 22nd day of April, 2008 on:

James R. Figliulo
Michael K. Desmond
James H. Bowhay
Figliulo & Silverman, P.C.
10 South LaSalle Street, Suite 3600
Chicago, IL 60603
jfigliulo@fslegal.com
mdesmond@fslegal.com
jbowhay@fslegal.com

Andrew J. Maxwell
Maxwell & Potts, LLC
105 West Adams Street, Suite 3200
Chicago, IL 60603
maxwelllawchicago@yahoo.com

Ronald R. Peterson
Barry Sullivan
Margaret J. Simpson
Jenner & Block LLP
330 North Wabash Avenue
Chicago, IL 60611
rpeterson@jenner.com
bsullivan@jenner.com
msimpson@jenner.com

Richard J. Prendergast
Richard J. Prendergast, Ltd.
111 West Washington Street, Suite 1100
Chicago, IL 60602
rprendergast@rjpltd.com

U.S.C.A.- 7th Circuit
F I L E D  AJB

APR 2 2 2008

GINO J. AGNELLO
CLERK

{000 RESP A0204940.DOC}          14

# EXHIBIT A

Case No. 07-2819

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| ANDREW J. MAXWELL, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., | |
| | Plaintiff-Appellant, |
| v. | |
| KPMG LLP, | |
| | Defendant-Appellee. |

## DECLARATION OF ANDREW J. MAXWELL

I, Andrew J. Maxwell, declare pursuant to 28 U.S.C. § 1746 as follows:

1.    I have personal knowledge of all facts stated herein, and I could competently testify to the facts stated in this Declaration if called to do so.

2.    I am an Illinois attorney and the managing member of Maxwell & Potts, LLC, a Chicago law firm. I concentrate my practice in bankruptcy law and that is my primary area of professional expertise. I have been a member of the panel of private trustees appointed and maintained by the Office of the United States Trustee for Region 11 pursuant to 28 U.S.C. § 586 for more than 20 years. I do not have any professional expertise in the areas of accounting and auditing malpractice or related state law claims.

3.    I am the duly appointed trustee for the chapter 7 bankruptcy estate of marchFIRST, Inc. ("marchFIRST"), the Plaintiff-Appellant in the above-captioned case. As such, pursuant to 11 U.S.C. § 323, I am the representative of the marchFIRST bankruptcy estate and have the capacity to sue parties on behalf of the estate. The litigation giving rise to this appeal was brought by me not individually, but solely in my capacity as trustee of the marchFIRST bankruptcy estate.

4.    As the chapter 7 trustee for marchFIRST, I am responsible for marshaling and liquidating the assets of the marchFIRST bankruptcy estate,

and for investigating the transactions that led to marchFIRST's bankruptcy filing in April 2001. Pursuant to an order of the bankruptcy court dated April 11, 2002, I retained Steven Roeder and the law firm of Freeborn & Peters LLP as special counsel to investigate and, if appropriate, pursue claims against certain of marchFIRST's former professionals and advisors. On September 6, 2002, Mr. Roeder left Freeborn & Peters LLP and joined Williams, Montgomery & John, Ltd. ("WM&J"). Pursuant to an order of the bankruptcy court dated September 26, 2002, I continued the retention of Mr. Roeder, discontinued the retention of Freeborn & Peters LLP, and initiated the retention of WM&J as special litigation counsel to continue to conduct the investigation and, if appropriate, pursuit of certain claims, including the malpractice claim asserted against KPMG LLP ("KPMG").

5. I retained WM&J as special litigation counsel based on its reputation and experience in commercial litigation and, more specifically, prosecution of malpractice claims. Mr. Roeder is a partner of WM&J who concentrates his practice in, amongst other things, commercial litigation and professional malpractice. Mr. Roeder's cases include the successful prosecution of auditing malpractice claims against PricewaterhouseCoopers, L.L.P. and Arthur Anderson, L.L.P. on behalf of the governing board of the City Colleges of Chicago. In that case, Mr. Roeder obtained a multi-million dollar recovery against the auditing firms. WM&J describes itself on its website (http://www.willmont.com/) as a "firm of trial lawyers" that can be distinguished from other firms based on "dedication, passion and the courage to try lawsuits." WM&J's website also asserts WM&J has a "reputation for excellent appellate work."

6. I approved of WM&J's retention of The Michel-Shaked Group ("Michel-Shaked") as the damages expert with respect to the claims asserted against KPMG. My approval of Michel-Shaked was based on WM&J's recommendation and Michel-Shaked's national reputation and experience in valuation and damage issues. According to Michel-Shaked's website (http://www.michel-shaked.com/), "[d]rawing upon our knowledge base in finance, accounting, economics, marketing and general business principles, combined with the industry expertise of our senior experts, The Michel-Shaked Group is well positioned to tackle a variety of damage cases pertaining to commercial litigation."

7. I monitored the progress of the litigation with KPMG and regularly consulted with WM&J regarding all major aspects of the case. Based on my supervision of the case, including my discussions with my retained professionals and my independent review of selected pleadings and other relevant information, at all times I believed that the claims asserted against KPMG were meritorious.

8. I have no personal animosity against KPMG, and my pursuit of

claims against KPMG on behalf of marchFIRST's bankruptcy estate was motivated solely by my fiduciary duty as chapter 7 trustee of marchFIRST to maximize the value of marchFIRST's assets for the benefit of all interested parties. My direct contacts with Michel-Shaked were limited. In exercising my judgment as trustee for the marchFIRST bankruptcy estate to prosecute the claims against KPMG and take an appeal from the district court's judgment, I relied upon the advice of WM&J. Based upon the advice of WM&J, as supplemented by Michel-Shaked's theory of damages, I understood that the prosecution of claims against KPMG on behalf of the bankruptcy estate was in the best interest of creditors.

Dated: April 22, 2008          By: _____
Chicago, Illinois                      Andrew J. Maxwell

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

# EXHIBIT K

DATE OF DECISION

MAR 2 1 2008

( ) + Sc + service

No. 07-2819

U.S.C.A.— 7th Circuit
RECEIVED

APR 2 2 2008 SMP

IN THE UNITED STATES COURT OF APPEALS GINO J. AGNELLO
FOR THE SEVENTH CIRCUIT        CLERK

| | | |
|---|---|---|
| ANDREW J. MAXWELL, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., | ) ) ) | Appeal from the    U.S.C.A.- 7th Circuit United States District    F I L E D  AJB Court for the Northern |
| Plaintiff-Appellant, | ) ) | District of Illinois,    APR 2 2 2008 |
| v. | ) ) | GINO J. AGNELLO Case No. 03 C 3524,    CLERK |
| KPMG LLP, | ) ) ) | Hon. Joan B. Gottschall, United States District Judge |
| Defendant-Appellee. | ) | |

## RESPONSE OF ANDREW J. MAXWELL, NOT INDIVIDUALLY, BUT AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF marchFIRST, INC., TO MOTION OF KPMG LLP FOR SANCTIONS ON APPEAL PURSUANT TO RULE 38

### INTRODUCTION

On March 21, 2008, this Court affirmed the judgment previously entered by the United States District Court for the Northern District of Illinois in favor of KPMG LLP and against Andrew J. Maxwell, not individually, but as Chapter 7 trustee of the marchFIRST Estates. *Maxwell v. KPMG LLP*, No. 07-2819, 2008 WL 746849, at *3 (7th Cir. Mar. 21, 2008) ("*Maxwell II*"). In its opinion, the Court raised the possibility that the Trustee's appeal might be deemed frivolous, and, without prejudging the outcome, invited KPMG to file a motion for an award of reasonable attorney's fees under Rule 38.

On April 4, 2008, KPMG filed its motion for sanctions under Rule 38, seeking approximately $234,000 in attorney's fees and $1,000 in costs for the defense of this appeal. KPMG does so primarily on the ground that the Trustee's legal theory was frivolous from the

outset. Of course, KPMG's present position is the product of hindsight. KPMG did not file a motion to dismiss the complaint in the District Court. Nor did KPMG ever move for Rule 11 sanctions in the District Court. Nor did KPMG ever seek to shift liability for its costs by making an offer of judgment in the District Court. Likewise, KPMG never advised the Trustee that KPMG believed the Trustee's appeal to be frivolous, and KPMG never argued to this Court that the appeal was frivolous, until the Court invited KPMG to do so. Indeed, as KPMG's time records show, its attorneys actually investigated the possibility of filing a Rule 38 motion at the very beginning of the appeal, but decided not to do so, presumably because KPMG did not believe that the motion was meritorious. If this appeal were truly frivolous, the time to file a Rule 38 motion was when KPMG first considered doing so – before the expenses of an appeal were incurred – rather than now. The truth of the matter is that KPMG's conduct of this litigation reflects its understanding that the Trustee's legal theory was an aggressive one, but one grounded in relevant Illinois case law, if also subject to dispute under other authorities.

This Court has made clear that Rule 38 sanctions are not to be granted routinely, but only where the appellee has established that:    1) the appeal is frivolous, and 2) sanctions are appropriate. *See Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 331 (7th Cir. 1995). That test cannot be met here.

In its Rule 38 submission, KPMG asserts that the Trustee lacked legal support for his claim. That is not the case. Throughout this litigation, the parties have contested the controlling legal principles. The Trustee pointed to one line of cases, while KPMG pointed to another. This Court has now settled that dispute. The Court has determined that KPMG was correct, and that the Trustee was wrong. But that does not make the Trustee's appeal frivolous.

2

The District Court's grant of summary judgment was predicated on its understanding that the Trustee, under Illinois law, was required to prove proximate cause by proving that KPMG's malpractice had actually "caused the merger to fail," *Maxwell v. KPMG LLP*, No. 03 C 3524, 2007 WL 2091184, at \*5 (N.D. Ill. July 19, 2007) ("*Maxwell I*"), and that the Trustee had not presented evidence sufficient to satisfy that requirement. The District Court further held that the Trustee was required to prove that KPMG could have foreseen that US Web was a poor merger partner and that the technology market would suffer a major fall, *Id.* at \*6. This articulation of the relevant legal standard by the District Court was central to its holding.

Based on his counsel's review of Illinois professional malpractice cases, the Trustee believed that the District Court's statement of the law was incorrect. The Trustee believed that the proper legal test of proximate causation, in an accounting malpractice case brought under Illinois law, is whether it was foreseeable that the auditor's failure could lead to the financial injury alleged. Brief of Plaintiff-Appellant Andrew J. Maxwell 24 ("Op. Br.") ("proximate cause is simply a test of foreseeability of injury, no more and no less"). The Trustee argued that KPMG's failure to identify certain financial risks, together with the existence of subsequent injuries, brought this case in line with the framework articulated in *Board of Trustees of Community College, Dist. No. 508 v. Coopers & Lybrand, LLP*, 775 N.E.2d 55, 63 (Ill. App. 2002) ("*City Colleges I*"), *aff'd in part, rev'd on other grounds*, 803 N.E.2d 460 (Ill. 2003) ("*City Colleges II*"). The Trustee also reasonably believed that the foreseeability requirement relates only to the *fact* of injury, which must be foreseeable, and not to the precise *means* by which the injury will occur (such as a technology market crash), which need not be specifically foreseeable. Finally, the Trustee also understood foreseeability, under Illinois law, to be a question for the jury.

3

Moreover, the Trustee, as a fiduciary, has the legal "duty to maximize the value of the estate." *Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 352 (1985).  The Trustee relied on legal counsel to evaluate the law in preparing the lawsuit and the appeal, and to advance proper arguments in presenting the relevant issues to the Court.  The Trustee also relied on his counsel's well-respected damages expert to evaluate damages.  In view of counsel's understanding of Illinois law, the decision to appeal was an appropriate step in satisfying the Trustee's fiduciary duty to recover assets that the Trustee believed to be property of the Estates.

KPMG has not met either prong of this Court's two-part test.  There was no sanctionable conduct in this case, and neither the Estates nor the Trustee should be liable for sanctions for contesting the correctness of the District Court's interpretation and application of Illinois law.  The motion for sanctions should be denied.

### ARGUMENT

The Trustee's decision to appeal from the District Court's grant of summary judgment was appropriate given counsel's understanding that the case was governed by the framework articulated in *City Colleges*, which appears to treat proximate causation entirely as a question of foreseeability of injury.  The decision to appeal also was appropriate in light of KPMG's alternative grounds for summary judgment, which were not addressed by the District Court, and it was consistent with the Trustee's fiduciary duties, including the duties that he owed to the Estates to pursue claims and maximize value for the benefit of all stakeholders.

KPMG has not met either prong of the two-part test.  Moreover, KPMG did not mitigate the costs of this appeal by filing a timely Rule 38 motion or otherwise warning the Trustee in a timely way that KPMG considered the appeal to be frivolous.  KPMG's failure to do so is all the more remarkable given the fact that its fee petition shows that KPMG's lawyers researched the

4

issue even before any briefs on appeal were filed.  Finally, if sanctions are imposed, neither the

Trustee nor the Estates should bear the expense.

I.    **THE TRUSTEE'S APPEAL WAS NOT FRIVOLOUS, BUT AN APPROPRIATE RESPONSE TO THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT, WHICH WAS BASED ON AN INTERPRETATION OF ILLINOIS LAW THAT THE TRUSTEE'S COUNSEL BELIEVED TO BE INCORRECT.**

   A.    **The Trustee Properly Argued that the District Court Misapplied Illinois Law in Granting Summary Judgment.**

      1.    **The Trustee properly argued that the District Court erred in holding that the Trustee, to survive a motion for summary judgment, was required to prove that KPMG "caused the merger to fail."**

The Trustee's opening brief focused in large part on the District Court's holding that the

Trustee was required to prove that KPMG's malpractice had "caused the merger to *fail*."  Op. Br.

24-25, 30-36 (emphasis in original).  The District Court stated that the Trustee could not survive

summary judgment without producing evidence on this element, and that he had failed to do so.

*Maxwell I*, 2007 WL 2091184, at *5.  The District Court thus equated proximate causation under

Illinois law with the "loss causation" concept used in the federal securities law context.  Based

on counsel's legal analysis, the Trustee believed that Illinois law relating to professional

malpractice liability did not require such proof, and that the District Court therefore erred in

granting summary judgment against him for that reason.  Thus, the appeal was unsuccessful, but

it cannot be deemed frivolous.

On appeal, the Trustee explained that "Illinois courts have declined to hold in accounting

malpractice cases that the plaintiff must show that the defendant auditor actually caused the

transaction to fail or to be a losing one to establish proximate cause."  Op. Br. 31 (citing *City*

*Colleges I*, 775 N.E.2d at 63).  The Trustee argued that the failures of KPMG's audit to identify

certain financial risks, together with the existence of subsequent injuries, brought this case within

the *City Colleges* framework – which does not require that a plaintiff show that the defendant

5

auditor caused the transaction to fail, or to be a losing one, to establish proximate cause. Instead, *City Colleges* holds that the test of proximate causation is simply foreseeability of injury, which is a factual question for the jury to decide.

The Trustee's reliance on *City Colleges* was reasonable. In *City Colleges*, as here, the plaintiff colleges alleged that an auditor was professionally negligent in failing to detect and report financial violations. *City Colleges I*, 775 N.E.2d at 60-61. The colleges also alleged that it was foreseeable that the failure to address those violations could lead to financial injuries. *Id.* at 63. In *City Colleges*, the auditor failed to report an investment practice that increased financial risk. The colleges' actual losses occurred after the audit had been completed. At some time after the audit, the composition of the colleges' portfolios was altered to include more of the risky investments; market conditions changed; and the colleges incurred substantial investment losses. *Id.* at 61. The auditor contended that these undisputed facts precluded the colleges from showing loss causation based on the auditor's actions, and that the granting of judgment *n.o.v.* was therefore appropriate. *Id.* at 63-64.

The Illinois Appellate Court rejected the auditor's loss causation argument. *Id.* at 63. Instead, after determining that there was sufficient evidence to show that the auditor failed to report a risk that it was charged with monitoring, the court treated proximate causation entirely as a question of foreseeability of injury. *Id.* The court went on to hold that a reasonable jury could find that the injury was foreseeable because the auditor's malpractice "could lead to the financial injury City Colleges alleges." *Id.*

Here, the Trustee based his position on a line of Illinois cases, all holding that "it is no bar to liability [for malpractice] that the party's acts or omissions did not *create* the source of damage." Op. Br. 31 (emphasis in original) (citing *Scott & Fetzer Co. v. Montgomery Ward &*

6

*Co.*, 493 N.E.2d 1022, 1029 (Ill. 1986)); *see also* Op. Br. 33 (citing *First Nat'l Bank of Sullivan v. Brumleve and Dabbs*, 539 N.E.2d 877, 880-81 (Ill. App. 1989); *Mansmith v. Hameeduddin*, 860 N.E.2d 395, 409-10 (Ill. App. 2006), *appeal denied*, 865 N.E.2d 969 (Ill. 2007)). It was enough, under this line of cases, that the Trustee establish that: 1) KPMG was responsible for detecting and reporting this type of financial risk, and 2) injuries that occurred were foreseeable based on the failure to address or account for the risks. Whittman-Hart incurred losses after KPMG's professional negligence, and, indeed, after the merger had closed and market conditions had changed. Op. Br. 19. The Trustee admittedly could not prove that KPMG's malpractice caused the merger to fail. But the Trustee reasonably believed, based on *City Colleges*, that he was not required to do so.

In *City Colleges*, board members testified that they would have taken action to prevent the risky investments if the audit had been done correctly. In this case, the Trustee relied on testimony that the merger would have fallen through if KPMG had properly performed its responsibilities, not because Whittman-Hart would have backed out, but because US Web would have. Op. Br. 18-19. In *City Colleges*, of course, it was the colleges' own Board that would have taken a different course, not a third party. But nothing in *City Colleges* suggests that that factual difference would be material. Moreover, the District Court did not consider this factual difference to have any possible legal significance; the District Court did not mention it. *City Colleges* relies on the concept of foreseeability. Here, the Trustee reasonably believed he had a sufficient factual basis for presenting a foreseeability argument to a jury. *See* pages 11-12, *infra*.

In its opinion, this Court expressed a concern that the law not be used in an attempt to make auditors insurers against business risks. *Maxwell II*, 2008 WL 746849, at *3. That obviously is an appropriate concern. Illinois law does not make auditors into insurers. But *City*

7

*Colleges* shows that it was reasonable for the Trustee to believe that Illinois law permits an auditor to be held accountable for a considerable share of the responsibility for bad investments that could have been avoided if the auditor actually had done his job, even if the auditor's client knew of the investment risks. The 1992 Illinois Public Accounting Act provides that Illinois' statutory comparative fault modifications apply in tort actions against accountants. Indeed, the *City Colleges* jury found that the colleges and their auditor shared in the blame and attributed 55% of contributory negligence to the auditor. *City Colleges I*, 775 N.E.2d at 61.

In its appeal to the Illinois Appellate Court, and then to the Illinois Supreme Court, the auditor argued that the trial court had wrongly limited the auditor's ability to introduce evidence that the City Colleges Board knew of possible investment policy violations. *City Colleges II*, 803 N.E.2d at 463. The trial court had excluded this evidence under the "audit interference doctrine," which holds that the negligence of the party that hires an accountant is only a defense when the hiring party has contributed to the professional's failure to perform the audit. *Id.* at 464-65. The Illinois Supreme Court held that neither the Accounting Act nor the statutory comparative fault modifications demonstrated a legislative intent to abrogate the common law audit interference doctrine. *Id.* at 466. The auditor also argued that the doctrine does not serve public policy because it relieves clients from responsibility for their own negligence and hence "encourages clients to take unjustified risks despite their superior knowledge of those risks." *City Colleges II*, 803 N.E.2d at 468. The Court rejected that argument because, among other things, the "audit interference doctrine gives the auditor incentive to exercise more skepticism of the client, resulting in greater care by the client." *Id.*

8

**2.** **The Trustee properly argued that the standard for foreseeability in professional audit cases does not require that the mechanism of injury be foreseeable and that, except in rare cases, the issue of foreseeability is left to the jury to decide.**

The Trustee also properly challenged the standard the District Court applied regarding the foreseeability of injury needed to show proximate causation. Op. Br. 35. The District Court stated that "the Trustee . . . failed to demonstrate that KPMG should have foreseen that US Web would be a poor merger partner for Whittman-Hart or that the technology market would undergo a major upheaval." *Maxwell I*, 2007 WL 2091184, at *6.

The Trustee believed that this was an incorrect statement of Illinois law, and that his failure to produce such evidence could not therefore provide a basis for entering summary judgment against him. The Trustee's position, based on relevant Illinois case law, was that "foreseeability is determined by the injury, not by the [particular] means by which the injury is accomplished." Op. Br. 35 (citing *City Colleges I*, 775 N.E.2d at 55 (injury was foreseeable when the auditor's failure to detect and report the investment policy violations "could lead to the financial injury City Colleges alleges"); *Brumleve and Dabbs*, 539 N.E.2d at 881 ("the possibility that [the plaintiff bank], believing its financial condition to make loans in a similar manner and, thereafter, suffered more losses" precludes finding of no proximate cause as a matter of law)).[1] Thus, the Trustee argued that he was required only to show that an injury was foreseeable from KPMG's breach of duty. The Trustee argued that he was not required under

---

[1] *See also* Reply Brief of Plaintiff-Appellant Andrew J. Maxwell 5-9 ("Reply Br.") (*i.e., citing Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 910 (Ill. App. 2007) ("Legal cause is established if an injury was foreseeable as the *type of harm* that a reasonable person would expect to see as a likely result of his or her conduct.") (emphasis added). Given the Illinois Supreme Court's reliance on a dental malpractice case in *City Colleges*, 803 N.E. 2d at 468, the Trustee also reasonably relied on malpractice cases involving doctors and other professional service providers that follow this rule. *See, e.g., Mansmith v. Hameeduddin*, 860 N.E.2d 395 (Ill. App. 2006), *appeal denied*, 865 N.E.2d 969 (Ill. 2007) (defendant doctor held liable for injuries cased by a staph infection that followed a steroid injection the defendant had neither prescribed nor administered, where the defendant gave an incomplete medical history to a subsequent doctor who, with accurate information, could have followed a different treatment).

9

Illinois law to show that KPMG did foresee, or should have foreseen, either that the technology market would crash or that US Web would be a poor merger partner. Op. Br. 40.

The Trustee reasonably concluded that the Illinois foreseeability rule for judging proximate causation in malpractice cases "is a far cry from the demanding rigid loss causation formulation that KPMG insists upon from cases that simply do not involve malpractice claims against professional service providers." Reply Br. 8.[2] The Trustee thereby categorically distinguished as inapposite the federal securities and breach of fiduciary duty cases cited by KPMG and the District Court. The Trustee also explained that *Martin v. Heinhold Securities, Inc.*, 643 N.E.2d 734 (Ill. 1994), which predates *City Colleges,* was distinguishable in that it was a state securities and consumer fraud case, rather than a malpractice case, and that the case holds only that proximate cause must be proved. Thus, in the Trustee's view, *Martin* did not bear on the law relating to Illinois malpractice, let alone suggest that a malpractice plaintiff may recover for foreseeable injuries only if the defendant also caused the transaction to fail. Reply Br. 4-5.

Based on Illinois case law, the Trustee reasonably believed that a jury should decide that the financial injury marchFIRST incurred was a foreseeable result of KPMG's breach. *See City Colleges I,* 775 N.E.2d at 63. *See also Ney v. Yellow Cab Co.*, 117 N.E.2d 74, 80 (Ill. 1954) ("The debatable quality of issues such as negligence and proximate cause . . . emphasize the appropriateness and necessity of leaving such questions to a fact-finding body . . .[t]o withdraw such questions from the jury is to usurp its function.").

The Trustee argued that he had a sufficient factual basis, under what he deemed to be the correct standard, to present his foreseeability argument to a jury. The Trustee's argument was based on KPMG's intricate knowledge of Whittman-Hart's financial status and KPMG's

---

[2] Referencing KPMG's cases: *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991 (7th Cir. 2007); *Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998); *L.R.J. Ryan v. Wersi Electronic GMBH and Co.*, 59 F.3d 52 (7th Cir. 1995); and *Bastian v. Petren Res. Corp.*, 892 F.2d 680 (7th Cir. 1990).

10

"substantial assistance" in the merger process. Op. Br. 38. "KPMG specifically knew of each of the merger risks and combined company risks that were set forth in the registration statement to which it twice provided its consent." Op. Br. 38. KPMG's consent to the registration statement was required before the shareholders could vote and Whittman-Hart could issue stock. Op. Br. 38. If KPMG had not given its second consent, the registration statement could not have become effective, and the merger could not have occurred. Op. Br. 38. The Trustee further argued that KPMG, based on its intimate knowledge of Whittman-Hart's affairs, should have foreseen financial risks ahead. Op. Br. 38. *Cf. City Colleges I*, 775 N.E.2d at 63 (finding "that there was sufficient evidence for the jury to determine that Cooper's failure to detect the treasurer's violation, and City Colleges not acting to correct the violation, could lead to the financial injury City Colleges alleges"). Moreover, if KPMG had insisted on the proper reporting of Whittman-Hart's financial results, it would have been clear that the revenue shortfall had already begun. Op. Br. 40.

In particular, the Trustee argued that KPMG knew that the merged company would be especially susceptible to revenue shortfalls because its expenses would be largely fixed. Op. Br. 39. Further, KPMG knew that the success of the merged company depended on rapidly expanding internet revenues. Op. Br. 38. As the Trustee pointed out, those risk factors were explicitly stated in the registration statement:

the combined company's expense levels will be based in part on its expectations concerning future revenues and will be fixed to a large extent. *The combined company will be unable to adjust spending in a timely manner to compensate for any expected shortfall in revenues. Accordingly, a significant shortfall in demand for services could have an immediate negative effect on the combined company's business and result operations.*

Op. Br. 39.

11

But KPMG also knew from performing the audit that the favorable results that Whittman-Hart attributed to revenues from internet-related operations did not exist. Op. Br. 39-40. Thus, KPMG also knew or should have known that the warning contained in the registration statement – about the "immediate negative effect" of a "significant shortfall in demand for services" – was not a theoretical market risk, but a risk that already had been realized. Op. Br. 40. The Trustee argued that this knowledge, coupled with KPMG's knowledge of the misstatement of earnings, Op. Br. 14-17, was sufficient, under the holding of *City Colleges*, to mandate presentation of the case to a jury.

**B.    The Decision to Appeal Was Appropriate in Light of the Alternative Grounds for Summary Judgment That, While Presented, Were Not Addressed By The District Court.**

KPMG presented other issues to the District Court on summary judgment, including issues relating to breach of duty, but-for causation, and damages. The District Court did not reach those issues. However, KPMG raised those issues on appeal, and this Court rejected the Trustee's positions with respect to them.

Since the District Court did not reach those issues, which were fact-intensive, the Trustee suggested that this Court allow the District Court to consider them in the first instance, rather than treat them as alternative grounds for affirmance. Reply Br. 11-25. The Court did not accept that suggestion. But it was not unreasonable for the Trustee to pursue the appeal in light of such challenges.

Nor did those challenges render the appeal frivolous. This Court questioned whether there was sufficient evidence to show that the acquisition would have fallen through. The Trustee reasonably believed that whether the deal would have collapsed was a factual question for the jury, and that there were sufficient record facts to permit that question to go to the jury. The Trustee pointed to testimony from both Whittman-Hart and US Web executives regarding

12

the impact of the financial results on the merger. Whittman-Hart's CFO testified that the results would be more than a "miss" – something he would consider "unexplainable." Op. Br. 4. The US Web officer who signed the merger agreement testified that it "would have had a big impact on our view of bringing the companies together." Op. Br. 6-7. The Trustee further pointed to testimony from Whittman-Hart's Chairman that his company would not have renegotiated the exchange ratio. Reply Br. 19. Moreover, there already was a great deal of speculation, both in the business press and internally that "the deal may well collapse." Op. Br. 9. Even at the negotiated exchange ratio, the market response was "immediately and overwhelmingly negative." Op. Br. 9. Whittman-Hart's stock fell 31% the day after the merger was announced, and was down 40% only three days later. Op. Br. 9.

This Court also questioned whether there was any evidence that KPMG's duty extended to advice regarding the merger. But it was reasonable to believe that the record contained sufficient evidence for the jury to find that KPMG had assumed a duty to assist substantially in the merger approval process and had failed to exercise due professional care in so doing. Op. Br. 38; Reply Br. 11-14. Finally, although this Court was critical of the Trustee's damages evidence, the District Court declined, after full briefing and oral argument on the issue, to rule on its admissibility under *Daubert*. It was therefore appropriate for the Trustee to suggest that the District Court should decide that issue in the first instance.

## II. THE DECISION TO APPEAL WAS APPROPRIATE IN VIEW OF THE TRUSTEE'S FIDUCIARY DUTIES.

The decision to appeal in this case was based not only on a reasonable, if ultimately incorrect, analysis of the facts and the law regarding the proper standard of proximate cause under Illinois law, but also with due regard for the Trustee's fiduciary duties. The Trustee owes duties both to the creditors and to the shareholders of marchFIRST, Inc., and he is obliged to

13

maximize the value of the Estates, so that both can be repaid, if possible. *See Commodity Futures Trading Com'n*, 471 U.S. at 355 (discussing the fiduciary duties of a bankruptcy trustee, which run to both creditors and shareholders); *In the Matter of Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir. 1987) (same). Moreover, as this Court has previously noted:

> The administration of bankruptcy estates has twin goals of maximization of realization on creditors' claims and of prompt and efficient administration of the estate. To carry out this fiduciary duty to meet these goals, the trustee has generally-recognized discretionary authority to take the actions that are necessary to accomplish them.

*Hoseman v. Weinshneider*, 322 F.3d 468, 475 (7th Cir. 2003).

The Trustee relied on legal counsel to analyze the law and to advance proper arguments in presenting the issues to this Court. Unlike other litigants, trustees typically are not fact witnesses with respect to critical events that happened before the bankruptcy filing. For that reason, trustees must rely on attorneys and experts to investigate and assess the facts. That is what the Trustee did in this case, when he relied on counsel and their experts to evaluate the proper framework for evaluating damages. In view of the Trustee's counsel's understanding of Illinois law, the decision to appeal was not simply an important step, but a necessary one, in satisfying the Trustee's fiduciary obligations. Indeed, given counsel's understanding of the law, any other action would have been simply inconsistent with the Trustee's duty to maximize the value of the Estates by claiming assets that the Trustee believed to be owed to the Estates.

The Court expressed concern that a trustee may not be constrained by the same economic forces that constrain other parties in determining whether to commence litigation or appeal from an adverse determination. *Maxwell II*, 2008 WL 746849, at *4. While the Trustee may not have the same "inhibitions" as his non-bankruptcy counter-part, he is subject to similar and possibly greater inhibitions. *Id.* First, bankrupt estates typically have little surplus cash waiting to be spent on litigation, or on anything else, and trustees are typically paid out of the assets of the

14

estate. If a trustee were to spend the scarce assets of the estate foolishly, he would risk losing his fees, as well as any recovery for creditors and shareholders. Second, unlike a private litigant, the Trustee's fees and those of his counsel and other professionals are subject to strict court review. *See, e.g., In re Taxman Clothing Co.,* 49 F.3d 310 (7th Cir. 1995). Third, in large cases such as this one, creditors closely monitor a trustee's actions and, like Monday morning quarterbacks, are not only generous with their input, but the first to complain to the Bankruptcy Court if their expectations are not met. Indeed, some creditors are often more aggressive than the trustee, because they are not constrained in the same way as the trustee when it comes to advocating the pursuit of litigation.

## III. SANCTIONS AGAINST THE TRUSTEE AND THE ESTATES ARE NOT WARRANTED IN THIS APPEAL.

Sanctions should not be awarded in this case because the prosecution of this appeal does not warrant the imposition of sanctions under either prong of the Court's two-part test. Even if it did, sanctions are unwarranted here because KPMG failed entirely to mitigate the costs of the appeal – even though their lawyers investigated the possibility of filing a Rule 38 motion before the Trustee had even filed his opening brief in this Court. *See* Appellee's Motion for Sanctions, Figliulo Aff. (billing records Aug. 2007) ("Motion"). Finally, if sanctions are imposed in this case, neither the Trustee nor the Estates should be liable for legal arguments advanced on their behalf, particularly where neither KPMG nor the District Court warned the Trustee about the prospect of sanctions.

### A. This Appeal Does Not Satisfy Either Prong of the Two-Part Test Utilized by This Court to Determine if Sanctions are Appropriate.

The Trustee's decision to appeal was appropriate, given his counsel's legal interpretation of Illinois law, and in light of the Trustee's fiduciary duties. *See* pages 5-12, 14-15, *supra.*

15

Rule 38, though, does not focus on whether the decision to appeal was "inappropriate," but on the higher-threshold question whether the appeal was frivolous.

This Court applies a two-part test to determine if Rule 38 sanctions are appropriate: 1) whether the appeal is frivolous and 2) if so, whether sanctions are appropriate. *Lorentzen*, 64 F.3d at 331. As we have shown, this appeal was not frivolous. It was reasonably based on counsel's interpretation of the Illinois law that counsel viewed to be controlling with respect to the issues.

Moreover, this appeal does not exhibit any of the characteristics to which this Court has pointed when it has found sanctions to be appropriate in the past. Specifically, this Court has found that sanctions are appropriate in cases where: the appeal is perfunctory and makes no more than a cursory effort in challenging the district court's decision, *Clark v. Runyon*, 116 F.3d 275, 279 (7th Cir. 1997); the appeal is prosecuted with no reasonable expectation of altering the district court's judgment and for purposes of delay or harassment, or out of sheer obstinacy, *Smith v. Blue Cross & Blue Shield United*, 959 F.2d 655, 661 (7th Cir. 1992); or there is some evidence of bad faith. *Ross v. City of Waukegan*, 5 F.3d 1084, 1090 (7th Cir. 1993); *Preze v. Board of Trustees, Pipefitters Welfare Local Fund 597*, 5 F.3d 272, 275 n. 6 (7th Cir. 1993).

None of these characteristics is present here. The Trustee's opening appellate brief, for example, was not a perfunctory restatement of the brief submitted to the District Court, but a fully reasoned argument which attempted to demonstrate that the relevant legal standard in this case was to be found in the Illinois law relating to professional malpractice claims. No one could possibly suggest that the Trustee sought to use this appeal to delay enforcement of the judgment, as the Trustee had nothing to gain from delay. Nor is there any contention – or evidence – that the Trustee acted in bad faith.

16

KPMG's belated argument for sanctions is based on the assertion that the Trustee's appeal exhibited "ostrich-like" behavior, *Hill v. Norfolk & Western Railway Co.*, 814 F.2d 1192, 1198 (7th Cir. 1987), but that is not the case either. The evidence of "ostrich-like" behavior is to be found, according to KPMG, in the Trustee's failure to give an individualized, point-by-point rebuttal of each of the federal securities cases cited by KPMG. Motion 5-6. But such a point-by-point rebuttal was unnecessary. The point that the Trustee made, which he did clearly and concisely, Reply Br. 8, is that the relevant principles were to be found in Illinois professional malpractice cases, not federal securities cases. He may have been wrong in that regard, but he was not "ostrich-like." Certainly, he did not attempt to mislead this Court by deliberately ignoring on-point precedent. KPMG and the Trustee simply disagreed (as they had throughout the litigation) about what precedents were relevant.

This appeal does not satisfy this Court's two-part test for awarding sanctions, and it does not share the characteristics of cases in which sanctions previously have been awarded. What this appeal represents is a good faith effort by the Trustee, based on legal analysis and advice, to advance an aggressive legal theory grounded in the most relevant body of Illinois case law, but obviously subject to dispute under other authorities. This Court ultimately rejected the Trustee's theory, and the relevance of the case law that he deemed most analogous, but that does not make the appeal frivolous.

**B.  KPMG's Failure to Mitigate the Cost of This Appeal or Provide Prior Notice of Its Intent to Seek Sanctions, Despite Its Having Researched the Issue, Precludes the Imposition of Sanctions.**

In its decision regarding sanctions, this Court should consider KPMG's failure to mitigate. This Court has held that "[t]he duty to mitigate is already recognized in cases under Fed. R. Civ. P. 11, and the same principles govern sanctions proceedings under Fed. R. App. P. 38." *Brooks v. Allison Div. of General Motors Corp.*, 874 F.2d 489, 490 (7th Cir. 1989)

17

(citations omitted) (denying sanctions completely because of a failure to mitigate); *see also Berwick Grain Co., Inc. v. Illinois Dept. of Agriculture*, 217 F.3d 502, 506 (7th Cir. 2000) (reducing the amount of sanctions for failure to mitigate).

In *Brooks*, this Court "den[ied] an otherwise meritorious motion for sanctions, because the movant failed to take reasonable steps to mitigate the burdens imposed on it by the frivolous pleading for which sanctions are sought." *Brooks*, 874 F.2d at 490 (citations omitted). As the Court said:

> Rather than filing a motion to dismiss the appeal on the ground that it was frivolous and hence did not even invoke this court's jurisdiction, and coupling the motion with a brief motion for sanctions, General Motors filed a full-fledged printed brief on the merits. This was a waste of General Motors' money and our time.

*Id.* (citations omitted).

KPMG never moved for sanctions in the District Court. And KPMG never moved for sanctions during the pendency of this appeal. KPMG actually investigated the imposition of Rule 38 sanctions as soon as the Trustee filed his notice of appeal, but chose not to make such a motion (presumably because their research showed that the motion would not be well-grounded or likely to succeed). Instead, KPMG chose to proceed with the merits briefing and oral argument. Nor did KPMG do anything to put the Trustee on notice that it might seek sanctions. The appeal was not frivolous when KPMG researched the issue and it did not become frivolous simply because the Trustee lost.

This Court should deny sanctions, or substantially reduce their amount, because of KPMG's failure to give notice or otherwise mitigate.

18

**C.    If Sanctions Are Imposed, Neither the Trustee nor the Estates Should be Held Liable for What They Deemed, Based on Professional Legal Advice, to be an Appropriate Appeal of an Incorrect Application of Illinois Law.**

Finally, if sanctions are imposed in this case, neither the Trustee nor the Estates should be held liable for the expense. It is truly an exceptional case in which a client represented by counsel will be held liable for Rule 38 sanctions based on the pursuit of a legal theory which is advanced in good faith, but eventually rejected by the Court of Appeals. In those instances in which this Court has imposed sanctions directly on the client, the client normally has been guilty of ignoring a direct warning and of choosing to carry on with the litigation nonetheless. *See, e.g., Ashkin v. Time Warner Cable Corp.*, 52 F.3d 140, 146 (7th Cir. 1994) (stating that "it appears that Ashkin herself was likely made aware of the insurmountable challenge she faced on appeal," yet chose to appeal despite her trial counsel's unwillingness to do so). Moreover, as this Court has noted, a client typically is not responsible for the legal arguments advanced on his or her behalf. *See Rennie v. Dalton*, 3 F.3d 1100, 1111 (7th Cir. 1993); *In re Roete*, 936 F.2d 963, 967 (7th Cir. 1991) (imposing sanctions on counsel for "unsupported arguments" under Fed. R. Civ. P. 11 and Bankr. R. 9011); *Hill*, 814 F.2d at 1201.

Certainly, the Trustee did nothing in this case to warrant departure from the usual rule. The Trustee, in his official capacity, and the Estates appealed from what they deemed, based on professional legal advice, to be an incorrect application of Illinois law. They did so to protect the interests of the creditors and shareholders, and to maximize the value of the Estates, as the Trustee was duty-bound to do. Indeed, at no point in this litigation did any party act in any way that reflects any belief that the Trustee's lawsuit or appeal was frivolous.

Both this Court and KPMG have stated the position that the Estates should not be forced to bear the costs of sanctions. *Maxwell II*, 2008 WL 746849, at *5; Motion 10-11. The Trustee, in his official capacity, believes that no sanctions are warranted, but concurs in the view that

19

sanctions should not be awarded in any event against the Trustee in his official capacity, or against the Estates. Otherwise, the Trustee, in his official capacity, would wish to contest both the amount of sanctions requested and the Estates' ability to bear that burden. *See In re Lane*, 991 F.2d 105, 108 (4th Cir. 1993).

### CONCLUSION

For the foregoing reasons, the motion for Rule 38 sanctions should be denied.

Respectfully submitted,

ANDREW J. MAXWELL, NOT INDIVIDUALLY, BUT AS THE CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF marchFIRST, INC.

By: _____
One of his Attorneys

Ronald R. Peterson
Barry Sullivan (Counsel of Record)
Margaret J. Simpson
Jenner & Block LLP
330 North Wabash Avenue
Chicago, IL 60611
Telephone: (312) 222-9350

Dated: April 22, 2008

20

## CERTIFICATE OF SERVICE

The undersigned attorney, one of the attorneys for Andrew J. Maxwell, not individually, but as Chapter 7 Trustee for the bankruptcy estates of marchFIRST, Inc., certifies that she caused the **Response of Andrew J. Maxwell, as Chapter 7 Trustee for the Bankruptcy Estates of marchFIRST, Inc., to Motion of KPMG LLP for Sanctions on Appeal Pursuant to Rule 38,** to be served upon:

James R. Figliulo
Michael K. Desmond
James H. Bowhay
Figliulo & Silverman, P.C.
10 S. LaSalle St.
Suite 3600
Chicago, IL 60603

Steven J. Roeder
Thomas C. Koessl
Alyssa M. Campbell
Williams Montgomery & John Ltd.
20 N. Wacker Dr.
Suite 2100
Chicago, IL 60606

Steven B. Towbin
Peter J. Roberts
Shaw Gussis Fishman Glantz
  Wolfson & Towbin LLC
321 N. Clark St.
Suite 800
Chicago, IL 60610

Richard J. Prendergast
Richard J. Prendergast, Ltd.
111 W. Washington St.
Suite 1100
Chicago, IL 60602

by electronic mail and U.S. Mail on this 22nd day of April 2008.

_Margaret J. Sim_
Margaret J. Simpson

U.S.C.A.- 7th Circuit
F I L E D  AJB

APR 2 2 2008

GINO J. AGNELLO
CLERK

08CV 2706 NF
JUDGE ZAGEL
MAGISTRATE JUDGE COLE

# EXHIBIT L

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | |
|---|---|
| WESTCHESTER FIRE INSURANCE COMPANY, | ) ) |
| | ) |
| Plaintiff, | ) ) |
| | ) Case No.: |
| vs. | ) ) |
| | ) |
| WILLIAMS MONTGOMERY & JOHN, LTD.; STEVEN J. ROEDER; THEODORE J. LOW; THOMAS C. KOESSL; and ALYSSA M. CAMPBELL. | ) ) ) ) |

Defendants.

_____

## **CERTIFICATION OF ROBERT O'NEIL**

COMES NOW Robert O'Neil, who hereby declares upon the penalty of perjury that the

following statements are true and correct:

1.    I am over age 18 and reside in Whitehouse Station, New Jersey.

2.    I would testify in accordance with the statements in this Certification if I were

compelled to appear and testify at trial.

3.    I currently hold the position of Executive Vice President with The Plus

Companies, 520 U.S. Highway 22, Bridgewater, NJ 08807.

4.    I make this Certification based on my own personal knowledge of the facts

contained herein.

5.    At all relevant times, The Plus Companies had the authority to underwrite, issue

and keep record of Lawyers Professional Liability Policy No. LPL-G2391 1553 001 on behalf of

Westchester Fire Insurance Company, subject to certain conditions and restrictions.

6.       Lawyers Professional Liability Policy No. LPL-G2391 1553 001 was

underwritten, issued and kept as part of the regularly conducted business activities of The Plus

Companies.

7.       Attached hereto as Exhibit 1 is a true, correct and complete copy, as kept in the

ordinary course of The Plus Companies business activities, of Lawyers Professional Liability

Policy No. LPL-G2391 1553 001, issued to Williams Montgomery & John, Ltd., effective

November 29, 2007 through November 29, 2008.

EXECUTED THIS 8TH DAY OF MAY 2008.

FURTHER DECLARANT SAYETH NOT.

*Robert O'Neil*

Robert O'Neil

2